# 23-1293

IN THE

# United States Court of Appeals
## FOR THE SECOND CIRCUIT

_____

GINA L. BIANCHI,

*Plaintiff-Appellee,*

-against-

MICHAEL C. GREEN,

*Defendant-Appellant,*

-and-

JOHN CZAJKA, KAREN DAVIS, JOHN DOE #1, JOHN DOE #2,
JOHN DOE #3, JOHN DOE #4, JANE ROE #1,
JANE ROE #2, JANE ROE #3, AND JANE ROE #4,

_____

*Defendants.*

On Appeal from a Judgment of the United States District Court
for the Northern District of New York

## APPELLANT'S BRIEF WITH SPECIAL APPENDIX

Patrick J. Fitzgerald, Esq.
Scott P. Quesnel, Esq.
Girvin & Ferlazzo, P.C.
*Attorneys for Defendant-Appellant*
20 Corporate Woods Blvd. 2nd Floor
Albany, New York 12211
(518) 462-0300

John W. Bailey, Esq.
Crystal R. Peck, Esq.
Bailey, Johnson & Peck, P.C.
*Attorneys for Plaintiff-Appellee*
5 Pine West Plaza, Suite 507
Washington Avenue Extension
Albany, New York 12205
(518) 456-0082

# **TABLE OF CONTENTS**

JURISDICTIONAL STATEMENT .........................................................1

STATEMENT OF ISSUES PRESENTED FOR REVIEW .......................................2

STATEMENT OF THE CASE..................................................................3

STATEMENT OF THE FACTS................................................................4

    1. Facts Relevant to Plaintiff's Claims ...........................................5

SUMMARY OF THE ARGUMENT ....................................................15

ARGUMENT ................................................................................16

    POINT I    THE DISTRICT COURT ERRED WHEN IT DENIED
            DEFENDANT GREEN QUALIFIED IMMUNITY ...............16

            A. First Amendment and Qualified Immunity .........................21

                1. Plaintiff Spoke to the OIG as an Employee of DCJS,
                   Not as a Citizen..............................................22

                2. Plaintiff Did Not Discuss Matters of Public Concern
                   with the OIG .................................................34

                    i.     Content .................................................36

                    ii.     Form and Context................................39

             B. Equal Protection Clause and Qualified Immunity..............41

                1. Contents .......................................................44

CONCLUSION........................................................................53

CERTIFICATION OF COMPLIANCE................................................55

SPECIAL APPENDIX ...............................................................56

MEMORANDUM-DECISION AND ORDER, U.S.D.J. SHARPE.............57

CONSTITUTION OF THE UNITED STATES, AMENDMENT I..............89

CONSTITUTION OF THE UNITED STATES, AMENDMENT XIV ........90

28 UNITED STATES CODE § 1292 ...........................................................92

42 UNITED STATES CODE § 1983 ...........................................................95

# TABLE OF AUTHORITIES

*Agosto v. New York City Dept. of Educ.*,
    982 F.3d 86 (2d Cir. 2020) ..............................................................35

*Amore v. Novarro*,
    624 F.3d 522 (2d Cir. 2010) ..........................................................53

*Amos v. Housing Authority of Birmingham Dist.*,
    927 F.Supp. 416 (N.D.Ala. 1996) ................................................51

*Anderson v. Creighton*,
    483 U.S. 635, 107 S.Ct. 303, 497 L.Ed.2d 523 (2000) ..........18, 19

*Ashcroft v. al-Kidd*,
    563 U.S. 731, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011) .....17, 18, 25, 33, 54

*Battle v. Board of Regents for Georgia*,
    468 F.3d 755 (11th Cir. 2006) ......................................................29

*Bellatoni v. Lamont*,
    2023 WL 8889516 (2d Cir. Dec. 26, 2023) .................................54

*Booker v. Brown & Williamson Tobacco Co.*,
    879 F.2d 1304 (6th Cir. 1989) ......................................................45

*Bornholdt v. Brady*,
    869 F.2d 57 (2d Cir. 1989) ............................................................41

*Cal. v. Roe*,
    543 U.S. 77, 125 S.Ct. 521, 160 L.Ed.2d 410 (2004) .................35

*Camreta v. Greene,*
    563 U.S. 692, 131 S.Ct. 2020, 179 L.Ed.2d 1118 (2011) ...........19

*Cf. Reuland v. Hynes*,
    460 F.3d 409 (2d Cir. 2006) ..........................................................35

*City of San Diego v. Roe*,
    543 U.S. 77 (2004) ..................................................................34, 35

*City of Tahlequah, Oklahoma v. Bond*,
    595 U.S. 9, 142 S.Ct. 9, 211 L.Ed.2d 170 (2021) ...................................18, 31

*Connick v. Myers*,
    461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983) .........................35, 36

*Coopers & Lybrand v. Livesay*,
    437 U.S. 463, 98 S.Ct. 2454, 57 L.Ed.2d 351 (1978) .....................................1

*Crawford-El v. Britton*,
    523 U.S. 574, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998) ..............................20

*Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc.*,
    450 F.3d 130 (3d Cir. 2006) ...........................................................................45

*D'Angelo v. School Bd. of Polk County, Fla.*,
    497 F.3d 1203 (11th Cir. 2007) ....................................................................29

*Davis v. Scherer*,
    468 U.S. 183, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984) ................................19

*Dill v. City of Edmond*,
    155 F.3d 1193 (10th Cir. 1998) ....................................................................38

*District of Columbia v. Wesby*,
    583 U.S. 48, 138 S.Ct. 577, 199 L.Ed.2d 453 (2018) ............................18, 30

*D'Olimpio v. Crisafi*,
    462 Fed.Appx. 79 (2d Cir. 2012) ...............................................25, 26, 27, 30

*EEOC v. Crown Zellerbach Corp.*,
    720 F.2d 1008 (9th Cir. 1983) ......................................................................45

*Garcetti v. Ceballos*,
    547 U.S. 410, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006) .................21, 31, 34

*Harlow v. 8 Fitzgerald*,
    457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) ................................16

iv

*Iannone v. Frederic R. Harris, Inc.*,
941 F.Supp. 403 (S.D.N.Y. 1996) ...................................................51

*Jackler v. Byrne*,
658 F.3d 225 (2d Cir. 2011) ...........................................35, 37, 38

*Johnson v. Newburgh Enlarged Sch. Dist.*,
239 F.3d 246 (2d Cir. 2001) .........................................17, 18, 36

*Jones v. Treubig*,
963 F.3 214 (2d Cir. 2020) .................................................17

*Lane v. Franks*,
573 U.S. 228, 134 S.Ct. 2369, 189 L.Ed.2d 312 (2014) ...........30, 31, 32, 33

*Lewis v. Cowen*,
165 F.3d 154 (2d Cir. 1999) .................................................19, 36

*Littlejohn v. City of New York*,
795 F.3d 297 (2d Cir. 2015) ........................................................41

*Locurto v. Safir*,
264 F.3d 154 (2d Cir. 2001) .......................................................20

*Malley v. Briggs*,
475 U.S. 335, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986) ................................54

*Mara v. Riling*,
921 F.3d 48 (2d Cir. 2019) .....................................................30, 54

*Meckenberg v. New York City Off–Track Betting*,
42 F.Supp.2d 359 (S.D.N.Y. 1999) ..........................................51

*Messerschmidt v. Millender*,
565 U.S. 535, 132 S.Ct. 1235, 182 L.Ed.2d 47 (2012) ................................53

*Montero v. City of Yonkers, New York*,
890 F.3d 386 (2d Cir. 2018) ..............................................22, 35

*Morris v. McCarthy*,
   825 F.3d 658 (D.C. Cir. 2016) .......................................................45

*Mullenix v. Luna*,
   577 U.S. 7, 136 S.Ct. 305, 193 L.Ed.2d 255 (2015) ............................30, 54

*Pace v. Town & Country Veterinary Clinic P.C.,*
   2022 WL 3027157 (N.D.N.Y. Aug. 1, 2022) .................................42

*Pavone v. Puglisi*,
   353 Fed. Appx. 622 (2d Cir. 2009) ..............................................33

*Pearson v. Callahan*,
   555 U.S. 223, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009) ................................16

*Reed v. A.W. Lawrence & Co.*,
   95 F.3d 1170 (2d Cir. 1996) ........................................................41

*Reichle v. Howards*,
   566 U.S. 658, 132 S.Ct. 2088, 182 L.Ed.2d 985 (2012) .......................18, 19

*Richardson–Merrell Inc. v. Koller*,
   472 U.S. 424, 105 S.Ct. 2757, 86 L.Ed.2d 340 (1985) ..................................1

*Rusk v. New York State Thruway Authority*,
   437 F.Supp.3d 578 (W.D.N.Y. 2014) ..........................................25

*Saucier v. Katz*,
   533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001) ...........................17

*Shechter v. Comptroller of New York*,
   79 F.3d 265 (2d Cir. 1996) .......................................................25

*Siegert v. Gilley,*
   500 U.S. 226, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991) ............................16

*Singer v. Ferro*,
   711 F.3d 334 (2d Cir. 2013) ......................................................22

*Singh v. City of New York*,
    524 F.3d 361 (2d Cir. 2008) ..........................................................38

*Snyder v. Phelps*,
    562 U.S. 443, 131 S.Ct. 1207, 179 L.Ed.2d 172 (2011) ............35, 36, 37, 40

*Specht v. City of New York*,
    15 F.4th 594 (2d Cir. 2021) ...................................................21, 35

*Stoutenger v. City of Fulton*,
    605 F. Supp. 3d 432 (N.D.N.Y. 2022) ..........................................42

*Taravella v. Town of Wolcott*,
    599 F.3d 129 (2d Cir. 2010) ..........................................................33

*Terebisi v. Torreso*,
    764 F.3d 217 (2d Cir. 2014) ..........................................................17

*Tierney v. Davidson*,
    133 F.3d 189 (2d Cir. 1998) ..........................................................21

*Townsend v. Benjamin Enterprises, Inc.*,
    679 F.3d 41 (2d Cir. 2012) ......................................................42, 43

*Vega v. Hempstead Union Free School Dist.*,
    801 F.3d 72 (2d Cir. 2015) ...........................................................41

*Volberg v. Pataki*,
    917 F.Supp. 909 (N.D.N.Y. 1996) ..............................................51

*Weintraub v. Board of Educ. of City School Dist. of City of New York*,
    593 F.3d 196 (2d Cir. 2010) ..........................................................26

*White v. Pauly*,
    580 U.S. 73, 137 S. Ct. 548, 196 L.Ed.2d 463 (2017) ..................17

*Wilson v. Layne*,
    526 U.S. 603, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999) .......17, 18

*Wrobel v. Cty. of Erie*,
  692 F.3d 22 (2d Cir. 2012) ............................................................35

*X-Men Sec., Inc. v. Pataki*,
  196 F.3d 56 (2d Cir. 1999) .......................................................2, 20

*Zalaski v. City of Hartford*,
  723 F.3d 382 (2d Cir. 2013) .........................................................30

## STATUTES

28 U.S.C. §1292(b) ........................................................................1

42 U.S.C. § 1983 ......................................................................1, 15

42 U.S.C. § 2000e .......................................................................41

42 U.S.C. § 2000e–3(a) ...............................................................42

Fed. R. Civ. P. 56 ..........................................................................1

New York Executive Law § 54(5) ...............................................28

New York Executive Law § 55 ................... 6, 7, 22, 23, 24, 27, 33, 36, 37

New York Labor Law § 27-a..........................................................44

## OTHER SOURCES CITED

Court of Appeals for the Second Circuit Local Rule 32.1.1(a) ..............................25

# JURISDICTIONAL STATEMENT

Plaintiff Gina Bianchi commenced this action in the United States District Court for the Northern District of New York pursuant to 42 U.S.C. §1983 claiming that Defendant Michael Green violated the First and Fourteenth Amendments to the United States Constitution when he removed Plaintiff as Special Counsel for the New York State Division of Criminal Justice Services. After discovery was completed, Defendant Green filed a Motion for Summary Judgment, seeking the dismissal of all claims pursuant to Fed. R. Civ. P. 56. Green argued, among other things, that he is entitled to qualified immunity on Plaintiff's Constitutional claims brought pursuant to 42 U.S.C. § 1983. On August 25, 2023, the District Court (Sharpe, J.) denied Defendant Green's motion. On September 20, 2023, Defendant Green appealed the District Court's decision that denied that part of his motion which sought qualified immunity for Defendant Green pursuant to 28 U.S.C. §1292(b), and under the collateral order doctrine.

Under the collateral order doctrine, even a nonfinal order may be appealed immediately if it: (1) "conclusively determine[s] the disputed question," (2) "resolve[s] an important issue completely separate from the merits of the action," and (3) would "be effectively unreviewable on appeal from a final judgment." *Richardson–Merrell Inc. v. Koller*, 472 U.S. 424, 430–31, 105 S.Ct. 2757, 86 L.Ed.2d 340 (1985) (internal quotation marks omitted); *Coopers & Lybrand v.*

1

*Livesay*, 437 U.S. 463, 468, 98 S.Ct. 2454, 57 L.Ed.2d 351 (1978). This doctrine permits the immediate appeal of an order denying qualified immunity. *X-Men Sec., Inc. v. Pataki*, 196 F.3d 56, 65 (2d Cir. 1999).

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1.  Did the District Court properly deny Defendant Green protection from individual liability under the doctrine of qualified immunity?

2.  Was it clearly established law on December 5, 2017, that Plaintiff Bianchi was engaging in Constitutionally protected First Amendment activity when she was interviewed by the New York State Office of the Inspector General?

3.  Was it clearly established law on December 5, 2017, that Plaintiff Bianchi was speaking as a citizen about a matter of public concern when she was interviewed by the New York State Office of the Inspector General?

4.  Was it clearly established law on December 5, 2017, that Plaintiff Bianchi was engaging in Constitutionally protected Fourteenth Amendment activity when she was interviewed by the New York State Office of the Inspector General?

5.  Was it clearly established law on December 5, 2017, that Plaintiff Bianchi was opposing discrimination prohibited by the Equal

Protection Clause when she was interviewed by the New York State Office of the Inspector General?

## STATEMENT OF THE CASE

Michael Green, in his role as Commissioner of DCJS, had a responsibility to ensure that he was receiving reliable, accurate and complete information from his Special Counsel, whose guidance and advice he relied upon to run one of the largest administrative agencies in the State of New York. The fulfillment of this responsibility through job repositioning does not violate Plaintiff's First or Fourteenth Amendments to the United States Constitution. Even if a colorable argument exists that Green's conduct violated Plaintiff's rights in an area of First or Fourteenth Amendment law that has seen limited discussion by the Supreme Court, the doctrine of qualified immunity limits the liability of public officials like Green in the performance of their duties unless the conduct violated a clearly established statutory or constitutional right at the time of the incident. The right asserted may not be defined at a high level of generality, but instead must clearly prohibit the alleged conduct in the particular circumstances at hand, such that all reasonable public officials would understand that the conduct is unlawful. Before the District Court Green demonstrated that his actions did not violate clearly established law at the time of the events giving rise to this litigation. As such, this Court should reverse the District Court and grant qualified immunity to Green.

# STATEMENT OF THE FACTS

Green is an experienced attorney who previously served as District Attorney for the County of Monroe, New York, for approximately seven years (2004-2011). JA-577 ¶ 3. In 2012, Green was appointed to serve as Executive Deputy Commissioner for the New York State Division of Criminal Justice Services ("DCJS"). JA-577 ¶ 3.

DCJS is a multi-function criminal justice agency with extensive responsibilities, including collecting and analyzing statewide crime data; acting as the State's repository of criminal history records; administrating federal and state funds that support local criminal justice programs; and administrating New York's Sex Offender Registry and DNA Databank. JA-577 ¶ 4. As Executive Deputy Commission, Green was responsible for overseeing all aspects of DCJS's operations, including its Office of Forensic Services ("OFS"). JA-578 ¶ 5.

Plaintiff is an attorney who has been employed by DCJS for almost 30 years. JA-121. Plaintiff began with DCJS in 1994 as a Senior Attorney, and held that and several other attorney positions until 2005, when she was promoted to serve as Deputy Commissioner and Counsel for DCJS. JA-121 – JA-135, JA-154.

When Green began serving as Executive Deputy Commissioner for DCJS in 2012, no one held the position of Director of OFS, although Plaintiff had been temporarily assigned to oversee the operations of OFS. JA-578 ¶ 6. At some point in

2012, Brian Gestring ("Gestring") was hired to serve as Director of OFS. JA-578 ¶ 6. Several months after Gestring was hired, a concern was raised about statements he made in the workplace that some employees found to be offensive. JA-578 ¶ 6. The matter was investigated and Gestring was issued two letters of counsel that were signed by Plaintiff and Green. JA-578 ¶ 6.

In 2014, Green was advised by the Office of Governor Andrew M. Cuomo ("Governor's Office") that Defendant John Czajka ("Czajka") would replace Plaintiff as Deputy Commissioner and Counsel for DCJS beginning in 2015. JA-578 ¶ 7. Since Czajka's appointment would cause Plaintiff to be removed as Deputy Commissioner and Counsel, Green decided to create a new position for Plaintiff at DCJS as his Special Counsel. JA-578 ¶ 7. Plaintiff began to serve in that position in 2015. JA-578 ¶ 7. In that role, Plaintiff continued to work closely with Green as an advisor to him in various DCJS matters. JA-578 ¶ 7. Plaintiff also was entrusted to be a competent and reliable representative of DCJS and Green. JA-578 ¶ 7.

1. **Facts Relevant to Plaintiff's Claims**.

In May 2017, DCJS was internally alerted to a concern associated with a record that had been created by OFS employee ███████████████. JA-579 ¶ 8. More specifically, DCJS was advised that ████████████ ████████████████████████████████████████████████ ██████████████████████████████████ record issue"). JA-579

¶ 8. Upon learning about the ███████ record issue, DCJS immediately self-reported it to the New York State Office of the Inspector General ("OIG") on May 23, 2017. JA-579 ¶ 8.

Between May 23, 2017, and approximately late July 2017, the OIG conducted its investigation of the ███████ record issue. JA-579 ¶ 9. During that time, Green was advised, either by Czajka or the OIG directly, that the OIG had expanded its investigation to look at broader issues within the OFS. JA-579 ¶ 9. The OIG did not, however, advise DCJS or Green about any of the specific matters it was investigating. JA-579 ¶ 9.

In late July or early August 2017, Plaintiff, who had been temporarily working in New York City due to a personal matter, advised Green that she had been asked to participate in an interview with the OIG. JA-579 ¶ 10. Plaintiff told Green that she intended to attend the interview. JA-579 ¶ 10. In response, Green told Plaintiff that he supported her decision, and that she should go and tell the truth. *Id*.

On August 3, 2017, Plaintiff met with two OIG investigators at the offices of the OIG during her workday. JA-144 – JA-145, JA-316 – JA-391. At the outset of her interview, the investigators explained to Plaintiff that the interview was being conducted pursuant to the OIGs authority under "Article 4A of the Executive Law". JA-326.[1] Plaintiff spoke with the OIG investigators for about an hour and fifteen

---

[1] N.Y. Executive Law § 55 is contained within Article 4-A of the Executive Law.

minutes. JA-318, JA-390. There is no dispute as to what Plaintiff said during her interview because it was audio recorded by the OIG. JA-318, JA-1172.

In October 2017, the OIG advised Czajka and Green that ███████████████ ███████████████████████████████████████████. JA-579 ¶ 11. On October 24, 2017, a meeting was held that was attended by ██████████████████ ████████████████████████████████████████████████████████ ██████████████████. JA-579 ¶ 11, JA-212 – JA-213. During the meeting, Leahy Scott and Freedman informed Green and Czajka that the ████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████ █████████████████████████████. JA-579 ¶ 11. The OIG also informed Green and Czajka that during the course of the OIG's investigation of the ████████ record issue, the OIG received information from OFS employees that ██████████████ ██████████████████████████. JA-579 ¶ 11, JA-223 – JA-224. Upon hearing this, Green expressed concern and advised the OIG that DCJS would immediately begin an investigation. JA-579 ¶ 11.

During the course of the October 24, 2017 meeting, the OIG advised Green and Czajka that ████████████████████████████████████████████ ████████████████████████████████████████████████████████



█████████████████████████████████████. JA-580 ¶ 12, JA-215 – JA-216, JA-218 – JA-219. Green asked the OIG for the recordings of the interviews in order to assist DCJS to investigate the concern the OIG identified. JA-580 ¶ 12. Green and Czajka were advised that they would be provided with the recordings. JA-580 ¶ 12.

After meeting with the OIG on October 24, 2017, Green directed DCJS's Affirmative Action Officer Sandra Van Kampen ("Van Kampen") to conduct a thorough investigation of the workplace atmosphere in OFS. JA-580 ¶ 13, JA-213 – JA-106, JA-225 – JA-231, JA-249 – JA-250, JA-254 – JA-256. Van Kampen previously served as an investigator for the New York State Division of Human Rights where she investigated more than a thousand claims of workplace discrimination and harassment. JA-249 – JA-250, JA-257 – JA-259, JA-270 – JA-271. Green made it clear to his direct reports that Van Kampen was to be given access to any documents, information, and witnesses she felt necessary to conduct her investigation. JA-580 ¶ 13. In order to provide Van Kampen with all pertinent sources of information, Green directed Czajka to contact the OIG and request the recordings of the DCJS employee interviews. JA-580 ¶ 14. Freedman subsequently advised Czajka that ████████████████████████████████████████ ██████████████████████████████████████████████. JA-580 ¶ 14, JA-221 – JA-222, JA-454 – JA-455.

By mid-November 2017, Van Kampen was actively conducting her investigation, but the OIG continued ███████████████████████████ ████████████████████████. JA-580 ¶ 14. By this time, Green also had learned that other former and current DCJS employees had been interviewed by the OIG, which the OIG had not previously disclosed to DCJS. JA-456 – JA-461. Since Green believed that reviewing all of the recordings that led the OIG to express its concerns to him on October 24, 2017, was important for Van Kampen to review as part of her investigation, he sent an email to Leahy Scott on November 19, 2017, ███████████████████████████████████████████████████ ████████. JA-580 ¶ 14, JA-456 – JA-461. Green received an immediate email response from Leahy Scott in which ████████████████████████████ ████████████████. JA-580 ¶ 14, JA-456 – JA-461. Early on the morning of November 28, 2017, Green disregarded Leahy's Scott's stated preference for verbal communications and sent another email to Leahy Scott █████████████ ██████████████████████████████████████████████. JA-580 ¶ 14, JA-456 – JA-461.

At some point on November 28, 2017, Leahy Scott issued a formal letter █ ██████████████████████████████████████████. JA-581 ¶ 15, JA-462 – JA-464. The letter stated, among other things, that the OIG's investigation found that ████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████. JA-581 ¶ 15, JA-462 – JA-464. Notably, Leahy Scott's

November 28, 2017 letter did not ████████████████████████████

██████████████████████. JA-581 ¶ 15, JA-462 – JA-464.

Sometime between October 24, 2017, and December 3, 2017, Green listened

to the audio recording of Plaintiff's OIG interview. JA-581 ¶ 16. Green reviewed

Plaintiff's responses to the questions posed to her and evaluated them based on what

she had been asked, how she responded, and what Green knew to be true at the time.

JA-581 ¶ 16. Upon doing so, Green became concerned by the manner in which

Plaintiff comported herself during portions of her interview with the OIG. JA-581 ¶

16. For example, shortly after Plaintiff was sworn under oath and began speaking

with the OIG investigators, she began her response to one of the first questions posed

to her ████████████████████. JA-581 ¶ 16, JA-323.  Plaintiff is an attorney

who had practiced law for more than twenty years at the time she met with the OIG.

JA-581 ¶ 16. Green felt that it should have been obvious to anyone with her level of

experience that audio recorded statements given under oath to an agency like an OIG

would not be "totally off the record." JA-581 ¶ 16. Plaintiff also referenced ████

█████████████████████████████████████████████████████.

JA-581 ¶ 16, JA-318 – JA-320, JA-323 – JA-324.  Green could not understand why

Plaintiff would make statements to the OIG that ████████████████████████

████████████████████████████████████████. JA-581 ¶ 16. If Plaintiff had

been asked a direct question by the OIG concerning whether she had heard any

particular rumors, then Green had no objection to her providing a truthful response.

JA-581 ¶ 16. Green found it unacceptable, however, for a person in Plaintiff's high

level counsel position to simply talk about rumors that she heard while speaking

under oath to an agency investigating DCJS as if they were fact, without making it

abundantly clear that she did not know whether the information she was providing

was true or just a rumor. JA-581 ¶ 16. Green also was concerned that Plaintiff made

definitive statements to the OIG about matters where she lacked sufficient

background information to offer those statements. JA-581 ¶ 16. Plaintiff offered a

number of conclusory statements and opinions to the OIG which Green believed she

did not have the underlying factual basis that would allow her to draw those

conclusions or form those opinions. JA-581 ¶ 16. To the extent that Plaintiff was

speculating, Green felt that she did not make it clear to the OIG that she was doing

so. JA-581 ¶ 16. Finally, there were things that Plaintiff shared with the OIG that

Green believed Plaintiff had not previously shared with him. JA-581 ¶ 16. Green

was deeply concerned that Plaintiff had informed the OIG about matters that, to the

extent she was accurate, she should have previously brought to his attention in her

role as Special Counsel to him so that he could address them. JA-581 ¶ 16. Since

Plaintiff had not done this, Green lost confidence in his ability to trust that Plaintiff

was providing him with all of the information he needed to perform his role as Executive Deputy Commissioner for DCJS, or that the information she was providing to him was based on reliable facts. JA-581 ¶ 16.

Green scheduled a meeting with Plaintiff for December 5, 2017, to go over the concerns he had with some of the statements that Plaintiff made to the OIG. JA-582 ¶ 17. In advance of that meeting, Green received an email from Czajka, copied to Mark Bonacquist ("Bonacquist"), First Deputy Commissioner for DCJS, which included a list of issues that Czajka identified with Plaintiff's statements and sample questions to pose to Plaintiff about her OIG interview. JA-582 ¶ 17. Green reviewed that email in anticipation of his meeting with Plaintiff. JA-582 ¶ 17.

Prior to meeting with Plaintiff, Green asked Czajka to communicate with the Governor's Office about removing Plaintiff as Special Counsel. JA-583 ¶ 18. Green's purpose in doing so was to ensure that the Governor's Office did not have any objection to Plaintiff's removal, and to confirm that the Governor's Office did not see any legal concerns associated with her removal. JA-583 ¶ 18. Czajka spoke with Adam Silverman ("Silverman"), Assistant Counsel to the Governor's Office, about removing Plaintiff as Special Counsel. JA-583 ¶ 18. Czajka subsequently advised Green that the Governor's Office did not object to removing Plaintiff and that it did not raise any other concerns. JA-583 ¶ 18. Green also directly communicated with his contact at the Governor's Office, Assistant Deputy Secretary

for Public Safety Joseph Popcun ("Popcun"), about removing Plaintiff as Special Counsel. JA-583 ¶ 18. Green's purpose in doing so was to ensure that the Governor's Office did not have any objection to Plaintiff's removal, and to confirm that the Governor's Office did not have any legal concerns associated with her removal. JA-583 ¶ 18. Popcun did not express any objection to removing Plaintiff as Special Counsel or raise any other concerns to Green. JA-583 ¶ 18.

On December 5, 2017, Green met with Plaintiff to go over some of the statements that she made to the OIG. JA-583 ¶ 19. Green also directed Van Kampen to attend the meeting as a witness and to take notes. JA-583 ¶ 19. At the meeting, Green asked Plaintiff to provide him with the factual basis for a number of statements she made to the OIG. JA-583 ¶ 19. Green also asked Plaintiff if she was aware of certain information that contradicted or conflicted with the statements she made to the OIG. JA-583 ¶ 19. Green's goal in asking Plaintiff these questions was to determine if the statements she made to the OIG were based upon established facts, as opposed to speculation, incomplete information and rumors. JA-583 ¶ 19. There were a significant number of instances where Plaintiff admitted to Green during this meeting that she did not have a factual basis for certain statements, that she was not aware of certain information that contradicted or conflicted with other statements that she made to the OIG, and that she had made statements to the OIG that were based on speculation, incomplete information and rumors without clearly

stating to the OIG that she did not have a factual basis for the statements. JA-583 ¶ 19. For example, Plaintiff ████████████████████████████████████████ ████████████████████████████████████████████████ ███████████████████████████████. JA-583 ¶ 19, JA-327. Green found this ████████████ to be dramatically inconsistent with his knowledge of ████████████████████████████████████████████████████ ████████████. JA-583 ¶ 19. When Green asked Plaintiff to provide him with a factual basis for ████████████████████████, she was unable to do so. JA-583 ¶ 19. From this, Green concluded that Plaintiff gave the OIG an unsolicited, negative opinion about DCJS's ████████████████████ that was not based upon any articulable facts. JA-583 ¶ 19.

At certain points during this meeting, Green also advised Plaintiff that, given the serious nature of the questions she was asked by the OIG, he expected a seasoned attorney working in a high-level counsel position would not respond to questions while under oath if the attorney did not have personal knowledge about the matters being discussed, or without making it clear that any statements that were made were not based upon personal knowledge. JA-583 ¶ 19. Green also told Plaintiff that he expected an experienced attorney would not offer an opinion unless she was specifically asked to do so, and that an opinion should only be provided if she had an adequate factual basis for the opinion. JA-583 ¶ 19. Green made it clear to

Plaintiff that he did not expect someone in her position to simply spitball thoughts and opinions off the top of her head while making sworn statements, as Green concluded she did. JA-583 ¶ 19.

Based upon Green's review of Plaintiff's OIG interview and Green's meeting with Plaintiff on December 5, 2017, Green concluded that Plaintiff had not exhibited the level of skill and expertise while making certain sworn statements to the OIG that he believed was necessary to perform the role of Special Counsel to the Executive Deputy Commissioner of DCJS. JA-583 ¶ 19. Green did not, however, believe that he needed to take the additional steps that would be necessary to terminate Plaintiff's employment with DCJS because he felt that Plaintiff still had the ability to perform the role of an Associate Attorney for DCJS. JA-583 ¶ 19.

Following his meeting with Plaintiff, Green had Davis prepare a letter for Plaintiff which set forth the decision to remove her from the position of Special Counsel. JA-585 ¶ 20. Green met with Plaintiff later in the day on December 5, 2017, and informed her that the decision had been made to remove her as Special Counsel. JA-585 ¶ 20.

## SUMMARY OF THE ARGUMENT

The District Court erred when it failed to grant Defendant Green qualified immunity on Plaintiff's Constitutional claims brought pursuant to 42 U.S.C. § 1983. Defendant Green showed that he did not take any action in relation to Plaintiff that

he knew, or a reasonable official in Green's position should have known violated clearly established First and Fourteenth Amendment precedent. There was no controlling authority from the Supreme Court, the Second Circuit, or a robust consensus of cases of persuasive authority to inform Green that the statements Plaintiff made about internal DCJS matters during a private interview with two attorneys from the OIG qualified as protected activity under the First or Fourteenth Amendments to the United States Constitution. In the absence of such authority, even when the evidence is viewed in light most favorable to Plaintiff, the District Court should have concluded that Green did not violate clearly established law and, therefore, granted Green qualified immunity.

## ARGUMENT

### POINT I

### THE DISTRICT COURT ERRED WHEN IT DENIED DEFENDANT GREEN QUALIFIED IMMUNITY

It is black-letter law that "[t]he doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009) (quoting *Harlow v. 8 Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)); *see Siegert v. Gilley,* 500 U.S. 226, 231-32, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991) (holding that if a right is clearly established at

the time of the alleged violation, however, a defendant will still be entitled to qualified immunity if the defendant's conduct was objectively reasonable). This Court utilizes a two-step framework derived from the Supreme Court in *Saucier v. Katz*, 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), when a public official raises a qualified immunity defense. *Jones v. Treubig*, 963 F.3 214, 224 (2d Cir. 2020). The court should consider whether: (1) the official violated a statutory or constitutional right; and (2) the right was clearly established at the time of the challenged conduct. *Id*.

In order for a constitutional right to be "clearly established", the "existing precedent must have placed the statutory or constitutional question beyond debate." *White v. Pauly*, 580 U.S. 73, 76, 137 S. Ct. 548, 551, 196 L.Ed.2d 463 (2017) (internal quotation marks and citation omitted). A constitutional question is placed beyond debate by either "controlling authority" from the Supreme Court, the Second Circuit, or "a robust 'consensus of cases of persuasive authority.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 742, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011) (quoting *Wilson v. Layne*, 526 U.S. 603, 617, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999)); *See Terebisi v. Torreso*, 764 F.3d 217, 231 (2d Cir. 2014) (holding that "[t]o determine whether the relevant law was clearly established, we consider . . . the existence of Supreme Court or Court of Appeals case law on the subject…."). This Court clarified the meaning of "clearly established" in *Johnson v. Newburgh Enlarged Sch. Dist.*, 239

F.3d 246 (2d Cir. 2001), instructing that a court should consider not what "a lawyer would learn or intuit from researching case law, but what a reasonable person in [the government actor's] position should know about the appropriateness of his conduct under federal law." *Johnson*, 239 F.3d at 251.

The Supreme Court "repeatedly" has instructed lower courts "not to define clearly established law at a high level of generality" when conducting qualified immunity analyses. *al-Kidd*, 563 at 742 (citing *Wilson*, 526 U.S. at 615; *Anderson v. Creighton*, 483 U.S. 635, 639-40, 107 S.Ct. 303, 497 L.Ed.2d 523 (2000). "It is not enough that a rule be suggested by then-existing precedent; the rule's contours must be so well defined that it is clear to a reasonable [official] that his conduct was unlawful *in the situation he confronted.*" *City of Tahlequah, Oklahoma v. Bond*, 595 U.S. 9, 11, 142 S.Ct. 9, 12, 211 L.Ed.2d 170 (2021) (internal quotations and citations omitted) (emphasis added). The stated legal principle must "clearly prohibit" the alleged conduct "in the particular circumstances" at hand, which requires "a high degree of specificity." *District of Columbia v. Wesby*, 583 U.S. 48, 63, 138 S.Ct. 577, 590, 199 L.Ed.2d 453 (2018) (internal quotation marks and citation omitted). These instructions apply equally to First Amendment claims. *See, e.g., Reichle v. Howards*, 566 U.S. 658, 664-65, 132 S.Ct. 2088, 182 L.Ed.2d 985 (2012) (analyzing the plaintiff's First Amendment claim and holding that "the right allegedly violated must be established not as a broad general proposition but in a particularized sense so that

the contours of the right are clear to a reasonable official"). This "clearly established" standard protects the balance between vindication of constitutional rights and government officials' effective performance of their duties by ensuring that officials can "reasonably ... anticipate when their conduct may give rise to liability for damages." *Reichle*, 566 U.S. at 664 (citing *Anderson, supra*, 483 U.S. at 639 (quoting *Davis v. Scherer*, 468 U.S. 183, 195, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984))).

This Court has given clear guidance that the assessment of an individual defendant's entitlement to qualified immunity is a narrow, legal question appropriately decided on a motion for summary judgment. *See Lewis v. Cowen*, 165 F.3d 154, 161-62 (2ⁿᵈ Cir. 1999). In *Camreta v. Greene*, the Supreme Court stated "indeed, our usual adjudicatory rules suggest that a court should forbear resolving this [constitutional] issue. After all, a longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them." *Camreta*, 563 U.S. 692, 705, 131 S.Ct. 2020, 179 L.Ed.2d 1118 (2011) (emphasis in original) (internal quotation marks and citations omitted). As was further stated in *Camreta*, "[i]n general, courts should think hard, and then think hard again, before turning small cases into large ones." *Id*. at 707.

The District Court sidestepped the question of whether, when viewing the evidence in a light most favorable to Plaintiff, Green's decision to remove Plaintiff

as Special Counsel for DCJS violated clearly established law. The District Court held that when "[v]iewing the facts in a light most favorable to Bianchi, there exist questions of fact with respect to Green's motive for terminating her as special counsel. As discussed above . . . a reasonable juror could conclude that Green's provided reason for Bianchi's termination was a pretext for retaliation and, as such, the court must deny summary judgment to Green on qualified immunity grounds." JA-1225 – JA-1226 (internal citations omitted).[2] The question presented on this appeal is amenable to resolution as a matter of law, independent of any factual issues identified by the district court. This Court recognized in *Locurto v. Safir*, 264 F.3d 154 (2d Cir. 2001) that "[t]he Supreme Court has suggested that a First Amendment retaliation claim may prove susceptible to summary judgment in appropriate cases based on the absence of elements from a plaintiff's threshold showing, such as whether the speech was on a matter of public concern as well as the element of causation." *Locurto*, 264 F.3d at 168 (citing *Crawford-El v. Britton*, 523 U.S. 574, 592-93, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998)); *see also X-Men Sec., Inc. v. Pataki*, 196 F.3d 56, 67-71 (2d Cir. 1999)(notwithstanding allegation of motive, plaintiffs' First Amendment retaliation claim should have been dismissed as a matter of law because defendant legislators' free speech rights precluded recovery)).

---

[2] The District Court failed to differentiate between Plaintiff's First and Fourteenth Amendment claims when it denied Green's motion seeking qualified immunity on both claims.

The District Court erred when it failed to view the evidence in a light most favorable to Plaintiff and ask whether removing her as Special Counsel because her testimony painted DCJS in a negative light[3] violated clearly established law under the First and Fourteenth Amendments to the United States Constitution. *See Tierney v. Davidson*, 133 F.3d 189, 194 (2d Cir. 1998) (holding that "[e]ven where the lower court rules that material disputes of fact preclude summary judgment on qualified immunity, we may still exercise interlocutory jurisdiction if the defendant ... contends that he is entitled to qualified immunity even under plaintiff's version of the facts."). Answering this question did not require the District Court to resolve any factual issues, for there is no case law from the Supreme Court or this Court which would clearly foreshadow to a reasonable person in Green's position that a violation of the First or Fourteenth Amendments to the United States Constitution would occur under the "particular circumstances" presented in this case.

## A.    First Amendment and Qualified Immunity

The speech of a public employee is protected by the First Amendment to the United States Constitution when the employee speaks as a citizen on a matter of public concern. *Specht v. City of New York*, 15 F.4th 594, 600 (2d Cir. 2021) (citing *Garcetti v. Ceballos*, 547 U.S. 410, 420–21, 126 S.Ct. 1951, 164 L.Ed.2d 689

---

[3] According to the District Court, "the record demonstrates through meeting notes and deposition testimony that the real reason Bianchi was terminated was because her testimony 'painted the agency in a negative light.'" JA-1206.

(2006)); *Montero v. City of Yonkers, New York*, 890 F.3d 386, 399 (2d Cir. 2018)(holding that a public employee pursuing a First Amendment claim must show that she "engaged in citizen speech," in other words, that she "spoke as a private citizen," and that "the speech at issue was on a matter of public concern"). Each element of this analysis poses a question of law that this Court should review *de novo*. *Singer v. Ferro*, 711 F.3d 334, 339 (2d Cir. 2013).

Neither controlling nor persuasive precedent support the conclusion that, as of December 5, 2017, it was clearly established law that a public employee who is compelled to sit for a private interview with a government oversight agency like the OIG is engaging in a constitutionally protected activity under the First Amendment.

### 1. Plaintiff Spoke to the OIG as an Employee of DCJS, Not as a Citizen

Plaintiff spoke with the OIG in her capacity as an employee of the State of New York and one of its administrative agencies, DCJS, and not as a private citizen exercising her First Amendment right to freedom of speech.

The speech at issue in this case occurred solely because Plaintiff believed that she was required to sit for an interview with the OIG. The OIG began its investigation after DCJS self-reported the ▮▮▮▮▮▮ record issue pursuant to DCJS's obligation under Executive Law § 55, which requires:

> "[e]very state officer or employee in a covered agency [to] report promptly to the state inspector general any information concerning corruption, fraud, criminal activity, conflicts of interest or abuse by another state officer or

employee relating to his or her office or employment, or by a person having business dealings with a covered agency relating to those dealings. *The knowing failure of any officer or employee to so report shall be cause for removal from office or employment or other appropriate penalty*."

N.Y. Executive Law § 55 (emphasis added). The OIG assumed jurisdiction over the ██████ record issue and began an investigation because the ██████ record issue concerned "corruption, fraud, criminal activity, conflicts of interest or abuse by another state officer or employee relating to his or her office or employment". *Id.* Green was aware of the fact that the OIG interviewed multiple DCJS employees about the ██████ record issue between May and July 2017. By August 2017, Green knew that the OIG had expanded its investigation into other matters relating to OFS for which it sought to interview Plaintiff. When Plaintiff learned that the OIG wanted to speak with her, she went to her superior, Green, for guidance. Thus, the particular circumstances under which Green learned that Plaintiff was required to speak with the OIG were such that it was objectively reasonable for Green to believe that Plaintiff was speaking with the OIG in her capacity as an employee of the State.

Green subsequently received a copy of an audio recording of Plaintiff's interview. Upon listening to the recording, Green heard the OIG attorney advise Plaintiff at the very beginning of her interview "██████████████████████ ████████████████████████████████████ ████████████████" JA-318 (emphasis added). Thus, from Green's

standpoint, everything that Plaintiff discussed with the OIG was discussed ███████ ████████████████████████████████████████████████████ and, therefore, Plaintiff's statements to the OIG were made in her capacity as an employee of the State. *Id.*

Green listened as Plaintiff spoke with the OIG for seventy-five minutes, during which Plaintiff provided ██████████ information about her time as the supervisor of OFS. JA-322. Green listened as the OIG asked Plaintiff about the ████████ record issue, which concerned a matter of potential fraud. JA-340 – JA-363. Green also heard the OIG pose a series of questions to Plaintiff about Gestring, including whether he engaged in any misconduct in the form of ████████████████ s███████████████, ██████████████████████████████████████████ █████, ████████████████████████████████████████, ██████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████, and ██████████████████ on a DCJS employee (JA-369 – JA-370, JA-372, JA-389 – JA-390) - all matters which fall within the ambit of Executive Law § 55. The District Court did not discuss any of this testimony from Plaintiff in its decision denying Green's motion for summary judgment. Instead, the District Court held that since Plaintiff spoke with the OIG about some matters which arguably fell outside of the OIG's jurisdiction under Executive Law § 55, Plaintiff was not required by law to "report" this information

to the OIG and, therefore, was acting as a citizen at all times while speaking with the OIG. JA-1212 - JA-1213. Even if the District Court's conclusion was correct, there is no clearly established law which would inform Green that an employee who provides information to the OIG is protected by the First Amendment so long as the information the employee provides falls outside of the OIG's jurisdiction.

The District Court only cited two cases - *D'Olimpio v. Crisafi*, 462 Fed.Appx. 79, 80 (2d Cir. 2012) and *Rusk v. New York State Thruway Authority*, 437 F.Supp.3d 578 (W.D.N.Y. 2014) - to support its conclusion that Plaintiff spoke with the OIG as a private citizen, not as an employee of DCJS. JA-1212. *Rusk* is a district court-level case which is not "controlling authority", and *Rusk* has not been cited as part of "a robust 'consensus of cases of persuasive authority.'" *al-Kidd*, 563 U.S. at 742 (citations omitted). Since this Court held *Shechter v. Comptroller of New York*, 79 F.3d 265, 271 (2d Cir. 1996) that the law cannot be "clearly established" for qualified immunity purposes by district court opinions, but only by the decisions of the applicable circuit court or the Supreme Court, *Rusk* does not inform the qualified immunity analysis in this case.

The other case cited by the District Court, *D'Olimpio,* is a ruling by summary order which does not have any precedential effect. *See* U.S. Court of Appeals for the Second Circuit Local Rule 32.1.1(a)(stating "rulings by summary order do not have

precedential effect"). This is critically important when establishing the state of clearly established law as of December 5, 2017.

Even if *D'Olimpio* was relevant to the qualified immunity analysis in this case, it would inform someone in Green's position that a public employee who provides information to the OIG when required to do so is fulfilling their duty as a public employee under Executive Law § 55 and, therefore, is not exercising their right as a citizen to freedom of speech. The Plaintiff in *D'Olimpio* filed a complaint with the OIG about misconduct within his law enforcement agency. This Court concluded that the plaintiff in *D'Olimpio* did not engage in protected activity under the First Amendment because he was acting pursuant to his statutory obligation to report misconduct and, therefore, "[s]peech that is 'part-and-parcel of [an employee's] concerns about his ability to properly execute his duties' is the speech of a public employee pursuant to his duties and not of a private citizen." *D'Olimpio*, 462 Fed. Appx. at 81 (citing *Weintraub v. Board of Educ. of City School Dist. of City of New York*, 593 F.3d 196 198, 201, 203 (2d. Cir. 2010) (holding that the plaintiff, who was a teacher that filed a grievance with his union to complain about his supervisor's failure to discipline a child in his classroom, was speaking pursuant to his official duties and, thus, was not speaking as a citizen). A reasonable extension of this rule would be that a public employee who provides testimony the OIG about their State employment when required to do so is fulfilling their duty as a public

employee under Executive Law § 55 and, therefore, is not exercising their right as a citizen to freedom of speech. Minimally, the fact that the District Court was required to distinguish the facts in this case from *D'Olimpio* shows that Green did not violate clearly established law.

The evidence in the record before the District Court showed that Plaintiff met with the OIG because she believed, correctly or incorrectly, that she was required to do so. As discussed *supra*, Green was informed by Plaintiff that the OIG asked to speak with her as part of its investigation of the ███████ record issue and OFS more generally. The District Court did not dispute that the ███████ record issue fell squarely within the OIG's jurisdiction, or conclude that it was unreasonable for Green to believe that the OIG interviewed Plaintiff as part of an investigation of matters that fell within the OIG's jurisdiction. Put differently, it would not have been objectively reasonable for an official in Green's position to assume that the OIG asked to speak with Plaintiff about matters which fell outside of the OIG's jurisdiction.

The District Court had before it the unrebutted testimony of Deputy Inspector General Spencer Freedman, who testified that ██████████████████████ ██████████████████████████████. JA-278 (emphasis added). Using this broad definition, Freedman testified:

Q.   ████████████████████████████████████
     ████████████

A. 

        *     *     *

Q. ███████████████████████████████

A. █████████

JA-64 – JA-65.

Once the OIG sought to interview Plaintiff as part of its investigation, she was required to participate in that interview solely by virtue of her public employment. Pursuant to New York State Executive Law § 54(5), "[t]he state inspector general shall have the power to … require any officer or employee in a covered agency to answer questions concerning any matter related to the performance of his or her official duties…*[t]he refusal of any officer or employee to answer questions shall be cause for removal from office or employment or other appropriate penalty*." N.Y. Exec. Law § 54(5)(emphasis added). The OIG's Executive Deputy confirmed during his deposition when he testified that ████████████████████████ ████████████████████████████████████████ ██████████ *Id; see also* JA-289 (confirming that public employees like Plaintiff ████████████████████████████████████████ ██████████). A private citizen has no such obligations and faces no consequences for refusing to answer the OIG's questions.

The record before the District Court established that Plaintiff understood that, as a public employee, she was expected to participate in an OIG interview.

According to Plaintiff, she was ███████ to meet with the OIG because it was her ████ to do so. JA-578, ¶ 6 (Plaintiff writing to the OIG ████████████). Plaintiff told Green █████████████████████████████████, ████████████████████, JA-581, ¶ 16, and that she ███████████████████████ ██████████████████ JA-578 ¶ 6 ; JA-581 ¶ 16 (Plaintiff stating ████████ ████████████████████████████████████████████ ██████████████). Plaintiff told Green while meeting with him on December 5, 2017, that she agreed to be interviewed by the OIG █████████████ ████ and that █████████████████████████████. JA-273, JA-486. In handwritten notes that Plaintiff created after meeting with Green on December 5, 2017, Plaintiff wrote, among other things, ████████████████ in reference to the OIG. JA-498. Plaintiff's own statements support the conclusion that she believed that she was required to provide testimony to the OIG. Plaintiff's admitted obligation to comply with her duty to give testimony to the OIG shows that it was reasonable for Green to believe that Plaintiff was acting as an employee of DCJS when she met with the OIG, not a citizen exercising her rights under the First Amendment. *See also D'Angelo v. School Bd. of Polk County, Fla*., 497 F.3d 1203 (11th Cir. 2007)(relying on a public employee's characterization of his speech as part of his "duty" to support the conclusion that the employee was not speaking as a citizen)(citing *Battle v. Board of Regents for Georgia*, 468 F.3d 755 (11th Cir. 2006)

29

(relying on admission of plaintiff that "she had a clear employment duty" to conclude that the employee was not speaking as a citizen).

*D'Olimpio* does not make it clearly established law that a public employee who is interviewed by the OIG during an active OIG investigation concerning matters which exclusively relate to that public employee's job is exercising their right as a citizen to freedom of speech. The Supreme Court has warned that "[i]t is not enough that the rule is suggested by then-existing precedent." *Dist. of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018). Rather, "the precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply. Otherwise the rule is not one that every reasonable official would know." *Id*. (internal quotation marks and citations omitted); *Mara v. Riling*, 921 F.3d 48, 68 (2d Cir. 2019) (quoting *Mullenix v. Luna*, 577 U.S. 7, 136 S.Ct. 305, 308, 193 L.Ed.2d 255 (2015) (holding that "the law must be so clearly established with respect to the 'particular conduct' and the 'specific context' at issue that 'every reasonable official would have understood that his conduct was unlawful'"). If the challenged conduct's illegality "would not be so apparent, officers are entitled to qualified immunity." *Id*. (citing *Zalaski v. City of Hartford*, 723 F.3d 382, 389 (2d Cir. 2013)).

Although it was not cited by the District Court, this case is distinguishable from *Lane v. Franks*, 573 U.S. 228, 134 S.Ct. 2369, 189 L.Ed.2d 312 (2014), where

the Supreme Court held "[t]ruthful testimony under oath by a public employee outside the scope of his ordinary job duties is speech as a citizen for First Amendment purposes. That is so even when the testimony relates to his public employment or concerns information learned during that employment." *Lane*, 573 U.S. at 238, 134 S.Ct. at 2378. In *Lane*, the Supreme Court distinguished the speech at issue in that case from the speech at issue in *Garcetti*, *supra*, holding:

> "[t]he sworn testimony in [*Lane*] is far removed from the speech at issue in *Garcetti* - an internal memorandum prepared by a deputy district attorney for his supervisors recommending dismissal of a particular prosecution. The *Garcetti* Court held that such speech was made pursuant to the employee's 'official responsibilities' because '[w]hen [the employee] went to work and performed the tasks he was paid to perform, [he] acted as a government employee."

*Lane*, 573 U.S. at 238, 134 S.Ct. at 2378.

The facts in this case align more closely with *Garcetti* than with *Lane*, although neither case establishes a rule with contours so well defined that it would be clear to Green that his conduct was unlawful in the situation he confronted. *See Tahlequah, supra*. When Plaintiff went to work on August 3, 2017, and performed the tasks she was required (and paid) to perform, it included privately meeting with the OIG and providing ███████ information about her agency. Plaintiff, who had no idea why the OIG wanted to speak with her,[4] sought and obtained the

---

[4] Plaintiff testified that she did not know why the OIG wanted to speak with her until the day she met with two OIG investigators. See JA-631 – JA-632 ¶¶ 33, 35.

approval of her superior, Green, before doing so. In stark contrast, the plaintiff in *Lane* sought to expose corruption in a public program he oversaw, and the misuse of state funds intended to help underprivileged youths. *Lane*, 573 U.S. at 231-323. The plaintiff in *Lane* initially attempted to expose the corruption internally, which caused the Federal Bureau of Investigation to begin a criminal investigation. *Id*. at 232. The plaintiff in *Lane* subsequently testified before a federal grand jury and, after criminal charges were filed, testified in two public criminal trials, all of which garnered significant media attention. *Lane*, 573 U.S. at 232-33, 134 S.Ct. at 2375-76. Although the Supreme Court held that the plaintiff's testimony in *Lane* was the protected speech of a citizen, it specifically noted that its decision did not address "whether truthful sworn testimony would constitute citizen speech under *Garcetti* when given as part of a public employee's ordinary job duties, and express no opinion on the matter today." *Lane*, 573 U.S. at 238, n. 4, 134 S.Ct. at 2378, n. 4.

Here, while Plaintiff's job duties as Special Counsel for DCJS did not include testifying before the OIG,[5] Plaintiff's duty as a public employee under Article 4-A of New York's Executive Law, by her own admission, required her to speak with the OIG. It was, therefore, reasonable for Green to conclude that Plaintiff was giving

---

[5] The record before the District Court established that Plaintiff ██████ provided information to the OIG for years in her former role as Deputy Commissioner and Counsel for DCJS, but not during the approximately two years Plaintiff served as Special Counsel. *See* JA-32 ¶ 24 (alleging ████████████████████████████████████████████████████; *see also* JA-630 ¶ 27 (describing Plaintiff as ████████).

sworn testimony pursuant to her duties as a public employee under New York Executive Law § 55 and, therefore, Plaintiff's statements to the OIG did not constitute citizen speech. To hold that *Lane* informed Green that his actions were unlawful would require this Court to define clearly established First Amendment law "at a high level of generality" which the Supreme Court has repeatedly warned against. *al-Kidd*, 563 at 742.

Finally, the District Court erred when it failed to consider whether it was reasonable for Green to believe that his actions were lawful under clearly established First Amendment precedent when his counsel (e.g., Czajka and Bonacquist, among others) did not raise any concern to Green about removing Plaintiff as Special Counsel. JA-308, Response to Interrogatory No. 9; JA-583 ¶ 18; JA-585 ¶ 21. Under Second Circuit precedent, reliance upon counsel is a relevant consideration when evaluating whether Green is entitled to qualified immunity. *See, e.g., Pavone v. Puglisi*, 353 Fed. Appx. 622, 626 (2d Cir. 2009); *Taravella v. Town of Wolcott*, 599 F.3d 129, 134 (2d Cir. 2010). Czajka and/or Bonacquist reviewed the statements Plaintiff made while speaking with the OIG and developed a list of issues and questions for Green to go over with Plaintiff on December 5, 2017. JA-582 ¶ 17. Receiving such a list from his counsel indicated to Green that there were no concerns associated with questioning Plaintiff about her OIG testimony. During discovery, Plaintiffs were given access to the pre-December 5, 2017 privileged communications

that Green exchanged with Bonacquist, Czajka and the other attorneys at DCJS, and none of those communications show that anyone who Green relied upon for legal advice and counsel raised a concern to Green that Plaintiff's statements were entitled to any level of constitutional protection. Although the District Court concluded that Czajka was not personally involved in the decision to remove Plaintiff as special Counsel, Czajka was well aware of the fact that Green was considering it, and there is no evidence that Czajka expressed any concern to Green that removing Plaintiff as Special Counsel could violate the Constitution.

### 2. Plaintiff Did Not Discuss Matters of Public Concern with the OIG

Government employees, like all citizens, should participate in and contribute to vibrant dialogue in a democratic society. Indeed, "[p]ublic employees are often the members of the community who are likely to have informed opinions as to the operations of their public employers, operations which are of substantial concern to the public." *City of San Diego v. Roe*, 543 U.S. 77, 82 (2004) (emphasis added). Thus, the Supreme Court's First Amendment jurisprudence is concerned with "civic discussion," "public debate," and "vibrant dialogue in a democratic society," with employees (whether they be private or public) being allowed to offer opinions on a variety of topics - including their employment - without fear of retaliation by their employer. *See Garcetti*, 547 U.S. at 419-20. At the same time, this Court has consistently applied a high bar for an issue to qualify as a matter of public concern,

and requires that the speech be intended to "advance a political or social point of view *beyond the employment conte*xt." *Agosto v. New York City Dept. of Educ*., 982 F.3d 86, 95 (2d Cir. 2020) (emphasis added). "Speech deals with matters of public concern when it can be fairly considered as relating to matters of political, social, or general interest to the community or value and concern to the public." *Specht,* 15 F.4th at 600 (citing *Snyder v. Phelps*, 562 U.S. 443, 453, 131 S.Ct. 1207, 1220, 179 L.Ed.2d 172 (2011)); *see also Jackler v. Byrne*, 658 F.3d 225, 236 (2d Cir. 2011) (holding that "a topic is a matter of public concern for First Amendment purposes if it is 'of general interest,' or 'of legitimate news interest,' or 'of value and concern to the public at the time' of the speech") (quoting *City of San Diego, Cal. v. Roe*, 543 U.S. 77, 83-84, 125 S.Ct. 521, 160 L.Ed.2d 410 (2004)); *Cf. Reuland v. Hynes*, 460 F.3d 409, 418 (2d Cir. 2006) (concluding that a statement addressed a matter of public concern where it "did not relate to employment policies or other internal workplace grievances" and "was made in an interview with a magazine with public circulation and not simply to co-workers").

Whether speech is of a matter of public concern is a fact-intensive inquiry and a question of law for the court to decide. *Wrobel v. Cty. of Erie*, 692 F.3d 22, 28 (2d Cir. 2012). It required the District Court here to consider the content, form, context of Plaintiff's statements to the OIG. *See Specht*, 15 F.4th at 600 (citing *Montero*, *supra*, 890 F.3d at 399); *see also Connick v. Myers*, 461 U.S. 138, 147, 103 S.Ct.

1684, 75 L.Ed.2d 708 (1983) (holding "[w]hether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record."). According to the Supreme Court, when "considering content, form, and context, no factor is dispositive, and it is necessary to evaluate all the circumstances of the speech, including what was said, where it was said, and how it was said." *Snyder*, 562 U.S. at 454.

The District Court erred because it failed to consider "the content, form, and context" of Plaintiff's statements to the OIG, "as revealed by the whole record", *Connick*, 461 U.S. at 147-48 & n. 7, when deciding whether Green violated clearly established First Amendment precedent.

### i.    Content

In order to conclude that Plaintiff was not acting pursuant to her obligations under Executive Law § 55 and, therefore, was speaking as a citizen, the District Court was required to conclude that Plaintiff's statements to the OIG did not relate to corruption, fraud, criminal activity, conflicts of interest or abuse by another state officer or employee relating to his or her office or employment - all of which could be potential topics of public concern. *See, e.g., Johnson*, 342 F.3d at 112–13 (concluding that speech "alleg[ing] unlawful and corruptive practices" is on a matter of public concern); *Lewis*, 165 F.3d at 164 (discussing as the "typical" public employee speech case one in which the speech concerns "corruption or public

wrongdoing"). The District Court nonetheless concluded that the matters Plaintiff discussed with the OIG which allegedly fell outside of the OIG's jurisdiction under N.Y. Executive Law § 55 were matters of public concern. Specifically, the District Court held:

> "...Bianchi was testifying to complaints of harassment that allegedly went ignored by OFS and DCJS management. Moreover, Bianchi's testimony did not relate to her own personal situation or personal grievances, in fact, she was testifying about complaints made by other female employees against Gestring within DCJS and OFS. While Bianchi did testify to her experience working with Gestring and her personal perception that he was a 'misogynist,' the content, form, and context of the speech in light of the record as a whole demonstrates that she was not airing out person grievances but testifying to a pattern of complaints of harassment going unaddressed by state officials. Ultimately, Bianchi was relaying that she had heard of complaints of harassment within DCJS that were never addressed, which can be considered misconduct by government officials and a matter of considerable concern to the public. *See Jackler*, 658 F.3d at 236."

JA-1211.

Even if the District Court's conclusion was correct, there is no Supreme Court or Second Circuit precedent in which it was held that "complaints of harassment going unaddressed" in one small office within a large administrative agency of the State of New York advances a political or social point of view beyond the employment context and, therefore, is a matter of public concern.

The District Court cited only *Jackler v. Byrne*, 658 F.3d 225, 236 (2d Cir. 2011) to support the conclusion that Plaintiff spoke on a matter of public concern. In *Jackler*, this Court found that a police officer spoke on a matter of public concern

when he refused to cooperate with the defendants and commit a criminal act by altering or falsifying a police report which concerned the assault of an arrestee. *Jackler*, 658 F.3d at 230-32. This Court had little difficulty concluding in *Jackler* that "for several reasons, including public safety and welfare ... police malfeasance consisting of the use of excessive force is plainly a matter of public concern." *Id*. at 236-37; *see Snyder v. Phelps*, 562 U.S. 443, 131 S.Ct. 1207, 179 L.Ed.2d 172 (2011)(holding that the display of placards which discussed "the political and moral conduct of the United States and its citizens, the fate of our Nation, homosexuality in the military, and scandals involving the Catholic clergy" highlighted "matters of public import"). When compared to criminal malfeasance by law enforcement officials as was at issue in *Jackler*, the general public does not have a substantial interest in matters that Plaintiff discussed with the OIG. *See Singer v. Ferro*, 711 F.3d 334, 340 (2d Cir. 2013); *Singh v. City of New York*, 524 F.3d 361, 372 (2d Cir. 2008). In contrast, the ████████ record issue – which Plaintiff told the OIG that she did not know anything about (JA-356 – JA-363) – would be a matter of public concern. The public would want to know if a DCJS employee created a fraudulent DNA test result that was to be used as evidence to convict a defendant in a murder trial. *See, e.g., Dill v. City of Edmond*, 155 F.3d 1193, 1202 (10th Cir. 1998) (holding speech involved a matter of public concern when plaintiff's motive was to bring to

light possible mishandling of murder investigation, including withholding of exculpatory evidence).

### ii.    Form and Context

The form and context in which Plaintiff spoke with the OIG supports the conclusion that Plaintiff did not intend to convey information that she believed were matters of concern to the general public.  Plaintiff did not ask to speak with the OIG – they asked to meet with her.  Green knew the OIG had asked to privately meet with Plaintiff who, as an attorney at DCJS, regularly interacted with the OIG for years. *See* Fn. 5, *supra*.  Plaintiff testified that she did not know why the OIG wanted to speak with her, so she reached out to her supervisor (e.g., Green).  After Green encouraged Plaintiff to attend the meeting, Plaintiff privately met with two OIG attorneys, where Plaintiff was asked about or discussed internal DCJS matters. Importantly, Plaintiff believed that the matters she discussed with the OIG during the meeting would remain confidential.  *See* JA-32, ¶ 22 (alleging █████████

████████████████████████████████████████████████████████████████

███████████████████████████████████████████); JA-33, ¶ 25 (alleging ████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████); JA-36, ¶ 46 (alleging ████████████████

████████████████████████████████████████████████████████████████

"); JA-41, ¶ 81 (alleging that former New York State Inspector General Cathy Leahy Scott committed the █████████ of providing the defendants with Plaintiff's sworn testimony to the OIG).

Plaintiff began her confidential testimony by stating that her statements were ████████████ JA-581 ¶ 16, JA-323. After Plaintiff concluded the meeting with the OIG, Plaintiff did not speak with anyone about her testimony until she met with Green on December 5, 2017. These undisputed facts support the conclusion that Plaintiff was not attempting to express a particular viewpoint on a subject matter that would be of interest to the general public. At a minimum, there is no clearly established precedent which holds that an employee who meets privately with an agency like the OIG and does so under the belief that no one will ever know what they said, is attempting to share information with the public and, therefore, is engaging in a constitutionally protected First Amendment activity. *Cf. Snyder,* 562 U.S. at 454-55, *supra* (discussing the context in which speech is conveyed and holding that the display of placards at a public place adjacent to a public street was intended to disseminate a message to the general public).

For all of the foregoing reasons, this Court should reverse the District Court and find, as a matter of law, that Plaintiff did not speak as a citizen on a matter of public concern under clearly established Supreme Court and Second Circuit precedent. Green has shown that he did not violate clearly established law and,

therefore, Green is entitled to qualified immunity on Plaintiff's First Amendment cause of action.

## B.     Equal Protection Clause and Qualified Immunity

It is not clearly established law that a public employee who is interviewed about matters which may touch upon issues addressed by Title VII is engaged in protected opposition under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

As the District Court noted: "[t]he elements of a retaliation claim based on an equal protection violation under [Section] 1983 mirror those under Title VII [of the Civil Rights Act of 1964 ("Title VII")]."  JA-1216 (citing *Vega v. Hempstead Union Free School Dist.*, 801 F.3d 72, 91 (2d Cir. 2015); *Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1177 (2d Cir. 1996)).[6]  First, a plaintiff must establish a prima facie case by demonstrating "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." *Littlejohn v. City of New York*, 795 F.3d 297, 315-16 (2d Cir. 2015) (citation omitted).

---

[6] Title VII prohibits employment discrimination based on race, color, religion, sex and national origin.  42 U.S.C. § 2000e *et seq.*   Title VII does not prohibit discrimination based on age. *See Bornholdt v. Brady,* 869 F.2d 57, 62 (2d Cir. 1989) (holding "Title VII plainly does not apply [to age discrimination claims] since that statute governs complaints relating only to discrimination on the basis of race, color, religion, sex, or national origin, and not discrimination on the basis of age.").

As to the first element of a prima facie case, "...a plaintiff engages in a protected activity if she 'oppose[s] any practice made an unlawful employment practice by Title VII, or make[s] a charge, testifie[s], assist[s], or participate[s] in any manner in an investigation, proceeding, or hearing under Title VII.'" JA-1216-17 (citing *Stoutenger v. City of Fulton*, 605 F. Supp. 3d 432, 459 (N.D.N.Y. 2022) (analyzing a claim for retaliation in violation of the Equal Protection Clause under the same framework as Title VII retaliation claims) (internal quotation marks and citations omitted)); *Pace v. Town & Country Veterinary Clinic P.C.,* 2022 WL 3027157, at *3 (N.D.N.Y. Aug. 1, 2022) (citation omitted and alteration in original) (holding that "[a] plaintiff engages in 'protected activity' when she '(1) opposes employment practices prohibited under Title VII; (2) makes a charge of discrimination; or (3) participates in an investigation, proceeding[,] or hearing arising under Title VII"). Thus, Title VII's anti-retaliation provision "has two parts: the opposition clause and the participation clause." *Townsend v. Benjamin Enterprises, Inc.*, 679 F.3d 41, 49 (2d Cir. 2012). The opposition clause makes it unlawful for an employer to retaliate against an individual because she "opposed any practice" made unlawful by Title VII, while the participation clause makes it unlawful to retaliate against an individual because she "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under" Title VII. 42 U.S.C. § 2000e–3(a).

This Court held in *Townsend v. Benjamin Enters., Inc.*, 679 F.3d 41, 48 (2d Cir.2012) that the language of the participation clause refers to retaliation that "occur[s] in conjunction with or after the filing of a formal charge with the EEOC." *Townsend*, 679 F.3d. at 49. It "does not include participation in an internal employer investigation unrelated to a formal EEOC charge." *Id*. Here, Plaintiff does not claim that she made a charge of discrimination or participated in an investigation, proceeding, or hearing arising under Title VII prior to December 5, 2017. *See* JA-28 – JA-51. Since the record established that Plaintiff did not make a charge of discrimination with the EEOC or participate in an investigation, proceeding, or hearing arising under Title VII prior to December 5, 2017, Plaintiff was required to show that she was opposing a practice made unlawful by Title VII when she spoke with the OIG.

The question that the District Court failed to address is whether it was clearly established law as of December 5, 2017, that a public employee who is compelled to sit for a private interview with a government oversight agency like the OIG, which has no jurisdiction over potential violations of Title VII, during which she may have briefly touched upon issues addressed by Title VII, is engaging in a constitutionally protected activity under the Fourteenth Amendment to the United States Constitution.

### 1. Contents

The overwhelming majority of Plaintiff's OIG testimony had no discernable connection to any conduct that could implicate Title VII. While before the District Court, Plaintiff did not claim that she spoke with the OIG about any matters relating to religion or national origin. See JA-28 – JA-51. Although Plaintiff alleged in her Amended Complaint that she testified before the OIG about ███████████████ ███████████████████, JA-49 ¶ 133, Plaintiff conceded during discovery that she did not raise any issues relating to race while speaking with the OIG, JA-10 (citing Dkt. No. 59-1, p. 5, fn. 3 (stating ████████████████ ███████████████████)), and workplace violence, wholly disconnected from an employee's race, color, religion, sex or national origin, is not addressed by Title VII. *Cf.* N.Y. Labor Law § 27-a (codifying New York's Workplace Violence Prevention Act).

As for the statements made by Plaintiff that could arguably be connected to sex, the content of Plaintiff's statements would not inform Green that Plaintiff spoke with the OIG because she had a good faith belief that *her employer*, DCJS, was violating Title VII.

The case law from the Second Circuit on this topic is limited. Outside of the Second Circuit, the federal courts have consistently held that merely touching upon issues that are addressed by Title VII is not sufficient to constitute protected activity

under Title VII. *See, e.g., Morris v. McCarthy*, 825 F.3d 658, 673 (D.C. Cir. 2016) (dismissing retaliation claim because employee's complaints did not "oppose any discrete practice that [the plaintiff] reasonably could have believed discriminated on the basis of race, color, religion, sex, or national origin"); *EEOC v. Crown Zellerbach Corp.*, 720 F.2d 1008, 1013 (9th Cir. 1983) (holding that "t]he employee's statement cannot be 'opposed to an unlawful employment practice' unless it refers to some practice by the employer that is allegedly unlawful."). Put another way, there must be "some perceptible connection to the employer's alleged illegal employment practice," and "it must be possible to discern from the context of the statement that the employee opposes an unlawful employment practice." *Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc.*, 450 F.3d 130, 135 (3d Cir. 2006); *see also Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1313 (6th Cir. 1989) (holding "that a vague charge of discrimination in an internal letter or memorandum is insufficient to constitute opposition to an unlawful employment practice").

According to the District Court here, "Bianchi [claims] that she was testifying to issues within OFS regarding gender and age[7] discrimination as well as

---

[7] The District Court did not find that Plaintiff expressed any concerns for age discrimination when she spoke with the OIG. This is likely the result of Plaintiff's OIG testimony. Plaintiff was asked by the OIG if she was aware of any comments made by Gestring about ███████████████████████████████████████████ JA-350 – JA-351. Plaintiff initially responded by saying Gestring ███████████████████████████████ JA-351. Plaintiff told the OIG that ███████████████████

45

harassment." JA-1216.  Specifically relating to gender, the District Court found that "[Plaintiff's] testimony concerned several instances of Gestring having difficulty reporting to female management, preferring to hire younger, female employees, and making threats to female employees, as well as comments of a sexual nature."  JA-1217 – JA1218.   The District Court supported this conclusion only with a general citation to the seventy-five page transcript of Plaintiff's OIG testimony. *See* JA-1217 (citing "See Generally JA-743 – JA-817").

With respect to the District Court's statement that Plaintiff testified about "instances of Gestring having difficulty reporting to female management", JA-1216, this assertion is not supported by the record.  A careful review of Plaintiff's OIG testimony confirms that Plaintiff did not testify about any specific ███████ or even more than one instance of such difficulties.  Rather, Plaintiff testified:



███████████████████████████████ without offering any specifics, but clarified that
█████████████████████████████. JA-351.

JA-326.[8]  From this testimony, Green knew only that Plaintiff told the OIG that

Gestring had a problem ████████████████ in the context of a discussion about

the period of time that Plaintiff supervised Gestring in OFS – several years before

Plaintiff spoke with the OIG.  Green understood that Plaintiff was expressing her

subjective view that Gestring had ████████████████████████████████

████████████████████, JA-326, when Plaintiff supervised Gestring

several  years  earlier,  not  that  female  DCJS  employees  were  subjected  to

discrimination or harassment on account of their sex in violation of Title VII.  There

is no clearly established law holding that an employee who offers their opinion that

a former subordinate had ████████████████ or ████████████ a supervisor of

the opposite sex several years earlier is opposing an unlawful employment practice

under Title VII.  The absence of such authority supports granting Green qualified

immunity.

　　　The District Court's reference to Plaintiff's expressed opinion that Gestring

preferred  to  hire  younger  *female*  employees  omits  any  reference  to  Plaintiff's

response when she was asked by the OIG whether it was her experience that Gestring

spent  more  time  and  plays  favorites  with  young  female  employees.    Plaintiff

responded: ████████████████████████████████████████████████████

---

[8] The District Court offered no analysis of how a male employee ████████████████ reporting to
████████████████ or, as Plaintiff actually testified, ████████████████████████████
without more, would implicate Title VII.

██████████████████████████████████████████

██████████████████ JA-364 – JA-365.  Ultimately, Plaintiff testified ██████

████████████████████████████████████████████

JA-364 – JA-366.  There is no clearly established law holding that an employee who

offers their opinion that a male supervisor prefers to spend time with certain female

subordinates – which, without more, does not amount to discrimination on account

of sex in violation of Title VII – is opposing an unlawful employment practice under

Title VII.   The  absence  of  such  authority  supports  granting  Green  qualified

immunity.

    With  respect  to  the  District  Court's  reference  to  "comments  of  a  sexual

nature", the only specific comments that Plaintiff discussed with the OIG that could

fit  within  this  broad  category  are  the  comments  reflected  in  the  two  counseling

memos  issued  to  Gestring  in  2012  ("2012  counseling  memos").   *See* JA-326-327

(testifying ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████).  Plaintiff did not

produce the 2012 counseling memos to the OIG.  DCJS did.  When Plaintiff was

shown the 2012 counseling memos by the OIG, she did not initially recall them, but

after reviewing them, Plaintiff told the OIG ████████████████████

48

████████████████████████████████████ JA-336, JA-355. There is no clearly established law holding that a person who discusses counseling memos issued five years earlier about conduct that could implicate Title VII is opposing an unlawful employment practice under Title VII when there has been no subsequent similar conduct by the employee who was counseled. To hold otherwise would transform any discussion about past conduct that implicates Title VII into a protected activity under the Fourteenth Amendment.

The District Court also erred by focusing solely upon the content of Plaintiff's OIG testimony while ignoring the context and form of her actions, which are particularly relevant considerations when assessing whether an experienced and well-trained attorney was opposing an unlawful employment practice of her agency. As discussed *supra*, the OIG's investigation initially concerned only the ████████ record issue, which has no discernable connection to an activity that would implicate Title VII. Green knew that the OIG asked to speak with Plaintiff as part of that investigation, and that Plaintiff did not know why the OIG wanted to speak with her. This latter fact immediately distinguishes this case from any other Fourteenth Amendment case where a public employee proactively sought to express a particular concern about discrimination or harassment in the workplace.

Green also knew that Plaintiff, like all other DCJS employees, had been trained on how to raise concerns about discrimination or harassment in the

workplace, and that the training did not include raising concerns to the OIG.   Before

the District Court, Plaintiff acknowledged that ███████████████████████

██████████████████████████████████████████████

█████████████████████████████████   JA-604 ¶ 105.   DCJS's Employee

Manual lists three ████████████ that DCJS employees can contact if they

believe they have been subject to discrimination, and the handbook does not identify

the OIG.   JA-984; *see* JA-46, ¶ 111 (alleging ██████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████); *see also* JA-46, ¶ 112 (alleging █████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████).   Green knew that Plaintiff - an experienced attorney - did not raise a

concern to any external agency which she knew to have jurisdiction over

discrimination claims at any time prior to December 5, 2017.

In *Meckenberg v. New York City Off–Track Betting*, 42 F.Supp.2d 359, 380 (S.D.N.Y. 1999) the Southern District Court held that the "determination of whether plaintiff's belief was reasonable and made in good faith depends in part on an assessment of plaintiff's legal sophistication." The Southern District Court had previously held in *Iannone v. Frederic R. Harris, Inc.*, 941 F.Supp. 403, 410 (S.D.N.Y. 1996) that "[a]n attorney or equal employment opportunity specialist will be held to a higher standard of expertise about Title VII than a layperson". *Iannone*, 941 F.Supp. at 410 (citing *Amos v. Housing Authority of Birmingham Dist.*, 927 F.Supp. 416, 422 (N.D.Ala. 1996) (holding that "[w]hen a person skilled in human relations and trained to defend EEOC charges makes a claim that has no logical basis, that claim could not have been made in good faith..."); *Volberg v. Pataki*, 917 F.Supp. 909, 914 (N.D.N.Y. 1996) (finding general counsel held to standard of reasonable attorney in assessing good faith)). While a lack of legal sophistication is most often cited to explain why a good faith mistake will not strip a plaintiff of Title VII's protections against retaliation, an inverse rule should be established here – where a sophisticated attorney who has knowledge and training on the requirements of Title VII and how to report Title VII violations does not act consistently with that knowledge or training, it is reasonable to conclude that they are not attempting to oppose an unlawful employment practice of their employer under Title VII. This conclusion is further supported by Plaintiff's admission that when she met with the

51

OIG, she ████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████ JA-633 ¶ 37 – the

appropriate channel for opposing unlawful discrimination at DCJS.

Finally, the District Court offered no response to Green's argument that it was objectively reasonable for him to believe that his actions were lawful since the attorneys who provided him with advice and counsel did not raise any concern that removing Plaintiff as Special Counsel could implicate, let alone violate, Title VII or the Equal Protection Clause. *See* JA-96 ¶¶ 138-140.

Once the Court strips away the hyperbolic rhetoric that Plaintiff employed in this lawsuit to give the false impression that she was standing up against a "pattern of complaints of harassment going unaddressed by state officials" at DCJS and reviews the actual statements Plaintiff made while speaking with two OIG investigators, the transcript of Plaintiff's OIG interview and the context in which those statements were made supports only one conclusion – Plaintiff did not speak with the OIG on August 5, 2017 because she sought to express a good faith belief that Title VII was being violated by DCJS. Plaintiff was simply providing ████████ information about a time when she supervised an office that the OIG was investigating because Plaintiff believed she was required to do so. As part of providing that background information, Plaintiff discussed her experience

supervising Gestring *in the past*, and her experience counseling Gestring for inappropriate conduct that was addressed by Green and Plaintiff *in the past*. Matters which, by Plaintiff's own admission, she ███████████████████████ There is nothing within Plaintiff's OIG testimony that would lead Green, or a reasonable official in Green's position to conclude under these particular circumstances that Plaintiff was engaging in protected activity under the Equal Protection Clause, or that Green was violating clearly established Fourteenth Amendment precedent.

For all of the foregoing reasons, this Court should reverse the District Court and find, as a matter of law, that Plaintiff did not oppose an unlawful employment practice at DCJS. Green has shown that he did not violate clearly established law and, therefore, Green is entitled to qualified immunity on Plaintiff's Fourteenth Amendment cause of action.

## CONCLUSION

The standard for granting qualified immunity to public officials is deliberately "forgiving," *Amore v. Novarro*, 624 F.3d 522, 530 (2d Cir. 2010), to give public officials like Green "breathing room to make reasonable but mistaken judgments" without fear of disabling liability. *Messerschmidt v. Millender*, 565 U.S. 535, 546, 132 S.Ct. 1235, 182 L.Ed.2d 47 (2012) (internal quotation marks omitted). As this Court recently held, the Supreme Court has repeatedly observed that qualified

immunity protects "'all but the plainly incompetent or those who knowingly violate the law.'" *Bellatoni v. Lamont*, 2023 WL 8889516, at *1 (2d. Cir. Dec. 26, 2023) (citing *Mullenix*, 577 U.S. at 12); *see Mara*, 921 F.3d at 69 (citing *Ashcroft v. al-Kidd*, 563 U.S. at 743 (quoting *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986)). Based upon the undisputed facts in this case, Green cannot be characterized as an incompetent public official who knowingly violated clearly established First or Fourteenth Amendment precedent. For this reason, the decision of the District Court denying Defendant Michael C. Green qualified immunity on Plaintiff's claims under the First and Fourteenth Amendments to the United States Constitution should be reversed.

Dated: January 3, 2024

GIRVIN & FERLAZZO, P.C.

By: _____

Scott P. Quesnel Esq.
*Attorneys for Defendant-Appellant*
*Michael C. Green*
Office and P.O. Address
20 Corporate Woods Blvd.
Albany, New York 12211
(518) 462-0300

# CERTIFICATION OF COMPLIANCE

I, Scott P. Quesnel, hereby certify that the within Brief of Defendant-Appellant Michael C. Green was prepared on a computer, using a Times New Roman font in 14 point typeface and was produced in double space. The brief consists of 13,591 words and is in compliance with Fed. R. App. P 32(a)(5) and 32(a)(6).

Dated: January 3, 2024

_____
Scott P. Quesnel Esq.
Girvin & Ferlazzo, P.C.
*Attorneys for Defendant-Appellant*
*Michael C. Green*
Office and P.O. Address
20 Corporate Woods Blvd.
Albany, New York 12211
(518) 462-0300

# SPECIAL APPENDIX

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**GINA L. BIANCHI,**

                           **Plaintiff,**

          **v.**

**MICHAEL C. GREEN et al.,**

                       **Defendants.**
_____

                                  **1:18-cv-619**
                                  **(GLS/DJS)**

**APPEARANCES:**

**FOR THE PLAINTIFF:**
Bailey, Johnson & Peck, P.C.
5 Pine West Plaza, Suite 507
Washington Avenue Extension
Albany, NY 12205

**FOR THE DEFENDANTS:**
*Michael C. Green*
Girvin & Ferlazzo, P.C.
20 Corporate Woods Boulevard
Albany, NY 12211-2350

*John Czajka*
Nixon, Peabody Law Firm
677 Broadway
10th Floor
Albany, NY 12207

1300 Clinton Square
Rochester, NY 14604-1792

*John Doe #1-4; Jane Roe #1-4*

**OF COUNSEL:**

JOHN W. BAILEY, ESQ.
CRYSTAL R. PECK, ESQ.

PATRICK J. FITZGERALD, III,
ESQ.
SCOTT P. QUESNEL, ESQ.

TINA E. SCIOCCHETTI, ESQ.
ANDREW C. ROSE, ESQ.
ERIN HUNTINGTON, ESQ.

TODD R. SHINAMAN, ESQ.

NO APPEARANCE

**Gary L. Sharpe**
**Senior District Judge**

## MEMORANDUM-DECISION AND ORDER

### I. Introduction

Plaintiff Gina L. Bianchi brought this action against Michael C. Green,

John Czajka, and several John Doe and Jane Roe defendants pursuant to

42 U.S.C. § 1983 for violations of the First and Fourteenth Amendments

and for violations of the New York State Human Rights Law (NYSHRL).

(Am. Compl., Dkt. No. 76 at 1-2.[1])  Green and Czajka have each moved for

summary judgment on all claims against them.  (Dkt. Nos. 188, 191.)  For

the reasons that follow, Czajka's motion is granted, Green's motion is

granted in part and denied in part, and the John Doe and Jane Roe[2]

defendants are dismissed.

---

[1]  Citations are to the pagination generated by CM/ECF, the Court's
electronic
filing system.

[2]   The John Doe and Jane Roe defendants have yet to be identified
by Bianchi, and, thus, are hereby dismissed from the action. *See Sachs v.
Cantwell*, No. 10 Civ. 1663, 2012 WL 3822220, at *10 (S.D.N.Y. Sept. 4,
2012) ("The Court dismisses John Doe [defendants] from the case without
prejudice for failure to prosecute, as [p]laintiff did not identify the John Doe
[d]efendants by the end of discovery.").

## II. __Background__

### A.   __Facts__[3]

Bianchi has been employed by New York State for over twenty-seven years, and, at all times relevant, was serving as Special Counsel at the Division of Criminal Justice Services (DCJS).  (Green's Statement of Material Facts (SMF) ¶¶ 6, 16, Dkt. No. 188, Attach. 26; Czajka's SMF     ¶ 1, Dkt. No. 191, Attach. 21.)  As Special Counsel, Bianchi reported directly to Green, Executive Deputy Commissioner for DCJS and was required to work closely with Green as an advisor in various DCJS matters.  (Pl.'s Counter SMF ¶ 6, 17 , Dkt. No. 195, Attach. 33.)  At all times relevant, Czajka was the Deputy Commissioner and Counsel for DCJS.  (Green's SMF ¶ 14.)

In 2012, Brian Gestring was hired to serve as Director of the Office of Forensic Services (OFS), a division within DCJS for which Green was

_____

[3]   Unless otherwise noted, the facts are not in dispute.

responsible overseeing.  (*Id*. ¶¶ 4, 10.)  At some point after Gestring was

hired, "a concern" was raised regarding offensive statements Gestring

made in the workplace.  (*Id.* ¶ 11.)  The concern was investigated and

Gestring was issued two letters of counsel regarding his statements.  (*Id.* ¶

12.)  Both letters of counsel were signed by Bianchi and Green.  (*Id*.    ¶

13.)

In May 2017, an issue with a DNA record created by an OFS

employee was raised with DCJS and DCJS self-reported the issue to the

New York State Office of the Inspector General (OIG).  (*Id*. ¶¶ 19-21.)  OIG

began investigating the DNA record issue and, at one point, expanded

their investigation to look at matters in OFS beyond that issue, which

included Gesting's behavior in the workplace.  (*Id.* ¶¶ 22-23.)  On or about

July or August 2017, Bianchi was asked to participate in an interview with

OIG as a part of their investigation and Bianchi advised Green that she

was going to participate in the interview.  (*Id*. ¶¶ 25-26.)  Bianchi met with

two OIG investigators on August 3, 2017, who informed her that her

testimony was not compelled.  (*Id.* ¶ 27.)  Bianchi's recorded testimony

lasted one hour and fifteen minutes, although Bianchi asserts that she also

engaged in off-the-record discussions before and after the recording.  (*Id*. ¶

30; Pl.'s Counter SMF ¶ 30.)  Bianchi was not the only DCJS employee,

including past and current employees, interviewed in conjunction with the

OIG investigation.  (Green's SMF ¶ 38.)

During her testimony, Bianchi was asked about her working

relationship with Gestring and any knowledge she had regarding

allegations against him.  (Pl.'s Counter SMF ¶¶ 10-11, 14.)  Bianchi

testified that when Gestring was hired in 2012 she was his supervisor but

felt that Gestring "ha[d] a problem reporting to women," and had made

"inappropriate" comments about pubic hair.  (Dkt. No. 195, Attach. 18 at

10:6-11:23.)  Bianchi testified that, eventually, Gestring was placed under

the supervision of another male employee to avoid further issues.  (*Id*.

21:23-22:8.)  Bianchi also testified that she had heard from two other

female employees within DCJS that had made complaints against Gestring

for inappropriate comments and threats, and that management and human

resources ignored these complaints.  (*Id.* at 15:25-16:18.)  Additionally,

Bianchi stated that, in her perception, Gestring preferred to hire younger

female employees while pushing out older female employees.  (*Id.* at

48:22-49:25.)  At a few points throughout her testimony, Bianchi mentioned

that some of the information she was testifying to was heard through "the

5

rumor mill" at work.  (*Id*. at 17:12, 52:5, 60:7.)

At the conclusion of the investigation, OIG informed Green and Czajka that in addition to investigating the DNA record issue, OIG was concerned about the work atmosphere and the potential risk of litigation within DCJS.  (Green's SMF ¶ 35.)  In response, Green directed Affirmative Action Officer Sandra Van Kampen to conduct an internal investigation into workplace atmosphere.  (*Id.* ¶ 41.)  Green also asked OIG for the recordings of their interviews with DCJS employees, and after several requests, including requests made by Czajka, OIG sent Green the interview recordings of some of the DCJS employees, which included Bianchi's testimony.  (*Id.* ¶¶ 39, 45-46, 50.)  Sometime prior to December 5, 2017, Green listened to Bianchi's testimony and was concerned with the way in which Bianchi conducted herself during the interview, including volunteering information she was not directly asked about, sharing information she heard through "the rumor mill," and stating things like "totally off the record" when she knew she was testifying under oath.  (*Id*. ¶¶ 56-59.)  Bianchi disputes this narrative, asserting Green was only concerned with her testimony because it painted DCJS in a negative light. (Pl.'s SMF ¶ 58.)

6

On December 5, 2017, Green held a meeting with Bianchi to review her testimony.  (*Id*. ¶ 56.)  Prior to his meeting with Bianchi, Green directed Czajka to review the testimony and point out areas of litigation concern for DCJS.  (Czajka's SMF ¶ 51.)  Bianchi disputes the purpose of Czajka's review of her testimony, asserting its purpose was to criticize her.  (Pl.'s Response to Czajka's SMF, Dkt. 195, Attach. 34 ¶ 51.)  Additionally, prior to Green's meeting with Bianchi and at Green's direction, Czajka contacted the Office of the Governor of the State of New York to inquire about any legal concerns if DCJS removed Bianchi as Special Counsel.  (*Id.* ¶ 48.)  During the December 5 meeting, Green questioned Bianchi about her testimony, including the factual basis for certain statements and the speculative nature of her testimony.  (*Id.* ¶¶ 56-63.)  Green also inquired why Bianchi had not reported certain serious issues to which she testified to, directly to him or other management.  (Green's SMF ¶¶ 68-71, 83.[4])  While Green contends that Bianchi admitted that some of her testimony did not have a factual basis or that statements she gave were based on

---

[4]  Bianchi asserts that, in the December 5 meeting, she told Green that she had previously reported these issues and that Green instructed her to not get involved.  (Pl.'s Response to Czajka's SMF, Dkt. No. 195, Attach. 34 ¶ 56.)

speculation, (*id.* ¶¶ 88-90),  Bianchi disputes this characterization of the meeting, asserting that she explained that she had advised OIG when she was speculating or did not have firsthand knowledge.  (Pl.'s Response to Green's SMF, Dkt. No. 195, Attach 35    ¶¶ 88-90.)  Approximately forty-five minutes after the December 5 meeting, Bianchi met with Green a second time wherein Green advised her that she was being demoted from the position of Special Counsel.  (*Id.*, Attach. 33 ¶ 68.)

## B.   Procedural History

Bianchi filed her original complaint on May 25, 2018, (Compl., Dkt. No. 1), and Green, Czajka, and two other named defendants moved to dismiss, (Dkt. Nos. 28, 30, 32, 36).  Bianchi then cross-moved to amend her complaint.  (Dkt. No. 58.)  In March 2019, this court granted Green and Czajka's motions to dismiss in part and denied in part and granted Bianchi's motion to amend her complaint.  (Dkt. No. 75.)  The claims against the other named defendants were dismissed.  (*Id.*; Dkt. No. 185.)

## III.  Standard of Review

The standard of review under Fed. R. Civ. P. 56 is well settled and will not be repeated here.  For a full discussion of the governing standard, the court refers the parties to its prior decision in *Wagner v. Swarts*, 827 F.

Supp. 2d 85, 92 (N.D.N.Y. 2011), *aff'd sub nom. Wagner v. Sprague*, 489

F. App'x 500 (2d Cir. 2012).


# IV.  Discussion

## A.    First Amendment Retaliation

Green and Czakja both argue that Bianchi's speech was not

protected because she was speaking on matters regarding her personal

situation and grievances, and because she was required to testify to OIG

pursuant to New York Executive Law, and, therefore, was speaking

pursuant to her official job duties.  (Dkt. No. 188, Attach. 25 at 12-17; Dkt.

No. 191, Attach. 20 at 12-15.)  Alternatively, Green and Czajka contend

that, even if Bianchi's speech was protected, her removal from her position

of Special Counsel was not due to a retaliatory motive but rather to the

nature in which she conducted herself during the interview with OIG, the

potential disruption her speech could have caused within DCJS, and the

fact that she testified not reporting information she was required to report.

(Dkt. No. 188, Attach. 25 at 17-22; Dkt. No. 191, Attach. 20 at 15-17.)

Czajka further argues that Bianchi's First Amendment claim against him

should be dismissed because he was not personally involved in the

9

adverse action against Bianchi nor did he hold any retaliatory animus. (Dkt. No. 191, Attach. 20 at 7-11.)

Bianchi counters that her testimony was not required pursuant to New York Executive Law because she was not reporting information concerning "corruption, fraud, criminal activity, conflicts of interest or abuse by another state officer or employee relating to his or her office or employment," nor did her speech otherwise relate to the performance of her official duties because she no longer supervised or worked directly with Gestring.  (Dkt. No. 195, Attach. 37 at 2-7.)  Additionally, Bianchi argues that her speech was a matter of public concern because she was testifying about complaints of harassment within DCJS from other employees that were never addressed, as well as age and gender discrimination.  (*Id.*) Bianchi further maintains that her removal from the position of Special Counsel was not justified and that any non-retaliatory reasoning proffered by defendants is pretext because the record demonstrates through meeting notes and deposition testimony that the real reason Bianchi was terminated was because her testimony "painted the agency in a negative light." (*Id.* at 8-10.)  Finally, Bianchi argues that Czajka was personally involved in the adverse action against her because he provided that basis

for her termination to Green when Czajka reviewed and took notes on Bianchi's testimony at Green's direction.  (*Id.* at 10-11.)

To survive summary judgment on a First Amendment retaliation claim, a public employee must "bring forth evidence showing that [s]he has engaged in protected First Amendment activity, [s]he suffered an adverse employment action, and there was a causal connection between the protected activity and the adverse employment action."  *Dillon v. Morano*, 497 F.3d 247, 251 (2d Cir. 2007) (citation omitted).  The standard for assessing whether a public employee's speech was protected speech under the First Amendment involves "two inquiries: (1) 'whether the employee spoke as a citizen on a matter of public concern' and, if so, (2) 'whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public.'"  *Ruotolo v. City of New York*, 514 F.3d 184, 188 (2d Cir. 2008) (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006)).

Whether an employee's speech addresses a matter of public concern is a question of law for the court to decide, and it should consider the content, form, and context of the speech in light of the record as a whole.  *See Lewis v. Cowen*, 165 F.3d 154, 163 (2d Cir.1999) (citing *Connick v.*

11

*Myers*, 461 U.S. 138, 147-48, n.7 (1983)).  Central to this assessment is whether the employee's speech was "calculated to redress personal grievances or whether it had a broader public purpose."  *Lewis*, 165 F.3d at 163-64.  Exposure of governmental misconduct is often considered a matter of considerable concern to the public.  *See Jackler v. Byrne*, 658 F.3d 22, 236 (2d Cir. 2011).  However, speech made pursuant to a public employee's job duties is not protected under the First Amendment, even when speaking on a matter of public concern.  *See Weintraub v. Bd. of Educ. of City School Dist. of City of N.Y.*, 593 F.3d 196, 201-02 (2d Cir. 2010).  Speech made pursuant to a public employee's job duties is "'speech that owes its existence to a public employee's professional responsibilities.'"  See *id*. at 201 (quoting *Garcetti*, 547 U.S. at 421).  The inquiry into whether speech was made pursuant to an employee's official job duties is "a practical one," focused on whether the speech "was part-and-parcel of h[er] concerns about h[er] ability to properly execute h[er] duties."  *Id*. at 202-03 (internal quotation marks and citations omitted).  The Second Circuit has found that where a state employee was required to, under New York State Executive Law       § 55, report for OIG "any information concerning corruption, fraud, criminal activity, conflicts of

interest or abuse by another state officer or employee relating to his or her office or employment," then such speech is not protected because it relates to the state employee's official duties. *D'Olimpio v. Crisafi*, 462 F. App'x. 79, 80 (2d Cir. 2012) (quoting N.Y. Exec. L. § 55(1)).

Summary judgment may still be granted where the plaintiff can make out a prima facie case for retaliation, if the employer can demonstrate that "it would have taken the same adverse action in the absence of the protected speech." *Anemone v. Metro. Transp. Auth.*, 629 F.3d 97, 114-15 (2d Cir. 2011) (citation omitted). Additionally, an employer will not be held liable for First Amendment retaliation against a public employee for speech on matters of public concern if the employee's speech was likely to cause a disruption, provided: "(1) the employer's prediction of the disruption that such speech will cause is reasonable; (2) the potential for disruption outweighs the value of the speech; and (3) the employer took the adverse employment action not in retaliation for the employee's speech, but because of the potential for disruption." *Id*. (quoting *Johnson v. Ganim*, 342 F.3d 105, 114 (2d Cir. 2003); *see Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968).

Turning first to Czajka's argument regarding personal involvement,

13

there is no evidence that demonstrates Czajka, who did not have authority to hire or fire Bianchi, was personally involved in Bianchi's termination. Czajka's involvement in Bianchi's termination was limited to one e-mail he provided to Green, at Green's direction, after reviewing Bianchi's testimony and taking notes on potential areas from her testimony that posed a threat of litigation, and contacting the Governor's office about any objections they had to terminating Bianchi as Special Counsel.  (Dkt. No. 191, Attach. 21 ¶¶ 33-36.)  There record is devoid of proof that Czajka had any knowledge of a retaliatory motive from anyone in DCJS with authority to terminate. Even if Czajka was aware of a retaliatory motive from Green, that knowledge is insufficient to establish personal involvement.  *See Zdziebloski v. Town of East Greenbush*, 336 F. Supp. 2d 194, 202 (N.D.N.Y. 2004).  Moreso, although Czajka testified to having conversations with Green and Van Kampen regarding Van Kampen's workplace investigation, Czajka's role in Bianchi's termination was limited to providing legal advice to Green, as was his duty as Deputy Commissioner and Counsel for DCJS, which is insufficient to find personal involvement for Section 1983 claims.  *See id*.; *33 Seminary LLC v. City of Binghamton*, 120 F. Supp. 3d 223, 257 (N.D.N.Y. 2015).  Additionally,

14

Czajka testified that he did not know of Green's final decision to terminate

Bianchi until after it occurred and that his knowledge of Green's December

5 meeting with Bianchi was to determine the basis for which Bianchi made

her statements to OIG and that there was a possibility of termination but no

decision had been made prior to the December 5 meeting.  (Dkt. No. 191,

Attach. 6, at 226:14-19.)  Because he has established a lack of personal

involvement and Bianchi has failed to demonstrate that a triable issue of

fact exists regarding the same, the claim against Czajka must be

dismissed.

Turning next to whether Bianchi's speech was protected, defendants

have not met their burden.  First, Bianchi was testifying to complaints of

harassment that allegedly went ignored by OFS and DCJS management.

Moreover, Bianchi's testimony did not relate to her own personal situation

or personal grievances, in fact, she was testifying about complaints made

by other female employees against Gestring within DCJS and OFS.  While

Bianchi did testify to her experience working with Gestring and her

personal perception that he was a "misogynist," the content, form, and

context of the speech in light of the record as a whole demonstrates that

she was not airing out person grievances but testifying to a pattern of

complaints of harassment going unaddressed by state officials.  Ultimately, Bianchi was relaying that she had heard of complaints of harassment within DCJS that were never addressed, which can be considered misconduct by government officials and a matter of considerable concern to the public.  *See Jackler*, 658 F.3d at 236.

While New York State Executive Law § 55(1) mandates state employees to report "any information concerning corruption, fraud, criminal activity, conflicts of interest or abuse by another state officer or employee relating to his or her office or employment," the court is unaware of and the parties have not identified any legal precedent for finding that this section of New York Executive Law covers general employee misconduct.  In fact, courts that have dealt with this issue have been careful to refer to the enumerated categories within the statute, rather than general misconduct. *See D'Olimpio*, 462 F. App'x at 80; *Rusk v. N.Y. State Thruway Auth.*, 37 F. Supp. 3d 578, 584 (W.D.N.Y. 2014).  Moreover, unlike cases where an employee suffers adverse action for reporting misconduct within his or her department to a supervisor, management, or to a union representative, Bianchi was testifying to misconduct within OFS, and DCJS by extension, to an external office that contacted her and informed her that her testimony

16

would be voluntary.  *See Matthews v. City of New York*, 779 F.3d 167, 174

(2d Cir. 2015); *Weintraub*, 593 F.3d at 203; *Cirencione v. County of*

*Ontario*, 21-CV-6615, 2022 WL 2067754, at *6 (W.D.N.Y. Jun. 8, 2022).

Accordingly, defendants have not established their entitlement to summary

judgment with respect to whether Bianchi's speech was protected.

Finally, issues of fact preclude summary judgment with respect to

causation and the rationale for terminating Bianchi as Special Counsel.  Of

note is the fact that OIG concluded in their investigation, which involved

interviewing current and past employees, that there were concerns

regarding the work atmosphere at DCJS and Van Kampen's internal

investigation revealed that two employees had fear of Gestring and

retaliation from him.  (Green's SMF ¶ 38, 41; Dkt. No. 195, Attach 23 at 6,

22, 31.)  Although Van Kampen's investigation concluded that Gestring

was not "creating an atmosphere of fear and intimidation," Bianchi's

testimony is, in part, corroborated by Van Kampen's report about individual

employees' complaints with Gestring.  (Dkt. No. 195, Attach. 23.)  In other

words, there is some support for Gestring's involvement in workplace

climate issues, although not every DCJS or OFS employee had issues with

him.  Green's proffered reasons for demoting Bianchi include, among other

things, that he could no longer trust her after giving testimony under oath that was not based on personal knowledge and not offering information unless directly asked.  (Dkt. No. 188, Attach. 26      ¶¶ 94-98.)  Despite arguments that Bianchi's testimony posed the risk of having a potential disruption to the daily functions of DCJS, (Dkt. No. 188, Attach. 25 at 17-23), the fact that there is some corroboration for Bianchi's testimony regarding complaints made about Gestring, cuts against granting summary judgment in Green's favor.  *See Jackler*, 658 F.3d at 237 ("[I]f the allegations of internal misconduct are indeed true, [the employee's] statements could not have adversely affected the proper functioning of the department since the statements were made for the very reason that the department was not functioning properly.") (citation and emphasis omitted).

Additionally, comparing Bianchi's testimony to Van Kampen's notes from the December 5 meeting highlights some inconsistences within Green's provided rationale for demoting Bianchi.  Specifically, that Green took issue with Bianchi not reporting alleged threats made by Gestring, which occurred after Green told her to stay out of workplace issues involving Gestring, and shows inconsistencies with Green's reasons for

terminating her because, according to Bianchi, she reported Gestring's threats to Green.  (Dkt. No. 188, Attach. 19 at 3; Dkt. No. 195, Attach. 32 ¶ 63.)  Van Kampen's notes also indicate that Bianchi expressed that she believed she was asked for opinion testimony, which she answered based on personal observations and information relayed to her by other employees, including the two female employees who had filed complaints against Gestring, while, on the other hand, Green characterized many of these statements as "inaccurate" and "painted a certain picture" of DCJS. (Dkt. No. 188, Attach. 19 at 4.)  Because Bianchi's testimony is, at least, in part, corroborated by statements made to Van Kampen during her workplace investigation and because there are weaknesses in Green's rationale for terminating Bianchi, a reasonable juror could infer that the explanation provided by Green was pretext for retaliation, and viewing the evidence in the light most favorable to Bianchi, summary judgment is not appropriate.

**B.**   **Equal Protection Retaliation**

Green and Czajka each contend that Bianchi did not complain of or otherwise oppose discrimination in her testimony to OIG.  (Dkt. No. 188, Attach. 25 at 26-33; Dkt. No. 191, Attach. 20 at 18-19.)  Additionally, Green

asserts that Bianchi has failed to demonstrate that any speech she made with respect to discrimination was the but-for cause of her termination as Special Counsel.  (Dkt. No. 188, Attach. 25 at 30-33.) Czajka further argues that, as with Bianchi's claim under the First Amendment, he was not personally involved in the deprivation under the Fourteenth Amendment.  (Dkt. No. 191, Attach. 20 at 18-19.)  Bianchi counters that she was testifying to issues within OFS regarding gender and age discrimination as well as harassment.  (Dkt. No. 195, Attach. 37 at 16-17.) Bianchi also maintains that the temporal proximity of her speech and the adverse action as well as "weaknesses" in Green's explanations for her termination are sufficient to defeat summary judgment.  (*Id*. at 17-19.)

The elements of a retaliation claim based on an equal protection violation under § 1983 mirror those under Title VII, as do retaliation claims under New York State Human Rights Law: "(1) defendants acted under the color of state law, (2) defendants took adverse employment action against [the plaintiff], (3) because [s]he complained of or otherwise opposed discrimination."  *See Vega v. Hempstead Union Free School Dist.*, 801 F.3d 72, 91 (2d Cir. 2015); *Reed v. A.W. Lawrence & Co.,* 95 F.3d 1170, 1177 (2d Cir. 1996).  For retaliation under the Fourteenth Amendment, a

plaintiff engages in a protected activity if she "oppose[s] any practice made an unlawful employment practice by Title VII, or make[s] a charge, testifie[s], assist[s], or participate[s] in any manner in an investigation, proceeding, or hearing under Title VII."  *Stoutenger v. City of Fulton*, 605 F. Supp. 3d 432, 459 (N.D.N.Y. 2022) (analyzing a claim for retaliation in violation of the Equal Protection Clause under the same framework as Title VII retaliation claims) (internal quotation marks and citations omitted).  "The causal connection needed for proof of a retaliation claim can be established indirectly by showing that the protected activity was closely followed in time by the adverse action."  *Cifra v. G.E. Co.*, 252 F.3d 205, 217 (2d Cir. 2001) (internal quotation marks and citation omitted).

Turning first to Czajka's involvement.  For the reasons articulated above, *see supra* Section IV.A, Bianchi's claim against Czajka is entitled to summary judgment.

Next, with respect to Green's argument that Bianchi was not complaining of or opposing discrimination, the court disagrees.  Bianchi's testimony included several instances of Gestring having difficulty reporting to female management, preferring to hire younger, female employees, and making threats to female employees, as well as comments of a sexual

21

nature.  (*See generally* Dkt. No. 195, Attach. 18.)  Moreover, Bianchi had

previously reported some of these incidents but was directed by Green to

"stay out of [it]."  (Pl.'s Counter SMF ¶ 63.)  While Green appears to argue

that her statements do not invoke the Equal Protection Clause, neither

defendant points to any legal authority to indicate that such statements,

after having previously raised the issue to higher management like Green,

do not qualify as complaining of or otherwise opposing age or gender

discrimination.

Turning to the causal relationship between Bianchi's testimony and

the adverse action, the temporal proximity is sufficient to establish a prima

facie case.  Green has offered a non-retaliatory reason for Bianchi's

demotion, however, as discussed above, *see supra* Section IV.A, the

inconsistencies and weaknesses in Green's reasons for doing so create an

issue of fact with respect to whether Green had a retaliatory motive, and,

therefore, summary judgment is precluded.  *See Zann Kwan v. Andalex*

*Grp. LLC*, 737 F.3d 834, at 845 (2d Cir. 2013) ("A plaintiff may prove that

retaliation was a but-for cause of an adverse employment action by

demonstrating weaknesses, implausibilities, inconsistencies, or

contradictions in the employer's proffered legitimate, nonretaliatory reasons

for its action.  From such discrepancies, a reasonable juror could conclude

that the explanations were a pretext for a prohibited reason.").

**C.    New York State Law Claims**

Green and Czajka argue that Bianchi's claims pursuant to N.Y.

Executive Law § 296(1) and (6) must be dismissed against them because

the New York State Court of Appeals determined in *Doe v. Bloomberg*, 36

N.Y.3d 450 (2021), that as individuals, they cannot be held liable as an

employer under New York law.  (Dkt. No. 188, Attach. 25, at 34-35; Dkt.

No. 191, Attach. 20 at 19-20.)  Green and Czajka also contend that they

cannot be held liable for aiding and abetting retaliation under NYSHRL

because Bianchi cannot establish liability on behalf of the

principal/employer because she did not bring suit against DCJS.  (*Id*.)

Bianchi maintains that the holding in *Boomberg* only addressed vicarious

liability of supervisors and has no impact on holding Green and Czajka

liable as individuals.  (Dkt. No. 195, Attach. 37 at 19-24.)  Alternatively,

Bianchi argues that, in the event the court agrees with Green and Czajka

about the holding in *Bloomberg*, the court "should permit [her] [c]omplaint

to be deemed amended" to add a cause of action arising out to N.Y.

Executive Law § 296(7)[5], (*Id*. at 23), a request Green and Czajka oppose

on numerous grounds including prejudice, futility, and failure to comply with

procedural rules.  (Dkt. No. 200, Attach. 7 at 4-5; Dkt. No. 204, Attach. 2 at

11, n.11.)

In *Doe v. Bloomberg*, the Court of Appeals held that individual

employees are not employers within the meaning of NYSHRL and thus

cannot be held liable for retaliation as employers under Executive Law    §

296(1).  However, under the NYSHRL individuals can be liable for "aid[ing],

abet[ting], incit[ing], compel[ling] or coerc[ing] the doing of" a discriminatory

act.  N.Y. Exec. Law § 296(6).  To hold an individual employee liable for

aiding and abetting retaliation under NYSHRL, the employee must have

actually participated in the conduct giving rise to the claim and the

———————————————

[5]  In her amended complaint, Bianchi alleged a claim for retaliation
pursuant to N.Y. Executive Law § 296(1) which makes it unlawful "[f]or any
employer . . . to discharge . . . any
person because he or she has opposed any practices forbidden under this
article or because he or she has filed a complaint, testified or assisted in
any proceeding."  (Am. Compl., Dkt. No. 76 ¶¶ 120-21.) Alternatively,
Bianchi asserts an aider and abettor claim pursuant to N.Y. Executive Law
§ 296(6).  (*Id.* ¶ 121.)  Bianchi now appears to seek to amend her
complaint for a second time to include claims under N.Y. Executive Law §
296(7), which makes it unlawful "for any person engaged in any activity to
which [Executive Law § 296] applies to retaliate or discriminate against
any person because he or she has opposed any [unlawful] practices. . . or
because he or she has filed a complaint, testified or assisted in any
proceeding."

employer's conduct must also be found retaliatory.  *See Farmer v. Shake Shack Enters.*, *LLC*, 473 F. Supp. 3d 309, 337 (S.D.N.Y 2020).  A plaintiff may succeed on a claim under the NYSHRL by showing the employer "encouraged, condoned, or approved the discriminatory conduct of a sole employee—the same discriminatory conduct which then, perhaps 'circular[ly]', proves individual liability under the aiding and abetting provision of Section 296(6)." *Johnson v. County of Nassau*, 82 F. Supp. 3d. 533, 537 (S.D.N.Y. 2015) (citing *Lewis v. Triborough Bridge & Tunnel Auth.*, No. 97 Civ. 0607, 2001 WL 46986, at \*2 (S.D.N.Y. Jan. 18, 2001) (citations omitted), *aff'd*, 31 F. App'x. 746 (2d Cir. 2002). Additionally, where retaliation can be imputed to the employer, an individual employee can be held liable for aiding and abetting under NYSHRL "regardless of whether his actions form the basis for [his employer's] liability in the first instance." *Boston v. Taconic Mgmt.*, No. 12–CV–4077, 2014 WL 4184751, at \*2 n.9 (S.D.N.Y. Aug. 22, 2014).  Courts have found that, under NYSHRL, a sufficient basis for imputing liability on to the employer can be found where a supervisor is involved in the complained of conduct.  *See Accely v. Consol. Edison Co. of N.Y., Inc.*, 19 Civ. 5984, 2022 WL 973415, at \*5 (S.D.N.Y. Mar. 31, 2022).

25

Regarding Bianchi's arguments with respect to the applicability of the Court of Appeal's decision in *Doe v. Bloomberg* to the matter at hand, the court agrees with Green and Czajka's interpretation that they are not employers within the meaning of NYSHRL and thus cannot be held liable for retaliation as employers under Executive Law § 296(1).  However, Bianchi may still have a claim, pursuant to Executive Law § 296(6), for aiding and abetting retaliation against Green and Czajka, which allows for a finding of individual liability for individuals who do not qualify as employers but actually participated in the retaliation.  *See Lore v. City of Syracuse*, 670 F.3d 127, 169 (2d Cir. 2012).  Here, Bianchi did not bring suit against DCJS or New York State and there is a split within the district courts within the Second Circuit about whether an individual can be liable for aiding and abetting when the principal/ employer is either not a party to the suit or immune from suit.  *See Bonaffini v. City Univ. of N.Y.*, 20-cv-5118, 2021 WL 2895688, at *3 (N.D.N.Y. Jul. 9, 2021) (collecting cases). The Second Circuit has not specifically addressed this issue, however, the court is inclined to follow the holding in *Bonaffini*, which held that "dismissal of the cause of action against the principal/employer warrants dismissal of the derivative, aiding and abetting cause of action only where the dismissal

against the employer/principal was on the merits." *Bonaffini*, 2021 WL

2895688, at *3 (internal quotation marks, citations, and emphasis omitted);

*see Lamere v. N.Y. State Office of the Aging,* No. 03-CV-356, 2005 WL

1174068, at *14-15 (N.D.N.Y. Apr. 27, 2005).

The court ultimately finds that Bianchi's claim under Executive Law §

296(6) against Green survives because the very basis for Bianchi's claims

here are Green's alleged retaliatory actions and, although Green cannot be

held liable as an employer under NYSHRL § 296(1), he can still individually

be held liable for aiding and abetting retaliation.  Moreover, for Green, as

Bianchi's supervisor and an individual involved in the alleged conduct,

liability can be imputed on to DCJS, meaning liability for aiding and

abetting retaliation can "circularly" be imputed on to Green.  Because

Bianchi has clearly adduced evidence that her NYSHRL claim stems from

Green's decision to demote her with a retaliatory motive, and because

Green was her supervisor and his actions can be imputed to the employer,

the claim pursuant to NYSHRL § 296(6)[6] against Green survives summary

---

[6]  To the extent that Bianchi seeks to amend her amended complaint
to articulate claims pursuant to NYSHRL § 296(7), she has not complied
with the Local Rules of Practice with respect to filing a motion to amend,
as she has not filed proposed amendments and, therefore, such motion is
denied.  *See* N.D.N.Y. L.R. 15.1(a),(b).

judgment. However, Bianchi's claim pursuant to Executive Law § 296(1) must be dismissed, in accordance with Bloomberg, as a matter of law.

Much like Bianchi's claims against him under Section 1983, summary judgment is granted with respect to Bianchi's NYSHRL claims against Czajka because he was not involved with the decision to demote Bianchi beyond giving some legal adive to Green and being appraised of the status of Van Kampen's investigation. *See Doran v. N.Y. State Dept. of Health Office of Medicaid Inspector Gen.*, 2017 WL 836027, at *13 (S.D.N.Y. Mar. 2, 2017) ("Retaliation claims under the NYSHRL are construed pursuant to the same standards at its federal counterparts, including Title VII and 1983.")

**D.  Qualified Immunity**

Green seeks qualified immunity on Bianchi's Section 1983 claims against him because his conduct did not violate clearly established law as of December 2017 because there is no Supreme Court or Second Circuit precedent holding that Green's actions violated the First or Fourteenth Amendments. (Dkt. No. 188, Attach. 25 at 23-26,33.) Bianchi maintains that she has established issues of fact that preclude summary judgment on qualified immunity grounds because she has adduced evidence that a

28

reasonable juror could find that Green had a retaliatory motive which caused Bianchi's termination, which would be a violation of clearly established law against retaliation.  (Dkt. No. 195, Attach. 37 at 11-15.)

Government officials are entitled to qualified immunity on Section 1983 claims "unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012).  A government official defendant is entitled to summary judgment on qualified immunity grounds

> if [he] adduce[s] sufficient facts [such] that no reasonable jury, looking at the evidence in the light most favorable to, and drawing all inferences most favorable to, the plaintiffs, could conclude that it was objectively unreasonable for the defendant[] to believe that he was acting in a fashion that did not clearly violate an established federally protected right.

*Hartline v. Gallo*, 546 F.3d 95, 102 (2d Cir. 2008) (internal quotation marks and citations omitted).  "Clearly established means that, at the time of the offic[ial]'s conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful."  *Wesby*, 138 S. Ct. at 589 (internal quotation marks and citations omitted).

Viewing the facts in the light most favorable to Bianchi, there exist

questions of fact with respect to Green's motive for terminating her as Special Counsel.  As discussed above, *see supra* Section IV.A; Section IV.B, a reasonable juror could conclude that Green's provided reason for Bianchi's termination was pretext for retaliation and, as such, the court must deny summary judgment to Green[7] on qualified immunity grounds.

**E.    Czajka's Request for Attorney's Fees**

Czajka seeks attorneys fees under 42 U.S.C. § 1998(b) because Bianchi's claims against Czajka were frivolous and she "should have known . . . that Czajka did not take adverse action against her, had no motive to retaliate against her, and acted . . . solely and properly in his role as General Counsel."  (Dkt. No. 195, Attach. 20 at 23-24.)  Bianchi opposes the request for attorneys fees, arguing that Czajka's request for attorneys fees "is designed to intimidate and chill free speech" and her claims against Czajka were not frivolous given the record evidence of his role in requesting her testimony from OIG and commenting on her testimony. (Dkt. No. 195, Attach. 37 at 24-25.)

"In any action or proceeding to enforce a provision of section. . .

---

[7]  Czajka also argued for summary judgment on qualified immunity grounds, however, because no claims against him survive, the court need not address whether Czajka's conduct in the constitutional violation was objectively unreasonable.

1983. . . , the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs." 42 U.S.C. § 1988(b).  A plaintiff should not be assessed attorneys fees unless there is "a finding that the plaintiff's action was frivolous, unreasonable or without foundation, even though the action was not brought in subjective bad faith."  *Christiansburg Garment Co. v. Equal Emp't Opportunity Comm'n*, 434 U.S. 412, 422 (1978).

Although the court has granted Czajka's motion with respect to all of Bianchi's claims against him because there was a lack of evidence to support his involvement, Bianchi's claim was not frivolous such than an award of attorneys fees would be warranted.  *See Sista v. CDC Ixis North America, Inc.*, 445 F.3d 161, 178 (2d Cir. 2006).  Accordingly, the court, in its discretion, denies Czajka's request for attorneys fees.

## V.  Conclusion

**WHEREFORE**, for the foregoing reasons, it is hereby

**ORDERED** that Czajka's motion for summary judgment (Dkt. No. 191) is **GRANTED**; and it is further

**ORDERED** that Green's motion for summary judgment (Dkt. No. 188) is **GRANTED IN PART** and **DENIED IN PART** as follows:

**GRANTED** as to Bianchi's claim under N.Y. Executive Law   §
296(1); and

**DENIED** in all other aspects; and it is further

**ORDERED** that the John Doe and Jane Roe defendants are

**DISMISSED** from this case; and it is further

**ORDERED** that defendant John Czajka is **DISMISSED** from this

case; and it is further

**ORDERED** that this case is deemed trial ready and a scheduling

order will be issued in due course; and it is further;

**ORDERED** that the Clerk provide a copy of this Memorandum-

Decision and Order to the parties.

**IT IS SO ORDERED.**

August 25, 2023
Albany, New York

Gary L. Sharpe
U.S. District Judge

32

United States Code Annotated
    Constitution of the United States
        Annotated
            Amendment I. Religion; Speech and the Press; Assembly; Petition

U.S.C.A. Const. Amend. I

Amendment I. Establishment of Religion; Free Exercise of Religion; Freedom
of Speech and the Press; Peaceful Assembly; Petition for Redress of Grievances

Currentness

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

<Historical notes and references are included in the full text document for this amendment.>

<For Notes of Decisions, see separate documents for clauses of this amendment:>

<USCA Const Amend. I--Establishment clause; Free Exercise clause>

<USCA Const Amend. I--Free Speech clause; Free Press clause>

<USCA Const Amend. I--Assembly clause; Petition clause>

U.S.C.A. Const. Amend. I, USCA CONST Amend. I
Current through P.L. 118-22. Some statute sections may be more current, see credits for details.

End of Document                                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
 Constitution of the United States
  Annotated
   Amendment XIV. Citizenship; Privileges and Immunities; Due Process; Equal Protection; Apportionment of
   Representation; Disqualification of Officers; Public Debt; Enforcement

U.S.C.A. Const. Amend. XIV

AMENDMENT XIV. CITIZENSHIP; PRIVILEGES AND IMMUNITIES; DUE PROCESS; EQUAL PROTECTION;
APPOINTMENT OF REPRESENTATION; DISQUALIFICATION OF OFFICERS; PUBLIC DEBT; ENFORCEMENT

Currentness

**Section 1.** All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

**Section 2.** Representatives shall be apportioned among the several States according to their respective numbers, counting the whole number of persons in each State, excluding Indians not taxed. But when the right to vote at any election for the choice of electors for President and Vice President of the United States, Representatives in Congress, the Executive and Judicial officers of a State, or the members of the Legislature thereof, is denied to any of the male inhabitants of such State, being twenty-one years of age, and citizens of the United States, or in any way abridged, except for participation in rebellion, or other crime, the basis of representation therein shall be reduced in the proportion which the number of such male citizens shall bear to the whole number of male citizens twenty-one years of age in such State.

**Section 3.** No person shall be a Senator or Representative in Congress, or elector of President and Vice President, or hold any office, civil or military, under the United States, or under any State, who, having previously taken an oath, as a member of Congress, or as an officer of the United States, or as a member of any State legislature, or as an executive or judicial officer of any State, to support the Constitution of the United States, shall have engaged in insurrection or rebellion against the same, or given aid or comfort to the enemies thereof. But Congress may by a vote of two-thirds of each House, remove such disability.

**Section 4.** The validity of the public debt of the United States, authorized by law, including debts incurred for payment of pensions and bounties for services in suppressing insurrection or rebellion, shall not be questioned. But neither the United States nor any State shall assume or pay any debt or obligation incurred in aid of insurrection or rebellion against the United States, or any claim for the loss or emancipation of any slave; but all such debts, obligations and claims shall be held illegal and void.

**Section 5.** The Congress shall have power to enforce, by appropriate legislation, the provisions of this article.

&lt;Section 1 of this amendment is further displayed in separate documents according to subject matter,&gt;

&lt;see USCA Const Amend. XIV, § 1-Citizens&gt;

&lt;see USCA Const Amend. XIV, § 1-Privileges&gt;

<see USCA Const Amend. XIV, § 1-Due Proc>

<see USCA Const Amend. XIV, § 1-Equal Protect>

<sections 2 to 5 of this amendment are displayed as separate documents,>

<see USCA Const Amend. XIV, § 2,>

<see USCA Const Amend. XIV, § 3,>

<see USCA Const Amend. XIV, § 4,>

<see USCA Const Amend. XIV, § 5,>

U.S.C.A. Const. Amend. XIV, USCA CONST Amend. XIV
Current through P.L. 118-22. Some statute sections may be more current, see credits for details.

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
   Title 28. Judiciary and Judicial Procedure (Refs & Annos)
      Part IV. Jurisdiction and Venue (Refs & Annos)
         Chapter 83. Courts of Appeals (Refs & Annos)

28 U.S.C.A. § 1292

§ 1292. Interlocutory decisions

Currentness

**(a)** Except as provided in subsections (c) and (d) of this section, the courts of appeals shall have jurisdiction of appeals from:

**(1)** Interlocutory orders of the district courts of the United States, the United States District Court for the District of the Canal Zone, the District Court of Guam, and the District Court of the Virgin Islands, or of the judges thereof, granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions, except where a direct review may be had in the Supreme Court;

**(2)** Interlocutory orders appointing receivers, or refusing orders to wind up receiverships or to take steps to accomplish the purposes thereof, such as directing sales or other disposals of property;

**(3)** Interlocutory decrees of such district courts or the judges thereof determining the rights and liabilities of the parties to admiralty cases in which appeals from final decrees are allowed.

**(b)** When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order. The Court of Appeals which would have jurisdiction of an appeal of such action may thereupon, in its discretion, permit an appeal to be taken from such order, if application is made to it within ten days after the entry of the order: *Provided, however,* That application for an appeal hereunder shall not stay proceedings in the district court unless the district judge or the Court of Appeals or a judge thereof shall so order.

**(c)** The United States Court of Appeals for the Federal Circuit shall have exclusive jurisdiction--

**(1)** of an appeal from an interlocutory order or decree described in subsection (a) or (b) of this section in any case over which the court would have jurisdiction of an appeal under section 1295 of this title; and

**(2)** of an appeal from a judgment in a civil action for patent infringement which would otherwise be appealable to the United States Court of Appeals for the Federal Circuit and is final except for an accounting.

**(d)(1)** When the chief judge of the Court of International Trade issues an order under the provisions of section 256(b) of this title, or when any judge of the Court of International Trade, in issuing any other interlocutory order, includes in the order a statement that a controlling question of law is involved with respect to which there is a substantial ground for difference of opinion and that an immediate appeal from that order may materially advance the ultimate termination of the litigation, the United States Court of Appeals for the Federal Circuit may, in its discretion, permit an appeal to be taken from such order, if application is made to that Court within ten days after the entry of such order.

**(2)** When the chief judge of the United States Court of Federal Claims issues an order under section 798(b) of this title, or when any judge of the United States Court of Federal Claims, in issuing an interlocutory order, includes in the order a statement that a controlling question of law is involved with respect to which there is a substantial ground for difference of opinion and that an immediate appeal from that order may materially advance the ultimate termination of the litigation, the United States Court of Appeals for the Federal Circuit may, in its discretion, permit an appeal to be taken from such order, if application is made to that Court within ten days after the entry of such order.

**(3)** Neither the application for nor the granting of an appeal under this subsection shall stay proceedings in the Court of International Trade or in the Court of Federal Claims, as the case may be, unless a stay is ordered by a judge of the Court of International Trade or of the Court of Federal Claims or by the United States Court of Appeals for the Federal Circuit or a judge of that court.

**(4)(A)** The United States Court of Appeals for the Federal Circuit shall have exclusive jurisdiction of an appeal from an interlocutory order of a district court of the United States, the District Court of Guam, the District Court of the Virgin Islands, or the District Court for the Northern Mariana Islands, granting or denying, in whole or in part, a motion to transfer an action to the United States Court of Federal Claims under section 1631 of this title.

**(B)** When a motion to transfer an action to the Court of Federal Claims is filed in a district court, no further proceedings shall be taken in the district court until 60 days after the court has ruled upon the motion. If an appeal is taken from the district court's grant or denial of the motion, proceedings shall be further stayed until the appeal has been decided by the Court of Appeals for the Federal Circuit. The stay of proceedings in the district court shall not bar the granting of preliminary or injunctive relief, where appropriate and where expedition is reasonably necessary. However, during the period in which proceedings are stayed as provided in this subparagraph, no transfer to the Court of Federal Claims pursuant to the motion shall be carried out.

**(e)** The Supreme Court may prescribe rules, in accordance with section 2072 of this title, to provide for an appeal of an interlocutory decision to the courts of appeals that is not otherwise provided for under subsection (a), (b), (c), or (d).

## CREDIT(S)

(June 25, 1948, c. 646, 62 Stat. 929; Oct. 31, 1951, c. 655, § 49, 65 Stat. 726; Pub.L. 85-508, § 12(e), July 7, 1958, 72 Stat. 348; Pub.L. 85-919, Sept. 2, 1958, 72 Stat. 1770; Pub.L. 97-164, Title I, § 125, Apr. 2, 1982, 96 Stat. 36; Pub.L. 98-620, Title IV, § 412, Nov. 8, 1984, 98 Stat. 3362; Pub.L. 100-702, Title V, § 501, Nov. 19, 1988, 102 Stat. 4652; Pub.L. 102-572, Title I, § 101, Title IX, §§ 902(b), 906(c), Oct. 29, 1992, 106 Stat. 4506, 4516, 4518.)

28 U.S.C.A. § 1292, 28 USCA § 1292
Current through P.L. 118-22. Some statute sections may be more current, see credits for details.

**End of Document** © 2023 Thomson Reuters. No claim to original U.S. Government Works.

🚩 KeyCite Yellow Flag - Negative Treatment

Unconstitutional or Preempted  Limited on Preemption Grounds by  Molinelli-Freytes v. University of Puerto Rico,  D.Puerto Rico,  July 27, 2010

🚩 KeyCite Yellow Flag - Negative Treatment

Proposed Legislation

United States Code Annotated
Title 42. The Public Health and Welfare
Chapter 21. Civil Rights (Refs & Annos)
Subchapter I. Generally

42 U.S.C.A. § 1983

§ 1983. Civil action for deprivation of rights [Statutory Text & Notes of Decisions subdivisions I to IX]

Effective: October 19, 1996

Currentness

<Notes of Decisions for 42 USCA § 1983 are displayed in multiple documents.>

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

**CREDIT(S)**

(R.S. § 1979; Pub.L. 96-170, § 1, Dec. 29, 1979, 93 Stat. 1284; Pub.L. 104-317, Title III, § 309(c), Oct. 19, 1996, 110 Stat. 3853.)

42 U.S.C.A. § 1983, 42 USCA § 1983
Current through P.L. 118-23. Some statute sections may be more current, see credits for details.

**End of Document**                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.