# 23-1293

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

GINA L. BIANCHI,

Plaintiff-Appellee,

-against-

MICHAEL C. GREEN,

Defendant-Appellant,

-and-

CATHERINE LEAHY SCOTT, KAREN DAVIS,
JOHN CZAJKA, JOHN DOE #1, JOHN DOE #2,
JOHN DOE #3, JOHN DOE #4, JANE ROE #1,
JANE ROE #2, JANE ROE #3 and JANE ROE #4,

Defendants.

On Appeal from a Judgment of the United States District Court
for the Northern District of New York

## APPELLEE'S BRIEF

Crystal R. Peck, Esq.
John W. Bailey, Esq.
BAILEY, JOHNSON & PECK, P.C.
*Attorneys for Plaintiff-Appellee*
5 Pine West Plaza, Suite 507
Albany, New York 12205
(518) 456-0082

# TABLE OF CONTENTS

STATEMENT OF ISSUES PRESENTED FOR REVIEW………………………..1

STATEMENT OF THE CASE…………………………………………………… 1

STATEMENT OF THE FACTS………………………………………………... 2

SUMMARY OF THE ARGMENT………………………..………………….. 19

ARGUMENT………………………………………………………………… 21

    POINT I    APPELLANT GREEN IS NOT ENTITLED TO
QUALIFIED IMMUNITY…………………………….....…21

    A.    Gina Bianchi Engaged in Protected Speech…………………23

    i.    It was clearly established that Gina Bianchi
was speaking as a citizen in providing sworn
testimony to the OIG…………………………………..24

    ii.    Gina Bianchi's testimony to the OIG was not within
her ordinary job duties or responsibilities………….…27

    iii.    The civilian analogue factor has been met……………32

    iv.    Ms. Bianchi spoke to the OIG on matters of public
concern…………………………………………………...34

    POINT II    GINA BIANCHI'S TERMINATION WAS NOT
JUSTIFIED………..…………………………………………..38

    POINT III    MS. BIANCHI ENGAGED IN PROTECTED ACTIVITY
UNDER THE EQUAL PROTECTION CLAUSE
AND APPELLANT GREEN TERMINATED HER
FOR THAT ACTIVITY……………………………………45

    A.    Ms. Bianchi Was Terminated Because She Provided
Testimony Of Ageism And General Harassment

And Discrimination To The OIG……………………………..47

CONCLUSION………………………………………………………49

CERTIFICATION OF COMPLIANCE……………………………….. 51

SPECIAL APPENDIX…………………………………………………52

New York State Executive Law §53……………………………….. 53

New York State Executive Law §54………………………………… 55

New York State Penal Law §210.00………………………………… 57

# TABLE OF AUTHORITIES

Page(s)

Federal Cases

*Anderson v. Creighton*,
  483 U.S. 635 (1987) ............................................................................ 22
*Caruso v. City of New York*,
  973 F. Supp. 2d 430 (S.D.N.Y. 2013) ............................................. 25, 26
*Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Ed.*,
  444 F.3d 158 (2d Cir. 2006) .................................................................. 45
*Connick v. Myers*,
  461 U.S. 138 (1983) ................................................................. 19, 20, 36
*Cotarelo v. Vil. Of Sleepy Hollow Police Dept.*,
  460 F.3d 247 (2d Cir. 2006) ............................................................ 36, 49
*Crawford v. Cuomo*,
  721 Fed. Appx. 57 (2d Cir. 2018) .......................................................... 22
*District of Columbia v. Wesby*,
  138 S. Ct. 577 (2018) ............................................................................ 22
*Ezekwo v. NYC Health & Hospitals Corp.*,
  940 F.2d 775 (2d Cir. 1991) .................................................................. 36
*Garcia v. Hartford Police Dept.*,
  706 F.3d 120 (2d Cir. 2013) .................................................................. 24
*Garcetti v. Ceballos*,
  547 U.S. 410 (2006) ............................................. 19, 20, 23,24, 25, 33, 34
*Golodner v Berliner*,
  770 F3d 196 (2d Cir 2011) .................................................................... 22
*Gordon v. City of New York*,
  612 Fed.Appx. 629 (2d Cir. 2015) ......................................................... 34
*Gordon v. New York City Board of Education*,
  232 F.3d 111 (2d Cir. 2000) .................................................................. 47
*Gorman–Bakos v. Cornell Co-Op Ext. of Schenectady County*,
  252 F.3d 545, (2d Cir. 2001) ................................................................ 22
*Hartline v. Gallo*,
  546 F.3d 95 (2d Cir. 2008) ................................................................... 21
*Jackler v. Byrne*,
  658 F.3d 225 (2d Cir. 2011) ............................................. 23, 26, 27, 35

*Kwan v. Andalex Group LLC*,
    737 F.3d 834 (2d Cir. 2013) ................................................................ 47
*Lane v Franks*,
    573 U.S. 228 (2014) ....................... 19, 20, 23, 24, 25, 26, 33, 34, 35, 37, 49
*Locurto v Safir*,
    264 F3d 154 (2d Cir 2001) ........................................................... 39, 50
*Mandell v. Cnty. of Suffolk*,
    316 F.3d 368 (2d Cir. 2003) ................................................................ 22
*Matthews v. City of New York*,
    779 F.3d 167 (2d Cir. 2015) ...................... 27, 28, 30, 31, 32, 33, 38, 49
*Pickering v. Board of Education*,
    391 U. S. 563 (1968) ................................................................. 19, 38
*Richardson v. Pratcher*,
    48 F.Supp 3d 651 (S.D.N.Y. 2014) ....................................................... 22
*Rookard v. Health & Hospitals Corp.*,
    710 F.2d 41 (2d Cir. 1983) ........................................................... 37, 38
*Ruotolo v. City of New York*,
    514 F.3d 184 (2d Cir. 2008) ................................................................ 23
*Sher v. National Ass'n of Securities Dealers, Inc.*,
    386 F.Supp.2d 402 (S.D.N.Y. 2005) ................................................... 25
*Snyder v. Phelps*,
    562 U.S. 443 (2011) .................................................................. 34, 35
*Sousa v. Roque*,
    578 F.3d 164 (2d Cir. 2009) ........................................................ 34, 37
*U.S. v. New York City Dept. of Educ.*,
    407 F.Supp.3d .......................................................................... 47

State Cases

*People v Doody*,
    72 AD 372 (3d Dept 1902) ................................................................ 25

Federal Statutes

42 U.S.C. § 1983 ........................................................................... 20
U.S. Const. amend. I ....................................................................... 45

State Statutes

Executive Law sec. 995-a [2][c] ........................................................... 3
Executive Law § 54(5) ..................................................................... 29

New York State Executive Law § 55 ...................................................... 28, 29, 31, 35
New York State Penal Law §210.00 ......................................................... 25
NY Exec. L. §53(1) .................................................................................... 33
NY Exec. L. §54(2) .................................................................................... 24

Federal Rules

Fed. R. App. P 32(a)(5) and 32(a)(6) ....................................................... 52

**STATEMENT OF ISSUES PRESENTED FOR REVIEW**

1. The District Court correctly determined that Ms. Bianchi engaged in Protected Speech.

2. The District Court correctly determined that issues of fact regarding Appellant Green's motive in terminating Ms. Bianchi warranted denial of qualified immunity.

**STATEMENT OF THE CASE**

Appellee Gina Bianchi ("Ms. Bianchi") was terminated from her position as Special Counsel for New York State Division of Criminal Justice Services ("DCJS") as a result of her sworn testimony to the New York State Office of the Inspector General ("OIG"). The OIG requested that Ms. Bianchi provide sworn testimony regarding reports of sexual harassment, age discrimination, racism, and workplace violence by Brian Gestring ("Gestring") after he was hired by DCJS to serve as Director of the Office of Forensic Services ("OFS"). ▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

After reviewing her testimony and questioning her about everything she said under oath, Green terminated Ms. Bianchi from her position in retaliation for her sworn testimony to the OIG. Ms. Bianchi's termination violated clearly established

statutory and constitutional rights. Before the District Court, Ms. Bianchi demonstrated that questions of fact exist which preclude a finding that Green's actions were objectively reasonable. As such, this Court should affirm the District Court's decision and deny qualified immunity to Appellant Green.

## STATEMENT OF THE FACTS

*Gina Bianchi's Employment at DCJS*

Gina Bianchi is an attorney who has been employed by DCJS for nearly thirty years. CJA-625 ¶¶ 3-11. Ms. Bianchi began her career with DCJS in May 1994 and was promoted to the position of Senior Attorney shortly thereafter. She was then promoted to Special Assistant, and then to Associate Attorney, all in the DCJS Office of Legal Services. In September 2005, she was appointed to the position of Deputy Commissioner and Counsel at DCJS and as Counsel to the Governor's Director of Criminal Justice.[1] CJA-625 ¶ 4. She also served as Counsel to the NYS Commission on Forensic Science and Counsel to the NYS DNA Subcommittee. CJA-625 ¶ 4. In 2007, in addition to her 2005 appointments, she was appointed as Executive Director of the Governor's Sentencing Commission; Appellant Green was a member of that Commission. In 2009, in addition to the aforementioned roles, she was selected to serve as the Commissioner's designee to Chief Judge's Justice Task Force ("JTF"),

---

[1] The "Director of Criminal Justice" position (and hence Counsel to the Director) ceased to exist in 2007.

and in 2012, she was selected to serve as the Commissioner's designee on the Chief Judge's Sentencing Commission. CJA-625 ¶ 4. Gina Bianchi served as Deputy Commissioner and Counsel under various Governors --from Mario Cuomo through Andrew Cuomo, including Pataki, Spitzer, and Paterson --and under seven DCJS commissioners.

In 2008, Ms. Bianchi was appointed to serve, in addition to her role as Deputy Commissioner and Counsel, as the Acting Director of OFS. CJA-625¶¶ 6, 12. In March 2010, she was appointed by the Governor as a statutory member of the NYS Commission on Forensic Science (*see,* Executive Law sec. 995-a [2][c]). CJA-626 ¶ 8. She served as the Acting Director until July 2012, when Brian Gestring was hired. CJA-625 ¶¶ 6, 12. During her tenure as the Acting Director of OFS, Ms. Bianchi worked closely with OFS personnel, including, among others, OFS managers Kimberly Schiavone and Cathy Levine. CJA-625 ¶ 14

In 2015, Ms. Bianchi's position changed to that of Special Counsel at DCJS – a position she held until she was terminated from it on December 5, 2017. CJA-625 ¶¶ 3-11. Ms. Bianchi was appointed to this position in January 2015 by Appellant Green in his capacity as Acting Commissioner of DCJS, a position he advocated to the Governor's Office to get for her because he valued her work.[2] CJA-625 ¶¶ 3-11.

---

[2] Appellant Green states he is an "experienced attorney," having served as District Attorney for the court of Monroe, New York, for approximately seven (7) years. CJA-577 ¶ 3. After serving as

As Special Counsel, Gina Bianchi reported directly to Appellant Green and was required to work closely with Appellant Green as an advisor in various DCJS matters. CJA-588 ¶ 6. From the time Green was appointed Acting Commissioner, up until the time he reviewed Ms. Bianchi's testimony to the OIG, he had no complaints regarding Ms. Bianchi's performance. CJA-89 ¶ 98; CJA-306-307.

As Special Counsel, Ms. Bianchi's responsibilities were much more limited and focused than the broad and all-encompassing duties that she had as Deputy Commissioner and Counsel to the Agency. CJA-630 ¶ 26. She was not authorized to speak for DCJS on general legal questions. CJA-630 ¶¶ 26-27. She did not serve as the DCJS liaison to the Inspector General's Office or to the Governor's Office. CJA-630 ¶ 27. She also was not personal counsel to Appellant Green; her responsibilities were to DCJS as an agency, and to the people of the State as an employee of the State. CJA-630 ¶¶ 26, 27.

*Investigation by the OIG*

███████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

---

District Attorney, Appellant Green was appointed to serve as Executive Deputy Commissioner for DCJS. CJA-625 ¶ 10.

██████ CJA-78 ¶ 19-20. DCJS self-reported it to OIG on May 23, 2017. CJA-78 ¶ 21.

Between the time of DCJS's self-reporting and July 2017, the OIG conducted its investigation, which included obtaining sworn testimony from various OFS employees. CJA-79 ¶ 22. In doing so, current and former employees of OFS began to relay information indicating that there were systemic problems in OFS. CJA-631 ¶28. The OIG expanded their investigation ████████████████████████ ████████████████████████████████████████. CJA-79 ¶ 23. And, sometime between May 23, 2017, and late July 2017, Appellant Green was advised that ████████████████████████████████████████████████ CJA-79 ¶ 23.

In late July 2017, Ms. Bianchi was contacted by the OIG and asked if she would provide testimony in connection with its investigation into DCJS. CJA-631-32 ¶ 33. Because it was outside of her ordinary duties and responsibilities as Special Counsel to testify before the OIG, Ms. Bianchi called Appellant Green to let him know that she was going to testify, and inquired as to what the investigation was about. CJA-632 ¶ 34. Appellant Green told Ms. Bianchi that he knew what the OIG investigation was about, but that he preferred that she hear it directly from the OIG, simply advising Ms. Bianchi that she was not the target of the investigation. CJA-632 ¶ 35.

On August 3, 2017, Ms. Bianchi appeared before the OIG at its New York City offices. CJA-632 ¶ 36. Upon arriving, Ms. Bianchi met with two investigators, Jeff Haber and Kristin Conklin. CJA-632 ¶ 36. Before providing her sworn testimony, Ms. Bianchi ███████████████████████████████████

████████████████████████████████████████████████████

███████████████████ CJA-318-21; CJA-632 ¶ 36. As noted in the transcript, portions of the conversations Ms. Bianchi had with Mr. Haber and Ms. Conklin occurred "off the record," both before and after the recording ended. CJA-321; CJA-632 ¶ 36.

Ms. Bianchi was identified by witnesses as someone who could corroborate OFS staff allegations. CJA-322. Thus, the OIG sought her testimony to see if she could corroborate witness allegations and provide background information regarding OFS. CJA-632 ¶ 36. Ultimately, Ms. Bianchi's testimony would assist the OIG in their ongoing investigation and be relied on by the OIG in issuing its findings. CJA-633 ¶ 38. Notably, Gina Bianchi's sworn testimony before the OIG was voluntary, and she had not been subpoenaed or otherwise compelled by the OIG to testify; she had voluntarily agreed to testify. CJA-589 ¶ 12.

**Gina Bianchi's Testimony to OIG**

Gina Bianchi testified before the OIG for approximately an hour and a half, not including the off-the-record discussions she had with the OIG investigators.

CJA-589 ¶ 13. Ms. Bianchi's testimony was sworn, under penalties of perjury, to be truthful. CJA-319. It was understood by the OIG investigators that if Ms. Bianchi did not have personal knowledge of the information that was requested, she made that abundantly clear and she stated the same. CJA-683:10-17; CJA-633 ¶ 38. Ms. Bianchi did not provide lawyerly "non-answers," mislead, or fail to truthfully respond to the OIG investigators in any way. CJA-633 ¶ 38; CJA-683:2-7. Rather, she provided truthful, sworn testimony, which was as honest and forthcoming as possible to assist the OIG with its investigation. CJA-633 ¶ 38.

Ms. Bianchi testified that █████████████████████████ ████████████████████████████████████████████████████. CJA-590 ¶ 16. Gina Bianchi's testimony to the OIG spoke of ████████████ █████████████████████. CJA-317-391. ██████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████. CJA-335-39. Ms. Bianchi further testified that ███████████████████████████████████ ████████████████████████████████████████████████████ ██████████████. CJA-341-43. She further testified that ███████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████

███████████████████████. CJA-341-46. Gina Bianchi also testified that

████████████████████████████████████████████████████████.

CJA-364-65. She testified that ███████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████.

　　Ms. Bianchi further testified ███████████████████████████████

████████████████████████████. CJA-334-35; CJA 329-50.

She testified ████████████████████████████████████████████████

███████████████. CJA-331. ████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████. CJA-331.

　　Ms. Bianchi also testified ████████████████████████████████████

████████████████████████. CJA-326. ██████████████████████████

████████████████████████████████████████████████████████████

███████CJA-364-65. Significantly, Ms. Bianchi's testimony was not simply isolated

to matters that took place five years ago. CJA-318-90. ██████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████. CJA-318-90.



Ms. Bianchi continued to state that ███████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████.” CJA-592 ¶ 29. Ms. Bianchi testified that ████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████. CJA-592 ¶ 30. When specifically questioned as to

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████. CJA-

340-341.

On a number of occasions, Ms. Bianchi raised these, and other concerns related to Gestring and to Appellant Green, but when she went to him to discuss what she had been told by OFS staff, he would listen briefly and then provided one of the following responses: "back off," that he didn't want her "in the crosshairs," that her involvement in reporting these issues was becoming "controversial," and to "stay

out of OFS issues," and that "we're handling it." CJA-631 ¶ 30. Notably, although Appellant Green disputes these reports – Spencer Freedman testified that ███████

██████████████████████████████████████████████████████████

███████████████████████████. CJA-692:18-21. ███████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████ CJA-631 ¶ 30.

     ███████████████████████████████████████████

██████████████████████████████████████████████████. CJA-

591 ¶ 27. Ms. Bianchi testified that in ████████████████████████

██████████████████████████████████████████████████████████

███████████████████████████████████████████. CJA-591 ¶

27.

     Ms. Bianchi also was specifically asked ███████████████████

██████████████████████████████████████████████████████████

███████████████████████████████. CJA-350. Ms. Bianchi responded ████

████████████████████████████████" CJA-350. From Ms. Bianchi's

perspective it appeared █████████████████████████. CJA-331, 352-53.

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████. CJA-352-54. ████████████████████



. CJA-353-54. Ms. Bianchi testified that

CJA-353-54.

Gina Bianchi was specifically questioned as to

. CJA-592 ¶¶ 30,

32. Ms. Bianchi testified that

. CJA-592 ¶ 32. Ms. Bianchi

further testified that

CJA-340-41.

Ms. Bianchi's testimony highlights not only the concerns raised by her former colleagues, but also concerns with the workplace environments within OFS and DCJS. CJA-318-90. Indeed, Ms. Bianchi's testimony implicated

. CJA-318-90.

*The Aftermath*

On October 24, 2017, Appellant Green, Deputy Commissioner and Counsel for DCJS John Czajka ("Czajka"), Inspector General Catherine Leahy Scott ("Scott"), and Executive Deputy Inspector General Spencer Freedman ("Freedman")

attended a meeting wherein Inspector General Scott and Freedman discussed, in detail, ███ ████████████████████████████████████ CJA-594 ¶ 43.

At the meeting, Inspector General Scott and Executive Deputy Inspector General Freedman had a detailed discussion with Appellant Green and Czajka about

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████" CJA-318-90; CJA-594-98 ¶ 44.

Thereafter, Czajka requested the audio files of the interviews taken by the OIG. CJA-826; CJA-595 ¶ 45. The OIG refused to provide audio files ███████

████████████████████████████████████████ CJA-826; CJA-595 ¶

45. ███████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████ ].” CJA-826;CJA-595 ¶ 46;

CJA-592 ¶ 31.

████████████████████████ ████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████

████████████████████████████████████████
██████████████████████████
████ ██ █ ███ ████ ████ ██ ███ ██ ████ ██ █
███ ██
████████████████████████████████████████
███████████████████████████████
████████████████████████████████████████
████████████

CJA-862; CJA-596 ¶ 50.

The December 4, 2017 email provided the basis for Ms. Bianchi's termination. CJA-862. Appellant Green testified that ████████████████████████████████ ██████████████████████████████. CJA-720-21.

On December 4, 2017, a December 5, 2017, 12:00 p.m. meeting was placed on Ms. Bianchi's calendar for her and Appellant Green regarding "OFS." CJA-633 ¶ 40. Ms. Bianchi was not informed of the purpose of the meeting, despite specifically calling and asking Appellant Green's secretary what the meeting was about. CJA-633 ¶ 40.

On the morning of December 5, 2017, prior to Ms. Bianchi's meeting with Appellant Green, Karen Davis prepared and signed a letter stating that Gina Bianchi was terminated from her position of Special Counsel, effective December 14, 2017. CJA-596 ¶ 53.

The purpose of the December 5, 2017, meeting was to interrogate and cross-examine Gina Bianchi about her testimony to the OIG. CJA-597 ¶ 56. At the meeting, Appellant Green was red-faced and noticeably upset – immediately confronting Ms. Bianchi about her testimony before the OIG. CJA-634 ¶ 42. Appellant Green began the interrogation by demanding to know why Ms. Bianchi testified that she thought Brian Gestring was a misogynist and questioned Ms. Bianchi as to whether she even knew the definition of the term. CJA-597 ¶ 57. Appellant Green told Ms. Bianchi that the OIG issues reports and that her testimony could cause real problems for DCJS. CJA-597 ¶ 58. Appellant Green berated Ms. Bianchi for providing opinion testimony to the OIG. CJA-597 ¶ 59. Ms. Bianchi was taken aback and, frankly, extremely frightened by Appellant Green's aggressive demeanor and tone. CJA-634 ¶ 42.

Appellant Green told Ms. Bianchi repeatedly that she should have responded to the OIG's questions by stating "I do not have a specific fact upon which to base an answer to your question." CJA-597 ¶ 60. Appellant Green told Ms. Bianchi that she should not have provided testimony to the OIG that was based on information

she had heard from OFS staff members. CJA-597 ¶ 61. Gina Bianchi told Appellant Green that she had a responsibility to testify truthfully to the OIG, and she did not think she should have provided "lawyerly non-answers." CJA-597 ¶ 62. Gina Bianchi stated she had tried to repeatedly report what she had heard about issues in OFS to Appellant Green but that he had told her to stay out of OFS issues. CJA-597 ¶ 63.

Appellant Green spent two and a half hours picking apart Ms. Bianchi's testimony and demanding to know why Ms. Bianchi testified as she had testified. CJA-634 ¶ 45. Appellant Green also demanded to know who had advised her about some of the different complaints. CJA-634 ¶ 45. Ms. Bianchi said that she would rather not become a pariah among executive staffers for throwing them in. CJA-634 ¶ 45. Because Appellant Green demanded that she tell him who said things, and she did not want to be insubordinate, Ms. Bianchi provided the names of various Executive staff members who had voiced their dissatisfaction to her regarding ███

████████████████████████████████████████████████████████

███████████████████████ CJA-634 ¶ 45. Ms. Bianchi also stated that her testimony was based on ████████████████████████████████████████

████████████████████████████████████████

After continuing to irately interrogate and berate Ms. Bianchi, Appellant Green asked her whether she understood that the OIG issues reports on matters "like

15

this" and stated that her testimony put him and DCJS in a very bad position. CJA-634 ¶ 44.

At the conclusion of the meeting, Appellant Green asked Ms. Bianchi how she could continue to work with Brian Gestring, Karen Davis, and Mark Bonacquist in light of her testimony to the OIG. CJA-598 ¶ 64. Ms. Bianchi responded that she has been working with these individuals for years and that she would and could continue to work with them professionally as she always had because she was a professional. CJA-598 ¶ 65. In fact, Ms. Bianchi's working relationship with Gestring, Davis and Bonacquist had not been impacted in the five months between her testimony and the December 5, 2017, meeting with Appellant Green. CJA-636 ¶ 51. Moreover, Appellant Green did not previously have any complaints or any concerns regarding Ms. Bianchi's performance or working relationships. CJA-598 ¶ 66.

Ms. Bianchi was dismissed from Appellant Green's office at approximately 2:20 p.m. CJA-636 ¶ 52. Approximately 45 minutes after the conclusion of the first meeting, Ms. Bianchi was called back to Appellant Green's office. CJA-598 ¶ 68. At this second meeting, Ms. Bianchi was handed a letter signed by HR Director Karen Davis stating that Ms. Bianchi was terminated from her position as Special Counsel. CJA-598 ¶ 68. Appellant Green told Ms. Bianchi that while the letter may say December 14th, as far as he was concerned, her termination was effective immediately. CJA-598 ¶ 69. He further stated that she could go back to her "hold"

position [a NYS Civil Service-protected position] because "there was nothing he could do about that." CJA-598 ¶ 69.

It is undeniably clear from both Appellant Green's statements and his interrogation of Ms. Bianchi, as well as Mr. Czajka's notes on her testimony, that the real and actual reason Gina Bianchi was terminated was because her testimony "placed the agency in a negative light" and she felt that she could "speak without consequences." CJA-634 ¶ 42-45; CJA-635 ¶ 49; CJA-471.

The next day, December 6, 2017, ███████████████████████████
████████████████████████████████████████████████████████
███ ██ ████ ██████ ████ ████ ████ █████ ████ ██
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
███████████████████████████." CJA-818-22; CJA-598 ¶ 70
(emphasis added).

On December 7, 2017, Gina Bianchi spoke with Executive Deputy OIG Freedman and told him that Appellant Green had interrogated her about her testimony before the OIG and terminated her as a result of the testimony she provided. CJA-599 ¶ 71. Executive Deputy OIG Freedman was shocked. CJA-599 ¶ 72. He stated that ███████████████████████████████████████ ████████████████████████████████████████████████████████████████████. CJA-637 ¶ 56. In all of Executive Deputy OIG Freedman's tenure at the OIG, he had never seen a witness that was not the target of an OIG investigation terminated as a result of providing testimony. CJA-599 ¶ 73; CJA-685. Indeed, Executive Deputy OIG Freedman testified that ████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████." CJA-685.

Gina Bianchi was terminated from her position as Special Counsel and involuntarily moved to her Civil Service-hold position after providing truthful, sworn testimony to the OIG. CJA-636 ¶ 61; CJA-744. Notably, ████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████ ██████ CJA-1141-1142.

## SUMMARY OF THE ARGUMENT

The contours of a public employee's First Amendment rights are well-established based on four landmark Supreme Court decisions, *Pickering v. Board of Education*, 391 U. S. 563 (1968); *Connick v. Myers*, 461 U.S. 138 (1983); *Garcetti v. Ceballos*, 547 U.S. 410 (2006); and *Lane v Franks*, 573 U.S. 228 (2014).

*Pickering* holds that a public employee has a First Amendment right to comment on matters of public concern and that that right must be balanced against the public employer's interest in promoting the efficiency of the public services it performs through its employees. 391 U. S. 563

*Connick* holds that before conducting the *Pickering* balancing test, a court must determine whether a public employee's speech touches upon matters of public concern or whether the employee's speech concerns "matters only of personal interest." *Connick*, 461 U.S. at 147. Where the employee's speech touches on a matter of public concern, First Amendment protections apply; on the other hand, where the employee's speech only relates to matters of the employee's personal interest, no First Amendment claim can be stated. *Id*.

*Garcetti* narrowed the *Connick* rule by holding that a public employee cannot assert a First Amendment retaliation claim when that claim is predicated on speech that the employee uttered pursuant to the employee's official duties. *Garcetti*, 547 U. S. at 421.

Significantly, *Lane v. Franks*, 573 U.S. 228 (2014) holds that a public employee's sworn testimony, even if it involves matters learned as a result of their employment, constitutes citizen speech eligible for First Amendment protection. *Lane,* 573 U.S. at 239.

Here, the District Court properly denied Appellant Green qualified immunity on Ms. Bianchi's Constitutional claims brought pursuant to 42 U.S.C. § 1983. Appellant Green terminated Ms. Bianchi as a result of her testimony, an action he knew --or should have known-- violated clearly established First and Fourteenth Amendment precedent that existed for at least three years before he fired her. Controlling authority from the United States Supreme Court should have informed Appellant Green, a self-proclaimed "experienced attorney,[3]" that he could not retaliate against Ms. Bianchi for any First Amendment-protected testimony made regarding sexual harassment, sex and age discrimination, and other offensive statements made by Brian Gestring after he was hired to serve as Director of the OFS. Considering such controlling authority and viewing the evidence in light most favorable to Ms. Bianchi, the District Court properly concluded that questions of fact preclude a finding that Appellant Green's conduct was objectively reasonable and, therefore, properly denied Appellant Green's qualified immunity claim.

## ARGUMENT

---

[3] See, Appellant's Br. P. 4.

## POINT I

## APPELLANT GREEN IS NOT ENTITLED TO QUALIFIED IMMUNITY

A government official defendant is entitled to summary judgment on qualified immunity grounds

> if [he] adduce[s] sufficient facts [such] that no reasonable jury, looking at the evidence in the light most favorable to, and drawing all inferences most favorable to, the plaintiffs, could conclude that it was objectively unreasonable for the defendant[] to believe that he was acting in a fashion that did not clearly violate an established federally protected right.

*Hartline v. Gallo*, 546 F.3d 95, 102 (2d Cir. 2008) (internal quotation marks and citations omitted).

"Clearly established means that, at the time of the offic[ial]'s conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful." *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (internal quotation marks and citations omitted); *Crawford v. Cuomo*, 721 Fed. Appx. 57, 58–59 (2d Cir. 2018) (summary order) (quotations and citations omitted). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in light of pre-existing law the unlawfulness must be apparent.'" *Golodner v Berliner*, 770 F3d 196, 206 (2d Cir 2011) citing *Anderson v. Creighton,* 483 U.S. 635, 640 (1987).

Further, "where there is a dispute over 'the manner in which' a speech was delivered, whether the speech 'had the potential to disrupt' a government function, and 'whether even if such disruption occurred, plaintiffs were in fact not dismissed because of the disruption but because of the content of their speech,' it is improper 'for the district court . . . to resolve the factual disputes between the parties, or to decide the proper balance between the parties' interests.'" *Richardson v. Pratcher*, 48 F.Supp 3d 651, 665 (S.D.N.Y. 2014) quoting *Gorman–Bakos v. Cornell Co-Op Ext. of Schenectady County,* 252 F.3d 545, 556–58, (2d Cir. 2001); see also *Mandell v. Cnty. of Suffolk*, 316 F.3d 368, 385 (2d Cir. 2003).

In this case, the District Court's determination was correct because (1) it was clearly established law that Gina Bianchi's testimony was protected under the First Amendment, and (2) qualified immunity turns on material facts genuinely in dispute regarding the basis for Ms. Bianchi's termination.

## A.    Gina Bianchi Engaged in Protected Speech.

In light of *Jackler v. Byrne,* 658 F.3d 225 (2d Cir. 2011), as discussed below, and *Lane*, *supra*, the law in this Circuit has long been clearly established that a government employer could not fire an employee because of testimony the employee gave, under oath and outside the scope of her ordinary job responsibilities. *Lane v. Franks*, 573 U.S. 228 (2014). The rules governing when a public employee can be disciplined for speech are well-established in this Circuit. "It is by now well

established both that a citizen, upon entering government service, by necessity must accept certain limitations on his or her freedom, and that upon accepting public employment, such employees do not check all of their First Amendment rights at the door." *Jackler v. Byrne*, 658 F.3d 225, 234 (2d Cir. 2011) (internal citations and quotation marks omitted).

The standard for assessing whether a public employee's speech was protected speech under the First Amendment involves "two inquiries: (1) 'whether the employee spoke as a citizen on a matter of public concern' and, if so, (2) 'whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public.'" *Ruotolo v. City of New York*, 514 F.3d 184, 188 (2d Cir. 2008) (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006)). If the employee engaged in protected speech, to prevail, the plaintiff needs to show that the speech was a "substantial or motivating factor in the [adverse employment action]." *Garcia v. Hartford Police Dept.*, 706 F.3d 120, 129-130 (2d Cir. 2013).

### i. It was clearly established that Gina Bianchi was speaking as a citizen in providing sworn testimony to the OIG.

Both controlling and persuasive precedent support the conclusion that, as of December 5, 2017, it was clearly established law that a public employee who provides sworn testimony is acting as a citizen even if the testimony concerns information learned during the course of his or her employment. *Lane*, 573 U.S. at

23

239. In such situations, the U.S. Supreme Court has stated that the obligations of an employee are "distinct and independent" from those of a citizen to testify truthfully and it is the obligation to tell the truth that "renders sworn testimony speech as a citizen and sets it apart from speech made purely in the capacity of an employee." *Lane*, 573 U.S. at 239. In issuing its ruling, the Supreme Court noted that, unlike the speech in *Garcetti*, one who testifies falsely under oath faces criminal charges and that false testimony is an "obvious and flagrant affront to the basic concept of judicial proceedings."

The circumstances supporting the Supreme Court's determination in *Lane* apply equally here. Under New York State law, the OIG is empowered to administer oaths and examine witnesses. NY Exec. L. §54(2). Pursuant to New York State Penal Law §210.00, providing false testimony under oath is a crime, and applies to investigations such as those conducted by the OIG. *See, e.g., Sher v. National Ass'n of Securities Dealers, Inc.*, 386 F.Supp.2d 402 (S.D.N.Y. 2005) (noting that administrative investigations are a proceeding under which the criminal penalties of perjury apply) *aff'd* 218 Fed.Appx. 46 (2d Cir. 2007). Indeed, New York courts have long recognized that the purpose of New York State's perjury statue is designed to prevent the failure of justice. *People v Doody*, 72 AD 372, 382 (3d Dept 1902), *aff'd* 172 NY 165 (1902).

The *Lane* Court recognized the significance of such sworn testimony in rendering its decision, stating that:

> [i]t would be antithetical to our jurisprudence to conclude that the very kind of speech . . . – speech by public employees regarding information learned through their employment – may never form the basis for a First Amendment retaliation claim. Such a rule would place public employees who witness corruption in an impossible position, torn between the obligation to testify truthfully and the desire to avoid retaliation and keep their jobs.

"Given the 'exceptional significance' of truthful testimony in the courts' pursuit of justice, the Second Circuit has long held that the testimony of public employees in judicial or other fact-finding proceedings is protected by the First Amendment." *E.g., Caruso v. City of New York*, 973 F. Supp. 2d 430, 448 (S.D.N.Y. 2013). Indeed, the courts of the Second Circuit have explicitly rejected the position that testifying truthfully under oath can ever be related to a government employee's job for purposes of *Garcetti*. *See, Caruso v. City of New York*, 973 F. Supp. 2d at 449 ("Caruso was nonetheless speaking as a citizen and not 'pursuant to his official duties' when he testified under oath before the grand jury"); *Jackler v. Byrne*, 658 F.3d 225, 239-242 (2d Cir. 2011) ("A law enforcement officer does not, by reason of his public employment, lose his civic right to give evidence." A police officer was speaking as a "citizen on a matter of public concern" when he "refus[ed] to retract his truthful [r]eport and make statements that would have been false").

Simply, "the obligation to testify truthfully, like the obligation to give truthful evidence, is not vitiated simply by the fact that a citizen is a government employee. Truthful testimony is of paramount importance to the courts' functions regardless of whether the witness is a civilian or a public employee." *Caruso v. City of New York*, 973 F. Supp. 2d at 450.

Here, Gina Bianchi was ███████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████. Ms. Bianchi had an independent obligation – separate and apart from her employment – to testify truthfully as to ████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████ There is no debate that, in this context, Gina Bianchi's speech qualified as citizen speech under the precedent set by *Lane v. Franks, supra*.

### ii. Gina Bianchi's testimony to the OIG was not within her ordinary job duties or responsibilities.

Should this Court determine that Ms. Bianchi's sworn testimony does not in and of itself result in Ms. Bianchi's testimony being deemed "citizen speech," it also meets the job duties and civilian analogue requirements. There is simply no basis in the record to suggest that Ms. Bianchi's speech to the OIG was made pursuant to her ordinary job duties or responsibilities. Second Circuit precedent holds that when a

public employee speaks to an outside agency responsible for receiving complaints from the public, that fact shows that the employee is not speaking as an employee, but as a citizen. *See Matthews v. City of New York*, 779 F.3d 167, 175 (2d Cir. 2015); *Jackler*, 658 F.3d at 241.

In *Matthews*, the plaintiff police officer attempted to report a quota system to his commanding officer on three occasions. 779 F.3d 167, 173-74. After the commanding officer was replaced, Matthews again reported the quota system to the new commanding officer, reporting the adverse effect it was having on the precinct. *Id. at* 174. The Court found that Matthews report to his commanding officers was not "part and parcel" of his regular job duties. *Id. at* 174-175.

Similar to *Matthews*, Ms. Bianchi's regular job duties as Special Counsel did not include speaking with, or testifying before, the OIG on behalf of DCJS. CJA-630, ¶¶ 26-27 (Ms. Bianchi discussing that in her role as Special Counsel, her responsibilities were more limited and focused than that of her previous position as Deputy Commissioner and Counsel to the Agency: she had no oversight for DCJS units or personnel; was not authorized to speak for DCJS on legal matters; and did not serve as the DCJS liaison to the Inspector General's Office). Appellant Green himself ███████████████████████████████████████████████

███████████████████████████████████████████. CJA-579 ¶ 10 (Appellant

Green stating ████████████████████████████████████████

████████████████████████████ .").

Also similar to *Matthews*, Ms. Bianchi's testimony was not a "report" within the parameters of New York State Executive Law § 55 that she was required by law to make. Indeed, had Ms. Bianchi's testimony been considered a "report" or Appellant Green interpreted Ms. Bianchi's testimony as one – her termination based on what she testified to would have been a clear violation of the New York State Executive Law. *See*, NYS Exec. L. §55(1)("any officer or employee who acts pursuant to this subdivision by reporting to the state inspector general improper governmental action. . . shall not be subject to dismissal, discipline, or other adverse personnel action).

Rather than acknowledging this fact, Appellant Green argues that had Ms. Bianchi refused to testify she would have faced employment consequences under the statute. First, consequences to Ms. Bianchi's employment could only have been at issue if she had been compelled to testify – which was not the case. *See*, NYS Exec. L. §54(5) (providing that "the state inspector general shall have the power to require any officer or employee…to answer questions [and]…the refusal to answer questions shall be cause for removal…"). Per the OIG's own understanding and interpretation of the situation, Ms. Bianchi's testimony was *voluntary;* thus Executive Law § 54(5) was not triggered. CJA-318-19.

Second, the purpose of the OIG calling Ms. Bianchi's to testify was not for a matter that fell within the reporting requirements of Executive Law § 55 Gina Bianchi was called to see ███████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████. CJA-321-22. New York State Executive Law *specifically* limits required report to "corruption, fraud, criminal activity, conflicts of interest or abuse by another state officer or employee relating to his or her office or employment." NYS Exec. L. § 55. Neither the OIG nor Appellant can expand the parameters of this statute simply by saying so.

The written policy and practice of DCJS further support the District Court's finding on this point. Appellant cannot point to a single policy or practice of DCJS which requires an employee to report discrimination or harassment to the OIG. CJA-927. Rather, the policy manual for DCJS lists resources and agencies to which discriminatory and workplace violence complaints should be referred. The manual is silent as to reports to the OIG. In testifying before the Inspector General as a witness in support of sex and age discrimination and sexual harassment complaints made by OFS staff, Ms. Bianchi acted outside of the chain of command articulated in the DCJS Employee Manual – again furthering the position that she did, in fact, speak as a private citizen.

Significantly, at the time the Ms. Bianchi testified before the OIG, she had not supervised Brian Gestring, nor had oversight responsibility for OFS in five years. CJA-629 ¶ 24, CJA-630. Ms. Bianchi had no Human Resources responsibilities at DCJS, nor did Ms. Bianchi have authority or responsibility for creating internal policies at DCJS. CJA-630. Ms. Bianchi had limited contact with Brian Gestring and neither he nor the hostility reported at OFS impact Ms. Bianchi's daily job responsibilities. CJA-355:8-12. In fact, much of the information that served as the basis of Ms. Bianchi's testimony ███████████████████████████ ███████████████████████████████. CJA-633 ¶ 37, CJA-329:8-19, CJA-343. Indeed, ███████████████████████ ██ ██ ███ ████████ ████ ██ ██ ██ ████ ███ ██ █ ███████████████████████████████████████. CJA-631 ¶ 30.

As this Court noted in *Matthews*,

> "even if Matthew's speech was deemed to fall within [internal procedure] Section 207-21, this provision would not be determinative of whether that speech was protected by the First Amendment. If the Patrol Guide's general duty to report misconduct were permitted to control whether the speech of any employee – without regard to whether the investigation and reporting of misconduct is an integral part of the employee's day-to-day job. . . enjoyed First Amendment protection, public

employers would be encouraged to simply prescribe similar general duties, thereby limiting such protection for wide swaths of employee speech." 779 F.3d 167 at 175.

As in *Matthews*, Appellant's interpretation of New York State Executive Law would mean that under no circumstance could a public employee's speech to the OIG ever be protected – regardless of context or content.

Finally, Appellant Green argues because Ms. Bianchi's testimony incidentally involved limited issues that could fall within Executive Law § 55's purview, her testimony automatically loses protection. By way of example, ▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ CJA-549 ¶ 10 ("▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Furthermore, Appellant Green admits that ▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮" Appellant's Brief at pg. 23 (emphasis added). However, when Ms. Bianchi advised Appellant Green that the OIG had asked to speak with her, he

advised that although he was aware what they were investigating, he would rather she hear it directly from them. Appellant Green merely advised that Ms. Bianchi was not the target of the OIG investigation. CJA-632 ¶¶ 34, 35.

Notwithstanding the above, Appellant Green fails to inform this Court that Ms. Bianchi did not provide any testimony relative to ██████████████████ ████████████████████████████████████ See, CJA-782-83.[4]

Nor does it change the fact that the purpose ████████████████████████

████████████████████████████████████████████

████████████████████████████ CJA-171, CJA-589 ¶ 11.

### iii.    The civilian analogue factor has been met.

Finally, the civilian analogue factor is satisfied here, just as it was in *Matthews*. As this Court has held, "[a]n indicium that speech by a public employee has a civilian analogue is that the employee's speech was to an 'independent state agency' responsible for entertaining complaints by 'any citizen in a democratic society regardless of his status as a public employee.'" *Matthews v City of New York*, 779 F3d at 175 (2d Cir 2015). The OIG does not just receive and investigate complaints of public employees. It has the authority "to receive and investigate

---

[4] The transcript of Ms. Bianchi's testimony regarding the "hit" letter issue begins on page 40. Mr. Haber and Ms. Conklin carried the remainder of this portion of testimony, explaining the "hit" letter issue to Ms. Bianchi. Of note, Appellant Green makes a to-do over Ms. Bianchi's testimony saying, "off the record, even though we're on the record" but does not relate Ms. Conklin's comment that the discussion of the "hit" letter ". . . stays here." CJA-783.

complaints from *any source*." NY Exec. L. §53(1) (emphasis added). In fact, in the instant case the OIG interviewed both current and former employees of OFS in its investigation of Gestring.

The instant matter requires the same holding as *Lane v. Franks*, 573 U.S. 228 (2014), where the U.S. Supreme Court found that the employee speech was citizen speech. *Id*. In that case, the United States Supreme Court held that "the Eleventh Circuit read *Garcetti* far too broadly." The Eleventh Circuit reasoned that the plaintiff "learned of the subject matter of his testimony in the course of his employment with [the City], [so] *Garcetti* require[d] that his testimony be treated as the speech of an employee rather than that of a citizen." *Lane,* 573 U.S. at 240. However, the United States Supreme Court held that "[i]t does not." *Lane*, 573 U.S at 239.

Rather, the Supreme Court clarified that "the mere fact that a citizen's speech concerns information acquired by virtue of his public employment does not transform that speech into employee—rather than citizen—speech. The critical question under *Garcetti* is whether the speech at issue is itself ordinarily *within* the scope of an employee's duties, not whether it merely *concerns* those duties." *Id*. at 240 (emphasis added). Similarly, simply because Ms. Bianchi learned of the allegations regarding Gestring during the time of her then-27 plus years of DCJS

employment, does not require that her testimony be treated as that of an employee rather than that of a citizen.

### iv. Ms. Bianchi spoke to the OIG on matters of public concern.

It is clearly established that "an employee's speech is protected by the First Amendment if he spoke as a citizen on a matter of public concern." *Gordon v. City of New York*, 612 Fed.Appx. 629, 631 (2d Cir. 2015) (Summary Order) citing *Garcetti v. Ceballos*, 547 U.S. 410, 418 (U.S. 2006). "Speech addresses a matter of public concern when it relates to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest." *Lane*, 573 U.S. 228, 241 quoting *Snyder v. Phelps*, 562 U.S.443, 453 (2011). "Among the relevant considerations in deciding if speech addresses a matter of public concern is whether the speech was calculated to redress personal grievances or whether it had a broader public purpose"…though the employee's motive behind the speech is not dispositive of whether the speech will be deemed a matter of public concern. *Sousa v. Roque,* 578 F.3d 164, 173-74 (2d Cir. 2009).

Ms. Bianchi's testimony is clearly speech on a matter of public concern. "Speech involves matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of

value and concern to the public." *Lane*, 573 U.S at 242 citing *Snyder v. Phelps*, 562 U.S. 443 (2011) (internal quotations omitted).

The District Court properly concluded that Ms. Bianchi was testifying ███

████████████████████████████████████████████████████████████████

███████████████████ CJA-1211. Ms. Bianchi's speech ██████████

████████████████████████████████████████████████████████████████

███████████████████████████████████████████. *Jackler*, 658 F.3d at 236. Thus, the District Court properly held that the matters that Ms. Bianchi discussed with the OIG were matters of public concern, outside the OIG's express jurisdiction under Executive Law § 55. *See, id*.

Identical to *Jackler*, the general public **does** indeed have a substantial interest in those matters that Ms. Bianchi discussed with the OIG. *Jackler*, 658 F.3d 225. "To constitute speech on a matter of public concern, an employee's expression must 'be fairly considered as relating to any matter of political, social, or other concern to the community.' Speech that, although touching on a topic of general importance, primarily concerns an issue that is "personal in nature and generally related to [the speaker's] own situation," such as his or her assignments, promotion, or salary, does not address matters of public concern." *Jackler*, 658 F.3d 225 (internal citations omitted) citing *Ezekwo v. NYC Health & Hospitals Corp.*, 940 F.2d 775, 781 (2d Cir. 1991), cert. denied, 502 U.S. 1013 (1991); *See, e.g.*, *Connick*, 461 U.S. at 148.

It was clearly established at the time of Gina Bianchi's termination that speech involving discrimination in the context of public employment constitutes a matter of public concern. *Cotarelo v. Vil. Of Sleepy Hollow Police Dept.,* 460 F.3d 247, 252 (2d Cir. 2006) (stating "we have repeatedly held that discrimination in a government workplace is a matter of public concern). The content of Ms. Bianchi's testimony – sex and age discrimination and sexual harassment – obviously involves matters of significant public concern. Such testimony was a matter of public concern and critically important, especially during the height of the "MeToo" movement which gained widespread attention in 2017.

Importantly, news sources including the *New York Times, NY Daily News, AP News, Rochester Democrat and Chronicle, Seattle Times,* multiple *Times Union* articles, and numerous other state, national and international media reported on Ms. Bianchi's case, including *The New Yorker*, which found Ms. Ms. Bianchi's testimony important to the public. Indeed, *The New Yorker* published an April 10, 2021, piece entitled "A Cautionary Tale of Workplace Harassment in the Cuomo Administration." CJA-1027. The article highlights that "Ms. Bianchi vouched for [Levine and Schiavone's] allegations." CJA-1031.

The OIG asked Ms. Bianchi to provide testimony about ███████████████. To qualify as a matter of public concern the speech must "relate to any matter of political, social, or other concern to

the community or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." *Lane*, 573 U.S. 228, 241-242. Here, former New York State Gov. Cuomo had issued multiple press releases indicating the importance of protecting public employees from exactly this type of behavior. Further, the media attention and public outcry regarding this specific investigation and the OIG's Report concerning the same support the finding that Ms. Bianchi's speech was a matter of public concern within the contemplation of the United States Supreme Court. *See*, *Lane*, 573 U.S at 242.

Appellant Green's attempts to characterize Gina Bianchi's testimony as a "private interview" to diminish the public importance of her speech. However, simply because the speech was privately relayed does not strip it of protection. *Rookard v. Health & Hospitals Corp.*, 710 F.2d 41, 46 (2d Cir. 1983); see also, *Sousa*, 578 F.3d at 173-74 (discussing Second Circuit precedent regarding the "public concern" requirement and expressly clarifying that motive was not a dispositive element regarding same). Further, Ms. Bianchi knew from her off the record conversation with the OIG investigators that her testimony ███████████████

████████████████████████████████████████████

██████████████████████████████████. She was aware that the NYS Inspector General issues reports of its investigations - a matter that was specifically ████████████████████████. Moreover, the OIG did,

in fact, issue a letter report that heavily relied on Ms. Bianchi's testimony. This goes directly to the form and context of the speech at hand. CJA-818-822.

## POINT II

### GINA BIANCHI'S TERMINATION WAS NOT JUSTIFIED

Appellant Green also cannot succeed under the *Pickering* analysis: "whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the public based on the government's needs as an employer." *Matthews*, 779 F.3d at 172. "In striking the balance between these interests, a court should consider whether the speech impaired the employee's ability to perform his duties, disrupted working relationships requiring personal loyalty and confidence, or otherwise impeded the regular operation of the employing agency." *Rookard v. Health & Hospitals Corp.*, 710 F.2d 41, 46 (2d Cir. 1983). Further, speech made privately, rather than publicly, does not remove it from First Amendment protection. *Id*. Finally, "even if the *Pickering* balance is resolved in the employer's favor, the employee may still demonstrate liability by proving that the employer disciplined the employee in retaliation for the speech, rather than out of fear of the disruption." *Locurto v Safir*, 264 F3d 154, 166 (2d Cir 2001).

There is no dispute that Gina Bianchi was fired due to the substance of her testimony to the OIG. However, Appellant Green argues that it was not Ms. Bianchi's

testimony about ███████████████████████████████████

██████████; it was that she provided unsolicited opinions about Gestring's discrimination and harassment of OFS staff, some of which were not based on her first-hand observations or investigation. As an initial matter, this incredible argument that strains the bounds of credulity requires a credibility determination that is not appropriate for summary judgment.

Gina Bianchi repeatedly and clearly stated in her testimony that she was either providing an opinion, or that the information she was providing was received from

████████████████████████████████████████ CJA-516-390; CJA-683. Further, if the information testified to was based on her first-hand knowledge, Ms. Bianchi also made that quite clear to the investigators. CJA-683. Even Sandra Van Kampen, who Appellant Green relied on to conduct a Workplace Climate Investigation Study testified that:



" CJA-740:16-23.

The pretext of Appellant's allegation is made abundantly clear by both the notes reviewed by Appellant Green in preparation of his interrogations of Ms. Bianchi and Appellant Green's own workplace climate investigation study. The Study "authored" by Sandra Van Kampen expressly stated ████ ████

███████████████████████████████████████. CJA-828. Van Kampen acknowledged ████████████

███████████████████████████████████████

███████████████████████████████████████

████. CJA-828. The Study also ██████████████████████

███████████████████████████████████████

██████████████████████████████████. CJA-895, CJA-601 ¶ 87.

Appellant Green appears to take issue with the fact that Ms. Bianchi volunteered information that she heard from third party sources – but he wholly failed to acknowledge that those identical allegations had been made by those third parties to DCJS Human Resources. Significantly, the Study ████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████████████.

Appellant Green now tries to argue that he did not like the "sloppy manner" in which Gina Bianchi testified. The reality is, however, that Appellant Green did not like the **substance** of Ms. Bianchi's testimony, which ████████████████████

██████████████████████████████ However, Appellant Green's notes that he admits to reviewing in preparation of his December 5th interrogation of Gina Bianchi are particularly telling. They highlight that Gina Bianchi was terminated from her

position because she dared to speak the truth about what was told to her by OFS staff, and how DCJS Executive Management abandoned its responsibilities to keep that staff safe from Gestring.

Significantly, one of the very first items identified in those notes – and in Appellant Green's interrogation of Ms. Bianchi – was her testimony that ███████ ████████████████ Portions of the notes prepared in anticipation of Ms. Bianchi's December 5th interrogation include:





Equally significant is that Ms. Bianchi ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ which is now disputed by Appellant Green. Ms. Bianchi testified both ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Appellant Green even acknowledges ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮. CJA-202. In response to the issues that Ms. Bianchi attempted to raise with him, Appellant Green told ▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮." CJA-805:19-24; CJA-631 ¶ 30.

It is undeniably clear from both Appellant Green's[5] statements to Ms. Bianchi, as well as Czajka's notes on Gina Bianchi's testimony, that the real reason Ms. Bianchi was terminated was because her testimony "placed the agency in a negative light" and she felt that she could "speak without consequences." CJA- 862-70. The record strongly supports a finding that the motivation behind Appellant Green's

---

[5] Appellant Green attempts to rely on Ms. Bianchi's testimony to the IG saying, "don't quote me" but fails to acknowledge that immediately following the statement, Ms. Bianchi expresses her understanding that they actually are "on the record."

termination of Gina Bianchi rests on a credibility determination that is within the purview of a jury to decide.

Further, Ms. Bianchi advised Appellant Green that, just as she had for approximately five (5) years, her ability to work professionally with Gestring, Mark Bonacquist or Karen Davis remained unchanged, regardless of her testimony about their effectiveness. CJA-714:11-18, CJA-636 ¶ 51. Ms. Bianchi testified that she was not concerned about her own work environment as Brian Gestring did not supervise her. *Id.* Rather, she testified about discriminatory actions taken against Gestring's subordinates and her fear that they would be retaliated against if their complaints were deemed unfounded. CJA-378.

Appellant Green, by his own admission, worked closely as Gina Bianchi's supervisor for five years, and had worked with her for years prior during the Governor's Sentencing Commission, without once ever questioning her sound judgment or legal abilities. It was only after ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮

Appellant Green began his interrogation of Ms. Bianchi by specifically cross-examining her about her testimony stating Gestring is a misogynist, his favoritism

████████████████████████████████████████ CJA-655, CJA-634 ¶ 43.

This fact is supported by both Ms. Bianchi's notes and those of Van Kampen. CJA-1041. Appellant Green further interrogated Ms. Bianchi about her support of the two complainants, Kimberly Schiavone and Cathy Levine, going as far as to suggest the complainants had been lying, berating Gina Bianchi for "volunteering" information, and stating that the ████████████████████████████████████████████

████████████████████████████████████████ CJA-635 ¶ 46.

Appellant Green had previous knowledge of the facts which Ms. Bianchi testified to before the OIG. Ms. Bianchi's testimony changed nothing - ████████████

███████████████████████████████████████████████████████████████

corridors of the OFS and DCJS but, instead, now had become available for possible disclosure following █████████████████████████████. Indeed, t██████████

██████████████████████████████████████    ███████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████

The private nature of Ms. Bianchi's testimony to the OIG when she testified does not deprive her sworn truthful testimony of First Amendment protection to the extent it addressed matters of public concern. U.S. Const. amend. I. That is the essence of a First Amendment claim, i.e., someone discloses material that the OFS

and DCJS would rather not have been disclosed. *See Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Ed.*, 444 F.3d 158 (2d Cir. 2006).

## POINT III

### MS. BIANCHI ENGAGED IN PROTECTED ACTIVITY UNDER THE EQUAL PROTECTION CLAUSE AND APPELLANT GREEN TERMINATED HER FOR THAT ACTIVITY

The record establishes that the OIG investigated allegations of "sexual harassment, ageism, racism…" and that Gina Bianchi provided sworn testimony in connection with that investigation.

Appellant Green continually attempts to minimize Ms. Bianchi's testimony before the OIG to support his baseless argument that Ms. Bianchi's testimony was about personal grievances, as opposed to a systemic problem involving discrimination and harassment in OFS. However, Gina Bianchi's testimony to the OIG spoke to problems ▌

▌S. Indeed, as found by the District Court, Ms. Bianchi was not reporting issues in order to benefit her personal interest but was concerned about the staff in OFS. CJA-378.

Although the elements of a retaliation claim based on an equal protection violation under § 1983 mirror those under Title VII, Appellant Green's argument that absent "clearly established law holding that an employee who offers their opinion that a male supervisor prefers to spend time with certain female subordinates . . .

without more, does not amount to discrimination on account of sex in violation of Title VII" is a gross and perverse alteration of the facts.

Indeed, Ms. Bianchi provided the following testimony:



The District Court correctly found that "Ms. Bianchi's testimony included



CJA-1217-18.

## A. Ms. Bianchi was terminated because she provided testimony of ageism and gender harassment and discrimination to the OIG

While retaliation must be a "but-for" cause of Gina Bianchi's termination, Ms. Bianchi need not provide proof that the *only* cause for her termination was her testimony – only that she would not have been terminated in the absence of

Defendant-Appellant's retaliatory motivation. *U.S. v. New York City Dept. of Educ.*, 407 F.Supp.3d at 402-03 quoting *Zan Kwan v. Andalex Group LLC* , 737 F.3d 834, 846 (2d Cir. 2013). "Proof of causation can be shown either: (1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Gordon v. New York City Board of Education*, 232 F.3d 111, 117 (2d Cir. 2000). Retaliatory motive can be demonstrated by "weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its actions." *U.S. v. New York City Dept. of Educ.*, 407 F.Supp.3d at 403 *quoting Zan Kwan v. Andalex Group LLC,* 737 F.3d 834, 846 (2d Cir. 2013).

In the instant case, there is both a temporal proximity between Ms. Bianchi's testimony to the OIG, i.e., her interrogation about her testimony, and her termination, as well as documentary evidence and testimony that demonstrate "weaknesses," "inconsistencies," and "contradictions" in Appellant Green's alleged legitimate nonretaliatory basis for Ms. Bianchi's termination. Appellant Green began his interrogation of ███████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████." CJA-707:18-23. Ms. Bianchi was

47

terminated approximately a mere 45 minutes after being interrogated for over almost two and a half hours about her testimony. The temporal proximity is abundantly clear.

The District Court properly held that "Appellant Green's reasons for [terminating Ms. Bianchi after she provided testimony] create an issue of fact with respect to whether Appellant Green had a retaliatory motive, and, therefore, summary judgment is precluded." CJA-1218. Appellant Green, again, argues a non-retaliatory reason for Ms. Bianchi's termination – claiming that Ms. Bianchi's testimony before the OIG had "no discernable connection to any conduct that could implicate Title VII." Again, this is a gross mischaracterization of the facts.

There is no dispute that Plaintiff was fired due to the substance of her testimony to the OIG. Any argument that it was not Ms. Bianchi's testimony about discrimination and harassment that resulted in her termination, and that it was that she provided unsolicited opinions about employment practices that were not based on her firsthand observations or investigation, requires a credibility determination that is not appropriate for summary judgment.

## CONCLUSION

As discussed above, the precedent in this Circuit was clear and settled law at the time Appellant Green reviewed Gina Bianchi's testimony and terminated her from her position as Special Counsel for that testimony. The U.S. Supreme Court

had held that sworn truthful testimony by a public employee, even involving matters learned from their employment, is speech as a private citizen. *Lane v Franks*, 573 U.S. 228 (2014). It was beyond debate that if the public employee's ordinary job duties did not involve making that speech (i.e., testimony in support of discrimination/harassment) to an outside agency, the speech is made as a private citizen. *Matthews v. City of New York*, 779 F.3d 167 (2d Cir. 2015).

Finally, the record evidence supports a finding that Gina Bianchi spoke on matters of discrimination which are protected under the First and Fourteenth Amendment. On this front, it has long been held by this Court that speech regarding discrimination in a public agency is a matter of public concern. *Cotarelo v. Vil. Of Sleepy Hollow Police Dept.*, 460 F.3d 247, 252 (2d Cir. 2006).

The notes relied on by Appellant Green in his questioning of Ms. Bianchi clearly contradict his argument that he terminated Ms. Bianchi because he lost faith in her ability to perform her job. Appellant's interrogation of Ms. Bianchi clearly indicates that his primary motivation was to punish her because she spotlighted the fact that executive management at DCJS created a discriminatory and hostile environment for its staff.

It is clear that the direct and circumstantial evidence supports Gina Bianchi's claim that Appellant Green had an unconstitutional motive in terminating her from her position as Special Counsel. See, *Locurto v. Safir,* 264 F.3d 154, 167 (2d Cir.

2001) (stating "a plaintiff may avoid summary judgment on First Amendment retaliation claim based on qualified immunity defense if he can show 'particularized evidence of direct or circumstantial facts supporting his claim of unconstitutional motive'").

Accordingly, based on the reasons detailed above, the District Court correctly denied Appellant Green qualified immunity and found that Gina Bianchi engaged in a protected activity and its holding should be affirmed by this Court.

Dated: April 3, 2024      Bailey, Johnson & Peck, P.C.


By: _Crystal R. Peck_
    Crystal R. Peck, Esq.
    John W. Bailey, Esq.
    *Attorneys for Plaintiff-Appellee*
    5 Pine West Plaza, Suite 507
    Albany, NY 12205
    (518) 456-0082
    CRPeck@baileyjohnson.com
    JWBailey@baileyjohnson.com

## CERTIFICATION OF COMPLIANCE

I, Crystal R. Peck, hereby certify that the within Brief of Plaintiff-Appellee, Gina L. Bianchi, was prepared on a computer, using a Times New Roman font in 14-point typeface and was produced in double space. The brief consists of 11,605 words and is in compliance with Fed. R. App. P 32(a)(5) and 32(a)(6).

Dated: April 3, 2024

Bailey, Johnson & Peck, P.C.

By: _____

Crystal R. Peck
*Attorneys for Plaintiff-Appellee*
5 Pine West Plaza, Suite 507
Albany, NY 12205
(518) 456-0082
JWBailey@baileyjohnson.com

SPECIAL APPENDIX

KeyCite Yellow Flag - Negative Treatment

Proposed Legislation

McKinney's Consolidated Laws of New York Annotated

  Executive Law (Refs & Annos)

    Chapter Eighteen. Of the Consolidated Laws

      Article 4-a. Office of the State Inspector General (Refs & Annos)

McKinney's Executive Law § 53

§ 53. Functions and duties

Effective: October 16, 2021

Currentness

The state inspector general shall have the following duties and responsibilities:

1. receive and investigate complaints from any source, or upon his or her own initiative, concerning allegations of corruption, fraud, criminal activity, conflicts of interest or abuse in any covered agency;

1-a. receive and investigate complaints from any source, or upon his or her own initiative, concerning allegations of corruption, fraud, use of excessive force, criminal activity, conflicts of interest or abuse by any police officer in a covered agency and promptly inform the division of criminal justice services, in the form and manner as prescribed by the division, of such allegations and the progress of investigations related thereto unless special circumstances require confidentiality. Nothing in this subdivision shall require the division of criminal justice services to participate in the investigation of such allegations or take action or prevent the division of criminal justice services from taking action authorized pursuant to subdivision three of section eight hundred forty-five of this chapter in the time and manner determined by the commissioner of the division of criminal justice services.

2. inform the heads of covered agencies of such allegations and the progress of investigations related thereto, unless special circumstances require confidentiality;

3. determine with respect to such allegations whether disciplinary action, civil or criminal prosecution, or further investigation by an appropriate federal, state or local agency is warranted, and to assist in such investigations;

4. prepare and release to the public written reports of such investigations, as appropriate and to the extent permitted by law, subject to redaction to protect the confidentiality of witnesses. The release of all or portions of such reports may be deferred to protect the confidentiality of ongoing investigations;

5. review and examine periodically the policies and procedures of covered agencies with regard to the prevention and detection of corruption, fraud, criminal activity, conflicts of interest or abuse;

6. recommend remedial action to prevent or eliminate corruption, fraud, criminal activity, conflicts of interest or abuse in covered agencies;

7. establish programs for training state officers and employees regarding the prevention and elimination of corruption, fraud, criminal activity, conflicts of interest or abuse in covered agencies.

**Credits**
(Added L.2005, c. 766, § 28, eff. Jan. 13, 2006. Amended L.2020, c. 104, § 2, eff. April 1, 2021; L.2021, c. 59, pt. BBB, § 2, eff. Oct. 16, 2021.)

Notes of Decisions (1)

McKinney's Executive Law § 53, NY EXEC § 53
Current through L.2024, chapters 1 to 49, 52, 61 to 112. Some statute sections may be more current, see credits for details.

End of Document

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

🚩 KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

McKinney's Consolidated Laws of New York Annotated
    Executive Law (Refs & Annos)
        Chapter Eighteen. Of the Consolidated Laws
            Article 4-a. Office of the State Inspector General (Refs & Annos)

McKinney's Executive Law § 54

§ 54. Powers

Effective: May 3, 2023
Currentness

The state inspector general shall have the power to:

1. subpoena and enforce the attendance of witnesses;

2. administer oaths or affirmations and examine witnesses under oath;

3. require the production of any books and papers deemed relevant or material to any investigation, examination or review;

4. notwithstanding any law to the contrary, examine and copy or remove documents or records of any kind prepared, maintained or held by any covered agency;

5. require any officer or employee in a covered agency to answer questions concerning any matter related to the performance of his or her official duties. No statement or other evidence derived therefrom may be used against such officer or employee in any subsequent criminal prosecution other than for perjury or contempt arising from such testimony. The refusal of any officer or employee to answer questions shall be cause for removal from office or employment or other appropriate penalty;

6. monitor the implementation by covered agencies of any recommendations made by state inspector general;

7. perform any other functions that are necessary or appropriate to fulfill the duties and responsibilities of office.

8. [Expires and deemed repealed May 3, 2026, pursuant to L.2023, c. 58, pt. III, § 3.] Appoint an independent monitor to provide guidance and technical assistance related to the policies, practices, programs and decisions of the Orange county industrial development agency, as authorized in subdivisions two, three, four and five of section nine hundred twelve of the general municipal law.

**Credits**
(Added L.2005, c. 766, § 28, eff. Jan. 13, 2006. Amended L.2023, c. 58, pt. III, § 2, eff. May 3, 2023.)

McKinney's Executive Law § 54, NY EXEC § 54
Current through L.2024, chapters 1 to 49, 52, 61 to 112. Some statute sections may be more current, see credits for details.

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

McKinney's Consolidated Laws of New York Annotated
  Penal Law (Refs & Annos)
    Chapter 40. Of the Consolidated Laws (Refs & Annos)
      Part Three. Specific Offenses
        Title L. Offenses Against Public Administration
          Article 210. Perjury and Related Offenses (Refs & Annos)

McKinney's Penal Law § 210.00

§ 210.00 Perjury and related offenses; definitions of terms

Currentness

The following definitions are applicable to this article:

1. "Oath" includes an affirmation and every other mode authorized by law of attesting to the truth of that which is stated.

2. "Swear" means to state under oath.

3. "Testimony" means an oral statement made under oath in a proceeding before any court, body, agency, public servant or other person authorized by law to conduct such proceeding and to administer the oath or cause it to be administered.

4. "Oath required by law." An affidavit, deposition or other subscribed written instrument is one for which an "oath is required by law" when, absent [1] an oath or swearing thereto, it does not or would not, according to statute or appropriate regulatory provisions, have legal efficacy in a court of law or before any public or governmental body, agency or public servant to whom it is or might be submitted.

5. "Swear falsely." A person "swears falsely" when he intentionally makes a false statement which he does not believe to be true (a) while giving testimony, or (b) under oath in a subscribed written instrument. A false swearing in a subscribed written instrument shall not be deemed complete until the instrument is delivered by its subscriber, or by someone acting in his behalf, to another person with intent that it be uttered or published as true.

6. "Attesting officer" means any notary public or other person authorized by law to administer oaths in connection with affidavits, depositions and other subscribed written instruments, and to certify that the subscriber of such an instrument has appeared before him and has sworn to the truth of the contents thereof.

7. "Jurat" means a clause wherein an attesting officer certifies, among other matters, that the subscriber has appeared before him and sworn to the truth of the contents thereof.

**Credits**
(L.1965, c. 1030.)

**Editors' Notes**

**PRACTICE COMMENTARIES**

by William C. Donnino

**Table of Contents**

**Perjury Defined**

**Degrees and Elements of Perjury**

--**Materiality**

--**Intentional falsehood**

--**Inconsistent statements**

**Corroboration**

**Defenses**

--**Perjury trap defense**

--**Affirmative defense of retraction**

--**Precluded defenses**

**Subornation of Perjury**

**Perjury Defined**

The key element of perjury is to "swear falsely," a defined term [Penal Law § 210.00(5). That definition, delineated by its three parts and annotated to the sections defining words used in the definition, is as follows:

A person swears falsely when such person:

(1) "intentionally" [Penal Law § 15.05(1)] makes a false statement

(2) which such person does not believe to be true

(3) either (a) while giving "testimony" [Penal Law § 210.00(3)], or (b) under "oath" [Penal Law § 210.00(1)] in a subscribed written instrument.

"Testimony" is an oral statement made under oath in a proceeding before a body or person authorized by law to conduct the proceeding and administer the oath. Penal Law § 210.00(3). The "oath" includes an affirmation. Penal Law § 210.00(1). A person who intentionally gives false testimony is subject to prosecution and conviction for perjury

even if that person testified under a grant of immunity for the commission of an offense. *See* CPL 50.10(1); *People v Feerick,* 93 N.Y.2d 433, 452-453; 692 N.Y.S.2d 638, 714 N.E.2d 851 (1999); *People v Tomasello,* 21 N.Y.2d 143, 150, 287 N.Y.S.2d 1, 234 N.E.2d 190 (1967) ("the protection against prosecution, whether under a statute or in consequence of a violation of the constitutional privilege, extends only to prosecution for past crimes and not to perjury committed in the very process of making the disclosure assertedly compelled").

Perjury is limited to a false oral statement made under oath in the requisite proceeding, or a false statement made under oath in a subscribed written instrument. A false oral statement made under oath but not in the requisite proceeding does not constitute perjury; nor does a sworn false statement embodied in a written instrument which is not subscribed constitute perjury.

Perjury "depends upon a false assertion, not upon an inference stated to be such and which turns out to be incorrect." *People v Rinaldi,* 34 N.Y.2d 843, 845, 359 N.Y.S.2d 64, 316 N.E.2d 346 (1974). And, when a defendant claims that the testimony or statement in question was truthful because of a particular meaning the defendant ascribed to a word, then ordinarily the jury determines from the context in which the word was used whether the claim is valid. *People v Neumann,* 51 N.Y.2d 658, 435 N.Y.S.2d 956, 417 N.E.2d 69 (1980).

With respect to a false swearing in a subscribed written instrument, the false swearing is not deemed complete "until the instrument is delivered by its subscriber, or by someone acting in his behalf, to another person with intent that it be uttered or published as true." Penal Law § 210.00(5). The instrument need not in fact be uttered or published as true; only delivery and the requisite intent are required. *See People v Williams,* 149 N.Y. 1, 43 N.E. 407 (1896).

### Degrees and Elements of Perjury

Perjury is divided into three degrees. In accord with the general structure of offenses divided by degrees, the lowest degree constitutes the basic offense, and the higher degrees are a combination of that basic offense and one or more aggravating factors.

The basic crime, "perjury in the third degree" [Penal Law § 210.05], requires only that a person swear falsely.

For "perjury in the second degree" [Penal Law § 210.10], in addition to swearing falsely, the false statement must be made in a subscribed written instrument for which an "oath is required by law" [defined in Penal Law § 210.00(4)]. The false statement must also be made with the intent to mislead a "public servant" [defined in Penal Law § 10.00(15)] and it must be "material" to the action, proceeding or matter involved. "Illustrative is a license application required to be sworn to in which the subscriber, knowing previous good character to be a qualification for the license, lies about his criminal record." Staff Notes of the Commission on Revision of the Penal Law. Proposed New York Penal Law. McKinney's Spec. Pamph. (1964), pp. 374-375.

For "perjury in the first degree" [Penal Law § 210.15], in addition to swearing falsely, the false statement must consist of "testimony" [defined in Penal Law § 210.00(3)]. The false statement must also be "material" to the action, proceeding or matter in which it is made. Unlike perjury in the second degree, there is no additional requirement that the false statement be made with an intent to mislead a public servant.

Thus, the major distinction between "perjury in the second degree" and "perjury in the first degree" is that the former requires the false statement in a subscribed written instrument and the latter requires that the false statement consist of testimony. The more serious treatment is accorded false testimony upon the theory that "perjury committed during testimony is generally more culpable than that committed in an affidavit--especially one prepared by an attorney or a person other than the affiant.... " Staff Notes of the Commission on Revision of the Penal Law. Proposed New York Penal Law. McKinney's Spec. Pamph. (1964), p. 374.

**--Materiality**

The common aggravating element of both "perjury in the second degree" and "perjury in the first degree," as well as the crime of "making an apparently sworn false statement in the first degree" [Penal Law § 210.40], is materiality. [It is not an expressed element of a crime, materiality is ultimately not an expressed element of "perjury in the third degree."] As with other elements of a crime, materiality is ultimately a question of fact for the jury. *People v Davis*, 53 N.Y.2d 164, 170, 440 N.Y.S.2d 864, 423 N.E.2d 341 (1981); *People v Clemente*, 285 A.D. 258, 136 N.Y.S.2d 202 (1st Dept 1954), *affd* 309 N.Y. 890, 131 N.E.2d 294 (1955).

The seminal definition of "materiality" was announced by the Court of Appeals in *Wood v People*, 59 N.Y. 117, 123 (1874). There, the Court stated: "It is not necessary that the false statements should tend directly to prove the issue in order to sustain an indictment. If the matter falsely sworn to is circumstantially material or tends to support and give credit to the witness in respect to the main fact, it is perjury." Thus, if the false swearing reflects on the matter under consideration, "even if only as to the witness' credibility," it is material. *Davis*, 53 N.Y.2d at 171; *People v Stanard*, 42 N.Y.2d 74, 396 N.Y.S.2d 825, 365 N.E.2d 857 (1977); *People v Courtney*, 94 N.Y. 490 (1884).

In the context of false testimony in the grand jury, the Court has indicated that the test of materiality may also "be said to be 'whether the false testimony has the natural effect or tendency to impede, influence or dissuade the grand jury from pursuing its investigation'." *Davis*, 53 N.Y.2d at 171 *quoting United States v Stone*, 429 F.2d 138, 140 (2d Cir 1970).

In *Stanard*, during a grand jury investigation of corrupt payments to police officers by gamblers for protection from arrest, the defendant, a police officer, falsely denied that he had met surreptitiously with three other police officers and a known gambler in the gambler's home. Although the meeting did not by itself prove corruption, the occurrence of the meeting in the context of other evidence which indicated that the purpose of the meeting was to discuss the corrupt payments rendered the false denial material to the investigation.

In *Davis*, a grand jury sought to determine whether the target of the investigation had bribed the defendant, a police officer, to identify an undercover police officer. In the grand jury, the defendant admitted that he had lied to his superiors in denying that he had stopped and questioned the undercover officer in the undercover's assumed character. He then testified falsely that he had lied to his superiors because one of them had indicated to him that someone meeting his description had assaulted someone at the location in issue, and he thought they were about to charge him with that assault. Davis was convicted of perjury and the Court of Appeals found his false testimony "material" because, if believed, it gave a reasonable explanation for his lie to his superiors and thereby substantially advanced the credibility of his claim in the grand jury that the stop was properly-motivated police work, rather than motivated by a bribe to identify the undercover officer.

In *People v Perino*, 19 N.Y.3d 85, 945 N.Y.S.2d 602, 968 N.E.2d 956 (2012), the defendant, a former police officer, had interrogated Eric Crespo for about 80 minutes inside a precinct interrogation room regarding a shooting. After the interrogation, Crespo's mother arrived and Crespo purportedly made a spontaneous, incriminating statement to his mother. At trial, the purported spontaneous statement was admitted in evidence and the officer falsely denied that he had interrogated Crespo prior to that statement. The Court of Appeals held that the officer's false testimony was material to Crespo's trial because "it was relevant to the jury's determination on whether Crespo's statement to his mother was truly spontaneous and voluntary or whether it was triggered by police conduct that could reasonably have been anticipated to evoke such a statement." *Id*. at 90.

In the end, the Court of Appeals has taken a broad view of what constitutes materiality. If the statement is of significance to the matter in issue or to the credibility of the witness, or has a tendency to derail the legitimate purpose of the inquiry, a jury may be permitted to find that the statement was material.

**--Intentional falsehood**

Although materiality is not an expressed element of perjury in the third degree, it must be remembered that, for any degree of perjury, the defendant must have intentionally made a false statement which he or she does not believe to be true. Thus, the defendant's "conscious objective" must be to tell the falsehood. Given the state of the human memory, it is not uncommon for memories to fade in whole or in part over time, particularly as to the details of an event, and particularly if the event was not especially memorable at the time it occurred. Even events which would ordinarily seem memorable may have been so traumatic for a participant or be so complex that he or she will exhibit very little capacity to remember the details or circumstances of the event. Further, given the varying capacity of people to correctly perceive an event in the first instance, it is not uncommon to obtain an incorrect recitation of an event, even a "memorable" one, from a person who sincerely believes in the accuracy of his or her statement. These natural human failings, by themselves and at times in combination, make it quite understandable that a person may give a sworn false statement, although not intentionally so. Thus, in fairness as well as law, care must be taken in the questioning of a person with respect to an event when it is believed that incorrect responses are being given, in order to determine whether the incorrect responses are intentional or not. *See People v Tyler*, 46 N.Y.2d 251, 413 N.Y.S.2d 295, 385 N.E.2d 1224 (1978).

No "bright line" test exists for determining whether there was an intentional falsehood. Rather, a series of factors must be examined to make that determination. Such factors include: whether the fact in issue was memorable; the length of time between the fact in issue and the recitation of that fact; the significance of the fact in issue at the time of its occurrence; whether the nature of the event provided an opportunity to perceive and mentally record the fact in issue correctly; and lastly, the fairness of the inquiry, including whether the examiner made a fair attempt to cue the speaker's memory and permit the speaker to give complete answers.

In *Tyler*, the defendant, a Supreme Court Justice, ultimately admitted to meeting with a person who was a client of the defendant when the defendant had practiced law and who was a reputed criminal. The meeting had taken place about a year prior to the defendant's testimony in the grand jury. The defendant incorrectly specified (1) that the meeting began in front of the restaurant which the parties admittedly went into, when in fact the meeting originated about ten blocks away from the restaurant and the parties drove to the restaurant; (2) that the meeting lasted ten to fifteen minutes, when in fact it lasted over an hour; and (3) that he left the restaurant first, leaving the other parties inside, when in fact they all left together. The Court found that the prosecutor had limited his inquiry to peripheral details of the time and place of a meeting which the prosecutor had not demonstrated to be memorable, and that, in sum, the record did not establish intentional falsity. *Id.* at 262.

**--Inconsistent statements**

When a person has made two sworn statements which are so inconsistent that one of them must be false, and each statement, if false, would constitute perjury, then even though the People cannot prove which of the two statements is false, a perjury prosecution may be initiated. Penal Law § 210.20. In such a prosecution, the falsity of one or the other of the statements may be established by proof of their irreconcilable inconsistency.

There are limitations on a perjury prosecution based on inconsistent sworn statements.

By decisional law, when a defendant testified in the grand jury with transactional immunity that a prior sworn written statement given to the police on the subject matter of the grand jury investigation was false, the defendant was immunized from prosecution for the falsity of the sworn statement to the police; hence, a perjury prosecution could not be premised on the "inconsistent statements" theory since, under that theory, guilt might be premised on the falsity

of the immunized statement to the police. *Matter of Rush v Mordue,* 68 N.Y.2d 348, 509 N.Y.S.2d 493, 502 N.E.2d 170 (1986).

By statutory law, there are three limitations on a perjury prosecution based on inconsistent statements. Penal Law § 210.20.

First, each statement must have been made within the jurisdiction of New York. The rationale for that limitation was that since conviction may occur without resolution of which statement is false, "it would seem essential to a valid judgment that both should have been made within the jurisdiction of New York" [Staff Notes of the Commission on Revision of the Penal Law. Proposed New York Penal Law. McKinney's Spec. Pamph. (1964), p. 375]; otherwise, New York might convict a person of having told the truth in New York and a falsehood in another jurisdiction.

Second, both statements must have been made within the period of the statute of limitations [CPL 30.10] of the crime charged. Again, since the conviction may occur without resolution of which statement is false, both statements should be independently prosecutable as false within their respective statute of limitations; thus, the effect is that the statement involving the shorter statute of limitations period will determine whether a perjury prosecution premised on inconsistent statements may be initiated.

Third, if perjury of different degrees would be established by the making of the two statements, the defendant will be guilty of the lesser of the two.

### Corroboration

A prosecution for any crime defined in Penal Law article 210, except perjury premised on inconsistent statements, requires that the "falsity of a statement may not be established by the uncorroborated testimony of a single witness." Penal Law § 210.50. This rule of corroboration is sometimes referred to as the "two witness rule" or the rule which precludes conviction premised on an "oath against an oath," i.e. the sworn statement of the defendant against the contrary sworn statement of a witness.

The Appellate Division, however, has held that the corroboration requirement "only applies when the People 'choose to rely on the suspect testimony of an accomplice or a single witness offering evidence, even direct evidence, of the defendant's perjury' (*People v Rosner,* 67 N.Y.2d 290, 296 [502 N.Y.S.2d 678, 493 N.E.2d 902 (1986)]). It does not apply where, as here, the People rely entirely on circumstantial evidence to prove perjury." *People v Esposito,* 225 A.D.2d 928, 930, 640 N.Y.S.2d 274 (3d Dept 1996).

The Court of Appeals has analogized the perjury corroboration rule to that of the accomplice corroboration rule, which requires evidence that " 'tends to connect the defendant with the commission of the crime in such a way as may reasonably satisfy the jury that the [witness] is telling the truth.' " *People v Sabella,* 35 N.Y.2d 158, 169, 359 N.Y.S.2d 100, 316 N.E.2d 569 (1974), *overruled in part on other grounds People v Brown,* 40 N.Y.2d 381, 386 N.Y.S.2d 848, 353 N.E.2d 811 (1976); *People v Stanard,* 42 N.Y.2d 74, 79-80, 396 N.Y.S.2d 825, 365 N.E.2d 857 (1977). At the time of those decisions, the accomplice corroboration rule required "independent evidence" that tends to connect the defendant with the commission of the crime in such a way as may reasonably satisfy the jury that the witness is telling the truth. In *People v Reome,* 15 N.Y.3d 188, 194, 906 N.Y.S.2d 788, 933 N.E.2d 186 (2010), however, the Court overruled the requirement that accomplice corroboration evidence had to be independent of the accomplice testimony. *See* CPL 60.22 [Rules of evidence; corroboration of accomplice testimony] and the Practice Commentary thereto; and the Guide to NY Evidence rule 6.10 [Testimony of accomplice; corroboration].

The perjury corroboration rule, however, requires only one element, the "falsity of the statement," to be corroborated. Thus, the objective falsity of a statement may not be established by the testimony of a single witness. Other elements

of the relevant crime do not require corroboration. Perhaps, therefore, the analogized rule should be more narrowly defined to require evidence which tends to demonstrate the falsity of the statement in such a way as may reasonably satisfy the jury that the witness is telling the truth with respect to the falsity of the statement. The independent evidence may be of either a direct or circumstantial nature. *Rosner*, 67 N.Y.2d 290.

That test fulfills the current purpose of the rule as that purpose was explained in *Weiler v United States*, 323 U.S. 606, 608-609, 65 S.Ct. 548, 550, 89 L.Ed. 495 (1945):

"The special rule which bars conviction for perjury solely upon the evidence of a single witness is deeply rooted in past centuries. That it renders successful perjury prosecution more difficult than it otherwise would be is obvious.... It is argued that since effective administration of justice is largely dependent upon truthful testimony, society is ill-served by [a] rule which tends to burden and discourage prosecutions for perjury. Proponents of the rule on the other hand, contend that society is well-served by such consequence. Lawsuits frequently engender in defeated litigants sharp resentments and hostilities against adverse witnesses, and it is argued, not without persuasiveness, that rules of law must be so fashioned as to protect honest witnesses from hasty and spiteful retaliation in the form of unfounded perjury prosecutions.... Since equally honest witnesses may well have differing recollections of the same event, we cannot reject as wholly unreasonable the notion that a conviction for perjury ought not to rest entirely upon 'an oath against an oath.' "

In short, it was believed that the absence of the corroboration rule " 'would promote unfounded perjury prosecutions based on the complaints of defeated litigants and made in retaliation against honest witnesses.' " *Sabella*, 35 N.Y.2d at 168, *quoting* Denzer and McQuillan, Practice Commentary to Penal Law § 210.50, McKinney's Penal Law (1967).

### Defenses

#### --Perjury trap defense

"Perjury" exists as a crime to deter people from intentional sworn falsehoods about antecedent events. The goal in eliciting the sworn statement is to learn the truth about such events for some legitimate purpose, not to elicit a falsehood, irrespective of its significance, in order to mount a perjury prosecution. Thus, "where a prosecutor exhibits no palpable interest in eliciting facts material to a substantive investigation of crime or official misconduct and substantially tailors his questioning to extract a false answer, a valid perjury prosecution should not lie." *Tyler*, 46 N.Y.2d at 259. In *Tyler*, in addition to finding that there was no intentional falsehood, as explained above, the Court found that, because the prosecutor had limited his inquiry to peripheral details of the time and place of a meeting which the prosecutor had not demonstrated to be memorable or material to the grand jury investigation, it was evident that "a perjury indictment, rather than the ascertainment of facts leading to substantive goals, was the object." *Id.* at 262. That object was, and should be, unacceptable. *Cf. People v Schenkman*, 46 N.Y.2d 232, 413 N.Y.S.2d 284, 385 N.E.2d 1214 (1978); *People v Pomerantz*, 46 N.Y.2d 240, 413 N.Y.S.2d 288, 385 N.E.2d 1218 (1978); *Davis*, 53 N.Y.2d 164--all three cases found no perjury trap.

If placed in issue, the question of a perjury trap is ordinarily one of fact to be submitted to the trier of fact. *Tyler*, 46 N.Y.2d at 259; *People v Fischer*, 53 N.Y.2d 178, 183, n.1, 440 N.Y.S.2d 872, 423 N.E.2d 349 (1981).

#### --Affirmative defense of retraction

In a perjury prosecution, it is an affirmative defense that the defendant "retracted his false statement *in the course of the proceeding in which it was made* before such false statement substantially affected the proceeding and before it became manifest that its falsity was or would be exposed." Penal Law § 210.25 (emphasis added). The defendant has the burden of establishing an affirmative defense by a preponderance of the evidence. Penal Law § 25.00(2).

The affirmative defense of "retraction" is derived from *People v Ezaugi*, 2 N.Y.2d 439, 161 N.Y.S.2d 75, 141 N.E.2d 580 (1957). In that case, a police officer testified falsely before a grand jury concerning the substance of his conversation with an informer. Unbeknownst to the officer, there was a tape recording of the conversation. Although given an opportunity to change his testimony before leaving the grand jury room, the officer persisted in the falsehood. Several days later, after the officer was convinced that the People had incontrovertible proof of his perjury, the officer reappeared before the grand jury and retracted the falsehood. The officer was convicted of perjury, and the judgment of conviction was affirmed. In affirming the conviction, the Court of Appeals set forth the parameters of what it referred to as the defense of "recantation." Concerned that such a defense might encourage perjury, particularly when a witness does not recant until he becomes convinced that his perjury no longer deceives, the Court held that "recantation as a defense is primarily designed to correct knowingly false testimony only if and when it is done promptly before the body conducting the inquiry has been deceived or misled to the harm and prejudice of its investigation, and when no reasonable likelihood exists that the witness has learned that his perjury is known or may become known to the authorities." *Id.* at 443. *See also People v Ashby*, 8 N.Y.2d 238, 203 N.Y.S.2d 854, 168 N.E.2d 672 (1960).

In codifying *Ezaugi*, the Legislature made some changes, adopting substantially the formulation of the defense in Model Penal Code § 241.1(4). In addition to changing the name of the defense from "recantation" to "retraction," the Legislature made the defense an affirmative defense, thereby placing the burden of proof of establishing the defense on the defendant. Also, the Legislature required that the retraction be done "in the course of the proceeding in which it was made," rather than, as *Ezaugi* held, simply "promptly."

## --Precluded defenses

By statute, it is not a defense to a prosecution for perjury that the "defendant was not competent to make the false statement." Penal Law § 210.30(1). If the defendant, although not competent, was permitted to give the testimony or make the subscribed written instrument, the defendant is accountable for false statements. *See* former Penal Law § 1623; Model Penal Code § 241.1(3); *Chamberlain v People*, 23 N.Y. 85 (1861); *People v Teal*, 196 N.Y. 372, 89 N.E.2d 1086 (1909).

Where the false statement was material to the action, proceeding or matter in which it was made, as required by perjury in the first and second degrees, it is no defense that the "defendant mistakenly believed the false statement to be immaterial." Penal Law § 210.30(2). Thus, the defendant's subjective belief of the lack of importance of the false statement is irrelevant. *See* former Penal Law § 1624; Model Penal Code § 241.1(2).

It is no defense that the oath [defined in Penal Law § 210.00(1)] "was administered or taken in an irregular manner." Penal Law § 210.30(3). *See* former Penal Law § 1621(1); Model Penal Code § 241.1(3).

It is also no defense that the "authority or jurisdiction of the attesting officer [defined in Penal Law § 210.00(6)] who administered the oath was defective, if such defect was excusable under any statute or rule of law." Penal Law § 210.30(3). *See* former Penal Law § 1621(2) and 1958 Report of the Law Revision Commission, pp. 463-464; Leg. Doc. [1958] No. 65[E]. For an example of a statute excusing certain defects in the acts of notaries public and commissioners of deeds, see Executive Law § 142-a.

### Subornation of Perjury

It is perhaps worth noting that, unlike the former Penal Law [§§ 1632, 1632-a], the instant Penal Law contains no separately-defined crime known as "subornation of perjury." The omission was deliberate because the conduct encompassed by the crime was otherwise made criminal. A person who suborns or procures another to commit perjury is, according to principles of accomplice liability, guilty of the perjury committed by the person who was suborned. Further, even if the perjury is not committed or attempted, the person who suborns the perjury may be liable for such

crimes as conspiracy, criminal solicitation, bribing a witness, tampering with a witness, or intimidating a victim or witness. *See* Staff Comments of the Commission on Revision of the Penal Law. Revised Penal Law. McKinney's Spec. Pamph. (1965), pp. 292-293.

Notes of Decisions (19)

### Footnotes

1        So in original.

McKinney's Penal Law § 210.00, NY PENAL § 210.00
Current through L.2024, chapters 1 to 49, 52, 61 to 112. Some statute sections may be more current, see credits for details.